**No. 21-56295**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

MOVING OXNARD FORWARD, INC.,

*Plaintiff-Appellant*,

v.

MICHELLE ASCENCION,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-04122-CBM-AFM
Hon. Consuelo B. Marshall

---

### APPELLANT'S OPENING BRIEF

---

**Chad D. Morgan, Esq.**
LAW OFFICE OF CHAD MORGAN, APC
P.O. Box 1989 PMB 342
40729 Village Drive #8
Big Bear Lake, CA 92315
Tel: 951-667-1927
Fax: 866-495-9985
Email: chad@chadmorgan.com

*Attorneys for Appellant*
Moving Oxnard Forward, Inc.

## DISCLOSURE STATEMENT

Plaintiff/Appellant Moving Oxnard Forward, Inc. has no parent corporation, and there is no publicly traded corporation that owns more than 10 percent of its stock (it is a nonprofit public benefit corporation and has not issued stock).

Date: May 11, 2022      LAW OFFICE OF CHAD D. MORGAN

By: */s/ Chad D. Morgan*
Chad D. Morgan
*Attorneys for Appellant,*
*Moving Oxnard Forward, Inc.*

# TABLE OF CONTENTS

**Page**

**Disclosure Statement**...................................................................... 2

**Table of Contents**........................................................................ 3

**Table of Authorities**.................................................................... 6

**Introduction** .............................................................................. 9

**Jurisdictional Statement**............................................................10

**Statutory and Regulatory Authorities** .........................................10

**Issues Presented**.........................................................................11

**Statement of Case**.......................................................................12

     I.    STATEMENT OF FACTS.............................................. 12

          A.    The Oxnard City Council submitted Measure B to voters, who adopted it in March 2020........................................ 13

          B.    Measure B's primary purpose was to reduce the amount of money spent on Oxnard campaigns..........................................14

          C.    Measure B imposed contribution limits as low as $500 in the City of Oxnard. ...................................................... 16

     II.    PROCEDURAL HISTORY.............................................. 17

**Standard of Review** ....................................................................18

**Argument** ..................................................................................19

     I.    FIRST CAUSE OF ACTION: MEASURE B'S INDIVIDUAL LIMIT IS UNCONSTITUTIONAL. ............................................ 21

A.    Defendant's evidence of a sufficiently important government interest is inadequate. ........................................................... 22

      i.    *The interests supporting Measure B's contribution limits are insufficient to justify the First Amendment restriction even if supported by evidence.*...................................................... 24

      ii.    *Even if these interests might be sufficient, the record does not have sufficient evidence of those interests to warrant summary judgment in Defendant's favor.* ......................................29

B.    Measure B's contribution limits are not "closely drawn" to any interest in preventing quid pro quo corruption or its appearance. .......................................................................................... 33

      i.    *Measure B's limits do not satisfy the Randall factors.* ........ 38

      ii.    *A $500 contribution limit should be unconstitutional per se.* 41

      iii.    *Measure B limits a candidate's right to spend his or her personal funds on a campaign.*........................................... 44

      iv.    *An interest in preventing quid pro quo corruption is better served by disclosure.* ...................................................... 46

      v.    *Measure B's limits infringe on a candidate's right to solicit funds.* ........................................................................ 49

II.    SECOND CAUSE OF ACTION: MEASURE B INCLUDES AN UNCONSTITUTIONAL AGGREGATE LIMIT. ....................... 51

III.    THE DISTRICT COURT SHOULD HAVE GRANTED PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT............ 53

**Conclusion** ..................................................................................55

**Statement of Related Cases**..........................................................57

**Certificate of Compliance** ............................................................58

**Certificate of Service** ...................................................................**59**

**Addendum**....................................................................... **60**

    I.    ARTICLE VII OF CHAPTER 2 OF THE OXNARD MUNICIPAL CODE..........................................................................60

    II.   CAL. GOV'T. CODE § 82015 — DEFINITION OF CONTRIBUTION ..................................................... 67

    III.  CAL. GOV'T CODE § 82047— DEFINITION OF "PERSON" . 69

    IV.  CAL. GOV'T CODE § 82007 — DEFINITION OF "CANDIDATE" ....................................................... 69

    V.   CAL. CODE. REGS., TIT. 2, § 18215 — REGULATORY DEFINITION OF CONTRIBUTION.................................. 70

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................ 19, 40

*Ariz. Free Enter. Club's Freedom PAC v. Bennett*, 564 U.S. 721 (2011)..20, 21, 27, 32, 48, 49

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................... 21, 25, 35, 42, 48

*Cal. Med. Ass'n v. Federal Elec. Comm'n*, 453 U.S. 182 (1981)................................35

*Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030 (9th Cir. 2000)..............................19

*Citizens United v. Fed. Election Com'n*, 558 U.S. 310 (2010) 20, 25, 26, 30, 32, 42, 48

*Davis v. Fed Election Com'n*, 554 U.S. 724 (2008) ....................................... 27, 33, 53

*Fair Housing Counsel of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132 (9th Cir. 2001)..................................................................................... 19

*Fed. Election Com'n v. National Political Conservative Political Action Committee*, 470 U.S. 480 (1985)....................................................................................25

*Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007)...19, 20, 37

*In re Scheer*, 819 F.3d 1206 (9th Cir. 2016).............................................................43

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ...................................................................43

*Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015)..................................................... 34, 38

*Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) ...........................................................39

*M.M. v. Lafayette School Dist.*, 681 F.3d 1082 (9th Cir. 2012) ...............................10

*Marable v. Nitchman*, 511 F.3d 924 (9th Cir. 2007)................................................18

*McConnell v. Fed. Elec. Comm'n*, 540 U.S. 93 (2003) ........................................... 42

*McCutcheon v. Fed. Election Com'n*, 572 U.S. 185 (2014).....19, 20, 23, 25, 26, 27, 30, 44, 47, 48, 49, 50, 52

*Mendler v. Winterland Production, Ltd.*, 207 F.3d 1119 (9th Cir. 2000) ................... 43

*Montana Right to Life Association v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) ........ 21

*Moving Oxnard Forward, Inc. v. Ascencion*, No. 2:19-cv-10368-CBM-(AFMx) (C.D. Cal. 2019) ................................................................................. 17

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) .............. 21, 22, 23, 35, 42

*Thalheimer v. City of San Diego*, 2012 WL 177414 (S.D. Cal., Jan. 20, 2012) ......... 34

*Thompson v. Hebdon*, 140 S. Ct. 348 (2019) ................................................... 35, 36, 39

*Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) ................................................... 36

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ................................................ 19, 49

**State Cases**

*In re Mariah T.*, 159 Cal. App. 4th 428 (Cal. App. 2008) ....................................... 43

*Unzueta v. Ocean View Sch. Dist.*, 6 Cal. App. 4th 1689 (Cal. App. 1992) ............... 43

**Constitutions**

U.S. Const. amend. I ............................................................................................. 19

**Statutes**

28 U.S.C. § 1291 ...................................................................................................... 10

42 U.S.C. § 1983 ...................................................................................................... 10

Cal. Elec. Code § 9217 ............................................................................................. 14

Cal. Elec. Code § 9280 ............................................................................................. 16

Cal. Gov't Code § 82000 ..................................................................................... 17, 60

Cal. Gov't Code § 82015 ...................................................................................... 40, 46

Cal. Gov't Code § 82047 ........................................................................................... 45

Cal. Gov't. Code § 82007 .......................................................................................... 45

Cal. Pen. Code § 12022.7 .......................................................................................... 43

Cal. Stats. 2019, ch. 556 ........................................................................................... 37

**Regulations**

Cal. Code Regs., tit. 2, § 18215.................................................................................46

Cal. Code Regs., tit. 2, § 18545 ..............................................................................37

**Local Ordinances**

Kern County Cal., Code § 2.130.050 ......................................................................46

L.A. County Cal., Code § 2.190.060 .......................................................................46

Oxnard Cal., Mun. Code § 2-240......................................................15, 22, 27, 60

Oxnard Cal., Mun. Code § 2-241 ...............................................................40, 45, 60

Oxnard Cal., Mun. Code § 2-243 ..................................16, 17, 28, 44, 51, 60, 61, 63

Oxnard Cal., Mun. Code § 2-244...........................................16, 17, 28, 44, 62, 63

Oxnard Cal., Mun. Code § 2-245 ...................................................17, 61, 62, 63, 67

Oxnard Cal., Mun. Code § 2-247 .................................................................. 17, 64

Oxnard Cal., Mun. Code § 2-248 .................................................................. 17, 66

Oxnard Cal., Mun. Code § 2-249 ..................................................................17, 67

San Fernando Cal., Mun. Code § 2-2909 ...............................................................46

Santa Clara County Cal., Code § A35-2 .................................................................46

**Rules**

Fed. R. App. P. 4..................................................................................................10

Fed. R. Civ. P. 56 ................................................................................................18

Fed. R. Civ. P. 59 ................................................................................................10

**Other Authorities**

U.S. Bureau of Labor Statistics, CPI Inflation Calculator......................................35

**INTRODUCTION**

The record below is that of a case where the parties contend their positions are correct as a matter of law. Plaintiff, for example, contends that Measure B's contribution limits are unconstitutional *per se*. No further evidence is necessary to reach this conclusion because there is no possibility that any evidence could justify limits so low.

If this Court does not reach this conclusion, it should not automatically conclude that Measure B must be valid. It must evaluate Defendant's summary judgment motion independent of Plaintiff's. On this First Amendment question, it is Defendant who has the burden of proving Measure B's constitutionality. Here, on summary judgment, the Court must credit Plaintiff's opposing evidence without weighing it in Defendant's favor. The district court erred by disregarding or discrediting Plaintiff's evidence and ignoring negative inferences reasonably drawn from Defendant's evidence.

For these reasons, this Court should order the district court to grant summary judgment in Plaintiff's favor. Alternatively, this Court should vacate the judgment, order that the district court deny Defendant's motion, and set this case for trial (with new discovery deadlines). In any event, summary judgment in Defendant's favor cannot stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 42 U.S.C. § 1983. *See* 1-ER-2. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the district court, which adjudicated all the parties' claims. 1-ER-32; *see also M.M. v. Lafayette School Dist.*, 681 F.3d 1082, 1089 (9th Cir. 2012).

The district court entered judgment on August 5, 2021. 1-ER-32. Twenty-eight days later, Plaintiff filed a motion for new trial. 2-ER-45 *et seq.*[1] Filing that motion tolled the 30-day deadline for Plaintiff to file a notice of appeal. Fed. R. App. P. 4(a)(4)(v). The district court denied the motion for new trial on November 29, 2021 (2-ER-34-532), and Plaintiff filed a notice of appeal the next day (3-ER-533). Due to the tolled appellate deadline, Plaintiff's appeal is timely.

## STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory authorities are reproduced in the Addendum to this brief. Those additional authorities include the following:

---

[1] The district court considered Plaintiffs motion for new trial as a motion for reconsideration under rule 59(e). 2-ER-37. That motion was timely filed on the 28th day after entry of judgment. Fed. R. Civ. P. 59(e).

- Article VII of Chapter 2 of the Oxnard Municipal Code (Measure B's campaign finance regulations).

- California Government Code section 82015: Contribution Defined

- California Government Code section 82047: Person Defined

- California Government Code section 82007: Candidate Defined (Statute)

- Title 2 of the California Code of Regulations, section 18215: Contribution Defined (Regulation)

## ISSUES PRESENTED

The broad issue is whether the district court erred when it granted Defendant's summary judgment motion, and if so, whether it should have entered judgment for Plaintiff. The ultimate question is whether contribution limits in the City of Oxnard, those set by Measure B, satisfy the First Amendment. This inquiry turns on two issues:

1. Did the City of Oxnard demonstrate that it has an interest in preventing quid pro quo corruption or its appearance in the manner Supreme Court precedents require; and

2. Is Measure B "closely drawn" to that interest.

Questions impacting resolution of these issues include:

11

- Is the government's interest in preventing quid quo pro corruption presumed, or must it be supported by evidence?

- Is there a lower limit beyond which contribution limits are unconstitutional *per se*?

- Do political candidates have a First Amendment right to raise money for their campaigns, and if so, should that subject contribution limits to strict scrutiny?

- Do modern Supreme Court precedents contemplate disclosure as a better means of preventing quid pro quo corruption or its appearance than contribution limits that are dangerously low?

- Does Measure B apply to a candidates' personal expenditure of their own funds on their campaigns?

## STATEMENT OF CASE

### I.  STATEMENT OF FACTS

Plaintiff Moving Oxnard Forward (MOF), is a nonprofit organization that engages in advocacy for and against proposed legislation and ballot measures in the City of Oxnard. 2-ER-166 (Starr Decl., ¶ 2). Its membership runs for city office and supports those that do, both as campaign volunteers and donors. 2-ER-166 (Starr Decl., ¶ 2).

MOF's President is Aaron Starr. 2-ER-167 (Starr Decl., ¶ 7). He has been a candidate for City Council or Mayor in every Oxnard election since 2014. 2-ER-167-60 (Starr Decl., ¶ 8). Measure B impacted his 2020 campaign for City Council by making it meaningless to solicit contributions for his campaign. 2-ER-168 (Starr Decl., ¶ 10). He was forced to choose between campaigning with his own money or spending all his time raising money — Measure B would not allow sufficient time for him to do both. 2-ER-168 (Starr Decl., ¶ 10); 2-ER-164 (Starr Depo., p. 6). Measure B's $500 limit was so small that it was effectively impossible for Starr to raise money for his campaign. 2-ER-168 (Starr Decl., ¶ 10).

**A. The Oxnard City Council submitted Measure B to voters, who adopted it in March 2020.**

On October 15, 2019, the Oxnard City Council adopted a resolution to place the "Oxnard Government Accountability and Ethics Act" on the March 3, 2020 primary election ballot. 3-ER-451-54 (City Council Resolution No. 15,271). The Act was later designated Measure B. 2-ER-166 (Starr Decl., ¶ 3). Measure B's full text was attached to the city council resolution. 3-ER-456-63. Its several provisions added different articles to Chapter 2 of the Oxnard Municipal Code: Article VII, a gift ban (3-ER-456); Article VI, campaign contribution limits (3-ER-457); and Article V, "Transparency in Public Contracts and Financial Reporting" (3-ER-

461). Measure B also extended the Mayor's term to four years instead of two (3-ER-461), and established term limits for the Mayor and City Council (3-ER-462). As discussed herein, it is Measure B's campaign contribution limits that are at issue in this appeal. Those provisions are found in 3-ER-457-61 and are reproduced in full in the Appendix. *See also* 3-ER-477-83 (the adopted ordinance, which is identical).

On March 3, 2020, Measure B passed with more than 80 percent of the vote. 2-ER-167 (Starr Decl., ¶ 5). The election was certified then adopted by the City Council on April 21, 2020. 3-ER-473; *see also* 2-ER-167 (Starr Decl., ¶ 5). Pursuant to California law, Measure B went into effect on May 1, 2020. *See* Cal. Elec. Code § 9217 (ordinances effective 10 days after day city declares election result).

### B. Measure B's primary purpose was to reduce the amount of money spent on Oxnard campaigns.

Focusing on its contribution limits, Measure B's relevant purpose is found in several official records, starting with its express declaration of purpose:

> The purpose of this Article is to advance compelling City interests by limiting large contributions from single sources to candidates for Mayor, members of City Council, City Clerk and City Treasurer, and by imposing reporting and accounting procedures for local campaigns. The City's interests are to provide a representative government which is accessible to all citizens, to deter corruption and the appearance of corruption caused by the coercive influence of large financial

contributions on candidates' positions, and to inform the electorate as to the sources and uses of political contributions.

Oxnard Cal., Mun. Code § 2-240 (3-ER-478).

When the City Council voted to place Measure B on the ballot, there were other manifestations of its purpose. This started with the resolution placing Measure B on the ballot. 3-ER-451. In that resolution, the City Council stated that Measure B would "impose contribution limits on candidates for Oxnard Mayor, City Council, City Clerk, and City Treasurer, significantly limiting special interest influence." 3-ER-451. Further, in the City Manager's staff report at that meeting, he described Measure B's intent, describing the measure as "[e]liminating the influence of special interest [sic] in Oxnard by imposing contribution limits to any candidate for elective office ensures that the City's interests are protected." 3-ER-448. These interests, he explained, "are to provide a representative government that is accessible to all citizens, to deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions." 3-ER-448.

Subsequently, at community forums prior to the Measure B election, city staff continued its focus on reducing the amount of money spent on campaigns in the City. 2-ER-166-67 (Starr Decl., ¶ 4). Aaron Starr offered testimony that Measure B was specifically intended to reduce the amount of money he spends on

15

campaigns in Oxnard. 2-ER-166-67 (Starr Decl., ¶ 4). The district court excluded that testimony. 2-ER-141 (objection); 1-ER-30 (ruling on objection).

### C. Measure B imposed contribution limits as low as $500 in the City of Oxnard.

In accordance with California law, the City Attorney prepared an impartial analysis of the measure, which was included in the ballot pamphlet. 3-ER-444 (Chaparro Decl., ¶ 7); 3-ER-469 (the analysis); *see also* Cal. Elec. Code § 9280 (statutory basis for this analysis). In this analysis, the City Attorney stated:

> Consistent with existing case law, Measure B does not place a limit on the amount of contributions that can be made to independent expenditure committees or to committees that raise money to support or oppose a City ballot measure.

3-ER-470.

Focusing on what candidates could receive rather than what donors could give, the City Attorney otherwise described Measure B as limiting city council candidates (who run in districts) to "$500 contributions from individuals and most political committees and $1,000 from political action committees." 3-ER-470; *see also* Oxnard Cal., Mun. Code § 2-243(A) (3-ER-479). As to city-wide candidates (Mayor, Treasurer, City Clerk), the respective limits are $750 and $1,500. 3-ER-470; see also Oxnard Cal., Mun. Code § 2-244(A) (3-ER-479-80). Contributions to candidates include in-kind contributions and are aggregated not only to a

candidate's campaign committee but also to other committees that candidate controls. (Oxnard Cal., Mun. Code §§ 2-243(A), 2-244(A) (3-ER-479-80).

Other Measure B provisions treated loans to candidates the same as contributions (Oxnard, Cal., Mun. Code §§ 2-243(B), 2-244(B)); limited anonymous contributions to $100 (*id*. at §§ 2-243(C), 2-244(C)); imposed "new" disclosure requirements which happened to mirror existing state disclosure requirements (*id*. at § 2-247); incorporated definitions of terms defined in Chapter 2 of Title 9 of the California Government Code, section 82000 *et seq*. (*id*. at § 2-241); provided for adjustments that reflect changes in the Consumer Price Index (*id*. at § 2-245); administration by the City Clerk (*id*. at § 2-248); and criminal penalties for violations (*id*. at § 2-249). See also 3-ER-478-82.

## II. PROCEDURAL HISTORY

On December 6, 2019, MOF filed suit seeking pre-election declaratory relief that Measure B was unconstitutional. *See Moving Oxnard Forward, Inc. v. Ascencion*, No. 2:19-cv-10368-CBM-(AFMx) (C.D. Cal. 2019); *see also* 2-ER-167 (Starr Decl., ¶ 6); 2-ER-160 (Morgan Decl., ¶ 2). That action was dismissed for lack of standing because the case was "not ripe for adjudication, and there [was] no live case or controversy because the proposed ordinance has not been enacted." *See* 2-ER-167 (Starr Decl., ¶ 6).

After Measure B was enacted, MOF filed suit again. *See* 3-ER-517. In that complaint, operative here, MOF alleged three causes of action: (1) "The per candidate contribution limits violate free speech and association" (3-ER-521); (2) "The aggregate contribution limits violate free speech, association, and equal protection"; (3-ER-524) and "The gift ban violates free speech and association" (3-ER-525). See also 1-ER-2-3 (ruling on MSJ).

On April 27, 2021, the parties filed cross motions for summary judgment. (3-ER-549). The district court heard those motions on May 25, 2021. 2-ER-53. On that date, the Court took the matter under submission with a written ruling to follow. *Id*. On August 5, 2021, the district court ruled on the motions, granting Defendant's and denying Plaintiff's. 1-ER-2 *et seq*. It entered judgment accordingly. 1-ER-2. This appeal followed, as described in the Jurisdictional Statement, *supra*.

## STANDARD OF REVIEW

Circuit courts review a district court's decision on cross motions for summary judgment *de novo*. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007). Courts consider "the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id*.; Fed. R. Civ. P. 56. Rather than weighing evidence, "[t]he evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in [the nonmovant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Further, "each motion must be considered on its own merits." *Fair Housing Counsel of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Even if the fact of the cross motions suggests that "both parties are asserting that there are no uncontested issues of triable fact …. [a] summary judgment cannot be granted if a genuine issue as to any material fact exists." *Id.*; *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 & n. 5 (9th Cir. 2000).

## ARGUMENT

In *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 481-482 (2007) (*WRTL*), the Supreme Court noted its frequent delay, in First Amendment opinions, to quote the Amendment itself: "Congress shall make no law … abridging the freedom of speech."[2] U.S. Const. amend. I. Of course, this is the starting point of the analysis where permissible abridgments are the exception rather than the rule. When considering First Amendment issues, courts must "err on the side of protecting political speech rather than suppressing it." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 209 (2014).

---

[2] Of course, this applies to the states through the Fourteenth Amendment. *See*, *e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442 (2015).

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government." *Ariz. Free Enter. Club's Freedom PAC v. Bennett*, 564 U.S. 721, 734 (2011) (*Bennett*). "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 339 (2010). When there is doubt, it must go to speech, not censorship. *WRTL*, 551 U.S. at 482.

These are not platitudes. It is inherent in this process that "voters must be free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 558 U.S. at 341. These sources necessarily include candidates themselves. A problem develops when oppressive contribution limits prevent candidates from effectively campaigning for office because "[t]he First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion." *Citizens United* at 350.

In this case, Plaintiff pled three causes of action alleging that different Measure B provisions violated the First Amendment. The first two, Measure B's individual limit and its aggregate limit are at issue here. On both, it is the government who bears the burden of proving that Measure B is constitutional. *McCutcheon*, 572 U.S. at 210. Considering that the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden" *(id.*

quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392 (2000) (*Shrink*)),

Defendant did not carry her burden, and the district court was wrong to grant

summary judgment in her favor.

## I.     FIRST CAUSE OF ACTION: MEASURE B'S INDIVIDUAL LIMIT IS UNCONSTITUTIONAL.

To evaluate Oxnard's individual contribution limits, the district court

applied *Montana Right to Life Association v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir.

2003): "[C]ampaign contribution limits will be upheld if (1) there is adequate

evidence that the limitation furthers a sufficiently important state interest, and (2)

if the limits are 'closely drawn'—*i.e.*, if they (a) focus narrowly on the state's

interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the

candidate to amass sufficient resources to wage an effective campaign." 1-ER-6.

*Eddleman* stated this rule based on *Buckley v. Valeo*, 424 U.S. 1 (1976) and *Shrink*,

528 U.S. 377. *See Eddleman*, at 1092.

The district court concluded that the Defendant satisfied this test. As

discussed below, subsequent Supreme Court precedents starting with *Randall v.*

*Sorrell*, 548 U.S. 230, 248 (2006) changed the analysis (*Eddleman* was decided

nearly 20 years ago). In the simplest terms, limits on contributions to candidates

must be "closely drawn to serve a sufficiently important interest." *Bennett*, 564

U.S. at 735. Measure B fails both prongs because Defendant does not have a sufficiently important interest and its limits are not closely drawn to the interests the City claims.

### A. Defendant's evidence of a sufficiently important government interest is inadequate.

The district court relied upon Measure B's express statement of purpose to identify the government interests that might support the measure. That purpose statement identified interests to (1) provide a representative government which is accessible to all citizens, (2) deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions, and (3) inform the electorate as to the sources and uses of political contributions. 1-ER-6 citing Oxnard Cal., Mun. Code § 2-240 (3-ER-478).

After identifying these interests, the district court concluded that "Defendant satisfied her 'evidentiary obligation' to demonstrate a sufficiently important governmental interest in contribution limits" 1-ER-6:16-18 9 citing *Shrink*, 528 U.S. at 393-94. The evidence that satisfied this obligation was as follows:

1.  A 2010 investigation by the District Attorney's office "in connection with allegations of conflict of interest, misappropriation, and violation of gift-reporting" (see 2-ER-206 *et seq.* [the report]);

2.  "[S]urvey results indicated that more than three-quarters of City voters would support a government accountability measure if it was placed on the March 3, 2020 ballot" (3-ER-486 [¶ 3]; 3-ER-451); and

3.  "The City decided to place Measure B on the ballot, rather than having the City Council adopt the campaign contribution limits and gift ban directly, and that 82% of the City's voters voted yes on Measure B, demonstrating their agreement with the need for contribution limits"[3] (3-ER-487 [¶ 8]).

1-ER-6:03-18. This evidence does not satisfy Defendant's burden. *See McCutcheon*, 572 U.S. at 210 (government's burden); *Shrink*, 572 U.S. at 391 (conjecture is insufficient).

---

[3] The source for this evidence was paragraph eight of the Declaration of Alexander Nguyen, the City Manager. 3-ER-487. The last portion of this sentence, "demonstrating their agreement with the need for contribution limits," was the subject of an evidentiary objection which the district court sustained. It should not be considered. 1-ER-27.

**i. The interests supporting Measure B's contribution limits are insufficient to justify the First Amendment restriction even if supported by evidence.**

The First Amendment requires a "sufficiently important interest" before restricting political speech by limiting campaign contributions. The district court focused more on whether the interest was "important" than whether it was "*sufficiently* important." 1-ER-6:21. This is an important distinction because the record identifies many interests that Defendant believes justify Measure B. To the extent these interests might be "important," they are not "*sufficiently* important."

In addition to the interests in its statement of purpose, identified above, the City promoted Measure B as "limiting special interest influence" (3-ER-451); reducing the amount of money spent on campaigns in the City (2-ER-166-67 [Starr Decl., ¶ 4]); and reducing the amount of money Aaron Starr spent on campaigns in the City (*id.*).[4] However, the Supreme Court has repeated time and again that there

---

[4] As mentioned elsewhere, the district court excluded Starr's testimony that Measure B was intended as a way to reduce the amount of money Starr spent on campaigns in the City. *See* 2-ER-166 (Starr Decl., ¶ 4); 2-ER-140 (Defendant's objection); 1-ER-30 (order sustaining the objection). The Court sustained the objection on the grounds that it is "argumentative, speculative, and lacking foundation." 1-ER-30. The testimony is neither speculative nor lacking foundation. Starr's declaration includes foundation for his presence at public meetings and community forums where he received that information, party admissions from the City who did not disclaim that testimony. 2-ER-166-67. "Argumentative" is an objection that would ordinarily apply to a question rather than testimony.

is only one governmental interest strong enough to justify a contribution limit's intrusion into protected First Amendment speech. That interest, sometimes simplified to preventing corruption and its appearance, is not so broad. More specifically, the only governmental interest sufficiently important enough to justify contribution limits is preventing *quid pro quo corruption* and its appearance. *McCutcheon*, 572 U.S. at 912; *Citizens United*, 558 U.S. at 358 ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption.").

What is quid pro quo corruption? "That Latin phrase captures the notion of a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 912. It is the hallmark of all types of corruption: the exchange of dollars for political favors. *Id.*; *Fed. Election Com'n v. National Political Conservative Political Action Committee*, 470 U.S. 480, 497 (1985). If a contribution limit is targeted at anything other than a

---

Regardless, this evidence is important in the context of the City's broader interest in limiting the amount of money spent on local campaigns where an intent to reduce Starr's contributions reinforces a broader intent to limit everyone's contributions. Also, in the context of a summary judgment motion, this evidence should have been credited in Starr's favor as part of his opposition to Defendant's motion. Therefore, this Court should consider this evidence.

candidate's acceptance of money for favors, then that regulation may not be allowed. *Id.*

Notably, quid pro quo corruption is different from "the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *McCutcheon*, 572 U.S. at 912. "Ingratiation and access ... are not corruption." *Id.* quoting *Citizens United*, 558 U.S. at 360. It is neither corruption nor is there a risk of quid pro quo corruption if political candidates feel gratitude towards their donors or give them access that exceeds the access given to their political opponents, persons unknown to them, or anyone else. Rather, these possibilities are expectations in the political process that cannot be legislated away.

For this reason, the City of Oxnard has absolutely no justifiable interest in using contribution limits to "provide a representative government which is accessible to all citizens."[5] What does this even mean? It looks like an interest in equalizing access or "leveling the playing field," neither of which serves an

---

[5] Plaintiff disregards Defendant's so-called interest in limiting contributions to inform the electorate as to the sources and uses of political contributions. This seems more aptly connected to Measure B's disclosure requirements, which are in the same chapter of the Oxnard Municipal Code. The district court's inclusion of this interest as part of its order on the contribution limit question was misplaced.

important government objective and never justifies a restriction on political speech. *Bennett*, 564 U.S. at 749; *McCutcheon*, 572 U.S. at 207; *see also Davis v. Fed Election Com'n*, 554 U.S. 724, 741-42 (2008) ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"). The same is true with respect to a purported desire to reduce the amount of money spent on campaigns, even if that desire is shared by 80 or even 99 percent of the City's residents. *McCutcheon*, 572 U.S. at 191; *Bennett*, 564 U.S. at 754.

To be fair, the City has stated that it has an interest to "deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions." Oxnard Cal., Mun. Code § 2-240. However, the phrase "quid pro quo" does not appear anywhere in the body of evidence Defendant submitted in support of her motion.[6] To the extent Defendant argues that "corruption caused by the coercive influence of large financial contributions" is the same as quid pro quo corruption, this interest does not appear anywhere in the record except Measure B itself. This is not enough. The fact that

---

[6] For this reason, Plaintiff's Excerpts of the Record includes all evidence Defendant submitted in support of her motion as well as the evidence Defendants submitted in opposition to Plaintiff's motion.

27

the government attorney who drafted the measure included the necessary interest does not mean that the interest actually exists. The government's conduct must reconcile with the measure's text lest the stated purpose becomes as illusory as it is here.

In this vein, the City's extrinsic focus on every interest but corruption supports an inference that Measure B's true purpose is something else, already identified by the Supreme Court as insufficient to support a contribution limit. This inference, in the context of a summary judgment motion, should have been resolved in Plaintiff's favor.

Furthermore, what is the effect of differing $500 and $750 contribution limits for city council members and candidates running for citywide office? Compare Oxnard, Cal., Mun. Code § 2-243(A) with *id*. at § 2-244(A). In other words, how is it that the mayor is not subject to corruption at $600 but a city council member is? Perhaps this is a need-driven approach whereby mayoral candidates get more money because they run citywide while council candidates get less because they run in districts. However, the City has six council districts, so if this was the logic, the citywide limit should be $500 times six, or $3,000 rather than $750. This would make more sense because citywide candidates must reach out to six times as many voters. This disparity and these questions further illustrate

the arbitrary nature of Measure B's limits. It is as if someone asked how low of a limit they could get away with and they picked the lowest number possible, not because they want to eliminate corruption but because they want to reduce the amount of money that is spent on city campaigns.

In any event, "corruption caused by the coercive influence of large financial contributions on candidates' positions" is not quid pro quo corruption. As discussed above, quid pro quo corruption is mutual. There is a direct exchange of money for a political favor. Coercion, especially the type that might influence a candidate's position, is more one sided. It is, by definition, threat-based. To limit contributions for this purpose is to presume that officials will act out of a fear that is projected onto them by others. Defendant offers no evidence that this has ever happened in Oxnard — not even once — and even if it did, the Court would be wrong to assume that it is always true. The First Amendment does not allow that assumption to create new governmental interests sufficient to justify contribution limits that have not previously appeared.

## ii. Even if these interests might be sufficient, the record does not have sufficient evidence of those interests to warrant summary judgment in Defendant's favor.

Assuming that evidence supports a conclusion that preventing quid pro quo corruption or its appearance is Measure B's subjective purpose — *i.e.*, this is the

governmental interest Measure B actually seeks to fulfill — the next step is to determine whether the City actually has this interest.

Preventing corruption (of any type) is the type of feel-good interest that is always present. But good feelings about a contribution limit are not sufficiently important to warrant its First Amendment intrusions. If the government is going to limit speech by restricting campaign contributions, to any degree, then it must provide evidence of the contributions' corrupting influence. The fact that other governments have satisfied this requirement to the satisfaction of other courts does not relieve the City of its obligation to do so here. Modern Supreme Court precedents, recognizing that campaign contributions rarely involve quid pro quo arrangements, reinforce this conclusion. *McCutcheon*, 572 U.S. at 221; *Citizens United*, 558 U.S. at 357.

From the City, the only evidence that came close to touching upon an interest in preventing quid pro quo corruption is the 172-page report by the Ventura County District Attorney's office titled "A Report on the Public Integrity Investigation of Oxnard City Officials."[7] 2-ER-206 - 3-ER-379. This report is 10

---

[7] Plaintiff objected to consideration of this report as evidence. The district court overruled the objections "as to the factual findings in the report" but sustained the

years old. 2-ER-206. It does not address the illegal campaign contributions, any potential corrupting influence of contributions, or anything else relevant to Measure B's contribution limits.[8]

Rather than considering quid pro quo corruption arising out of campaign contributions, the report focused on gifts, mostly those given to staff rather than elected officials. This report might justify Measure B's gift restrictions, but those restrictions are not at issue in this appeal. This raises questions. What do improper gifts have to do with campaign contributions? How would limiting campaign contributions prevent or ease concerns about unlawful gifts? If the conduct described in the report was already illegal, how are new regulations tailored in the slightest degree to preventing that conduct? If the objective is to prevent perceptions of quid pro quo corruption, how will new laws change that perception as to conduct that is already illegal? The City cannot answer these questions, and that shows Measure B's contribution limits are not closely drawn to an interest in preventing quid pro quo corruption or its appearance.

---

objections "to the summary of any witness statements or legal conclusions in the report." 1-ER-24:12-14.

[8] MOF does not appeal the district court's ruling on the third cause of action, which relates to gift limits.

Aside from the District Attorney's report, the City otherwise relied upon the following evidence: (A) survey results indicating "that more than three-quarters of City voters would support a government accountability measure if it was placed on the March 3, 2020 ballot," and (B) that "[t]he City decided to place Measure B on the ballot, rather than having the City Council adopt the campaign contribution limits and gift ban directly, and that 82% of the City's voters voted yes on Measure B." 1-ER-6. This evidence has nothing to do with whether contribution limits will reduce the appearance of quid pro quo corruption.

This evidence also contravenes the entire point of the First Amendment, which is "to protect speakers against unjustified government restrictions on speech, even when those restrictions reflect the will of the majority." *Bennett*, 564 U.S. at 754; *Citizens United*, 558 U.S. at 339-40. Put differently, the limits can be valid only if they are closely drawn to a sufficiently important government interest, which must be proven independent of the fact that the people want it. If anything, the City's reliance on this evidence raises suspicions about Measure B's validity because the City should not need to focus on its popularity if the measure is constitutionally sound.

But even if Measure B's popularity could sustain its First Amendment restrictions, there is insufficient evidence that Measure B passed because it limited

contributions as it did so much more. Similarly, there is insufficient evidence that Measure B passed because it was intended to help prevent quid pro quo corruption as opposed to one of the many other interests the City focused on. Indeed, there is such little information in the record relating to an interest in preventing quid pro quo corruption that it is most reasonable to conclude that Measure B passed for other reasons.

### B. Measure B's contribution limits are not "closely drawn" to any interest in preventing quid pro quo corruption or its appearance.

The prevention of quid quo pro corruption and its appearance "directly implicate[s] the integrity of our electoral process." *Randall*, 548 U.S. at 248. But this does not mean "the lower the limit, the better" because "contribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id*. at 248-49. When this happens, the contribution limit "could itself prove an obstacle to the very electoral fairness it seeks to promote." *Id*. at 249. Even though courts tend to give deference to legislative findings with respect to contribution limits, they must engage in the "exercise of independent judicial judgment as a statute reaches those outer limits." *Id*. "[L]imits that are too low cannot stand." *Davis*, 554 U.S. at 737.

When evaluating the Vermont limit it disapproved, *Randall* looked at danger signs that trigger the need for further review. In *Lair v. Bullock*, 798 F.3d 736, 743 (9th Cir. 2015), this Court described four danger signs present in *Randall* "(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those [the Supreme Court has] previously upheld." *See Randall*, 548 U.S. at 249. When any danger sign exists, the court must move onto the next step and evaluate whether the limits are closely drawn to the government's interest in preventing quid pro quo corruption. *Lair v. Bullock* at 743; *Randall* at 249, 253.

The district court concluded that danger signs "do not exist here and a 'closer review' of Measure B's contribution limits is therefore not warranted." 1-ER-8:15-18. The district court reached this decision based on its conclusion that "Measure B's contribution limits are not the lowest in California and are near the median level of other California cities." 1-ER-8:09-10. It also relied upon an unreported order from California's Southern District where another district court upheld a $500 limit. 1-ER-8:11-14 citing *Thalheimer v. City of San Diego*, 2012 WL 177414, at *8-*9 (S.D. Cal., Jan. 20, 2012).

34

A flaw in the district court's analysis is that one unchallenged constitutional violation is an insufficient basis to establish free reign for the government to pile on additional violations that compound the error. In this regard, the danger sign is not a comparison to limits approved by other jurisdictions or limits approved by lower courts. The danger sign is whether the limit is lower than limits the Supreme Court has approved.

On this question, the district court ignored the irrefutable conclusion that the Supreme Court has never approved a contribution limit so low. To the contrary, when the Supreme Court considered comparatively low limits, it rejected them. *See Randall*, 548 U.S. at 249; *Thompson v. Hebdon*, 140 S. Ct. 348, 350 (2019) (*Thompson I*) (vacating this Court's judgment upholding a $500 limit). These unconstitutionally low limits contrast with those the Supreme Court has approved: $1,000 in 1976 to federal candidates (*Buckley*, 424 U.S. 1); $5,000 in 1981 to multicandidate political committees (*Cal. Med. Ass'n v. Federal Elec. Comm'n*, 453 U.S. 182 (1981)); and $1,075 in 2000 to candidates for Missouri state auditor (*Shrink*, 528 U.S. 377). *See Randall*, 548 U.S. at 247 (discussing these cases).[9]

---

[9] In today's dollars, each of these limits is $5,170, $16,523, and $1,830, respectively. U.S. Bureau of Labor Statistics, CPI Inflation Calculator, http://bls.gov/data/inflation_calculator.htm (last visited May 10, 2022).

Indeed, just days before the district court ruled on the parties' summary judgment motions, this Court changed course and overturned a $500 limit it previously upheld. *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021) (*Thompson II*). This decision followed the per curiam *Thompson I* opinion, mentioned above, where the Supreme Court vacated this Court's judgment and directed it to apply the *Randall* factors, which it previously disregarded. *Thompson II* at 816; *see also Thompson I*, 140 S. Ct. at 350. Once this Court applied the *Randall* factors, it reached the conclusion that the $500 limit cannot stand.

Furthermore, Defendant's evidence comparing Oxnard's rates to those in other cities was shaky. Looking specifically to the district court's conclusion that Oxnard's rates are comparable to those in other cities, the district court was wrong to credit Defendant's evidence because it is insufficient on its face.

A fundamental flaw in Defendant's expert report was that Dr. Kousser only compared Oxnard's limit to cities that also had limits. 3-ER-419 (Kousser Decl., ¶ 11) ("In Table 1, I compare the citywide contribution limits enacted in Oxnard to analogous limits in the 21 other California cities with populations between 100,000 and 300,000 that have adopted citywide limits."). By limiting his analysis only to cities that have enacted limits, Dr. Kousser failed consider that 31 comparably sized cities had no limit whatsoever. 2-ER-109 (Exhibit 2 to Dr. Kousser's declaration

provided this list). In this context, Oxnard does not compare to the median because the median is no limit. Moreover, after Dr. Kousser prepared his analysis, California imposed a $4,900 statewide limit. Cal. Stats. 2019, ch. 556; *see also* Cal. Code Regs., tit. 2, § 18545. This means that the median limit is $4,900 — an 880 percent increase from Oxnard's lowest limit. In this regard, Oxnard's limit is so far below the limits in comparable cities that its limits become the exception rather than the rule.

Inferences that Oxnard's limits are among the lowest of comparably sized cities are reasonable on the face of Dr. Kousser's report. These inferences should have been credited in Plaintiff's favor. *See WRTL*, 551 U.S. at 469 (describing policy objective of resolving First Amendment disputes quickly, with minimal discovery, to avoid continued chilling of protected speech). On balance, Dr. Kousser's opinion can be interpreted as follows: "Oxnard's limits are similar to other cities that also have low limits but not to cities with higher limits because we're going exclude those cities from our dataset and pretend that they do not exist." That inference is another that should be credited to Plaintiff, and this inference should discredit all Dr. Kousser's opinions, analyses, conclusions, and other testimony.

Ultimately, with danger signs present, the Court must evaluate whether Measure B is closely drawn to Defendant's purported interest in preventing quid pro quo corruption or its appearance. As discussed above, the City's evidence fails to satisfy any threshold showing that Measure B's contributions are drawn to the requisite purpose. But even if the Court credits a threshold showing, a closer review of the *Randall* factors along with other considerations demonstrates that Measure B is not closely drawn to the stated interest.

**i. Measure B's limits do not satisfy the *Randall* factors.**

When *Randall* concluded that the Vermont limits were not closely drawn to an interest in preventing quid pro quo corruption, it considered the following factors:

> (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by exactly the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are ... adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive.

*Lair v. Bullock*, 798 F.3d at 743 quoting *Randall*, 548 U.S. at 253-62. Based on one fact, that "only 6.3% of donors' contributions would have exceeded Measure B's limits in connection with the City's November 2018 election," the district court

concluded that "nothing in the record demonstrates Measure B's contribution limits 'come[s] close to curtailing the average contributor's participation in campaigns.'" (1-ER-9:10-15; *see also Lair v. Motl*, 873 F.3d 1170, 1183 (9th Cir. 2017). As to the *Randall* factors, there is nothing that considers the "average contributor's participation in campaigns." To this end, the district court ignored *Randall* in a way that is comparable to this Court's first *Thompson* decision. *See Thompson I*, 140 S. Ct. at 350. This, along with failing to credit Plaintiffs contrary evidence, was an error.

**Measure B's "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns."**

The question is candidate funding not donor participation, so whether Measure B's limits "come close to curtailing the average contributor's participation in campaigns" is wholly irrelevant to the factors *Randall* relied upon. To be fair, the district court was relying on reasoning from *Lair v. Motl*, 873 F.3d at 1183 (*see* 1-ER-9:14-15), but that reasoning is not part of the *Randall* factors. Therefore, it is wrong. Instead, the relevant consideration is whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns."

39

For the moment, if the Court accepts that the record contains evidence from Defendant that Measure B will not restrict challenger's funding, that evidence should not be credited in Defendant's favor. Instead, the Court must credit Plaintiff's contrary evidence. That evidence is testimony that the $500 limit made it impossible to fund a competitive campaign. 2-ER-168 (Starr Decl., ¶ 10). With a limit so low, candidates have two choices: spend their own money and preserve time for campaigning or spend all their time fundraising. *Id*. To discredit this evidence is an error because Plaintiff's evidence was "to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. This is especially true considering it is the government who bears the burden of proving Measure B's constitutionality.

### "Volunteer services" are considered contributions that would count toward the limit.

Another problem in *Randall* was that the statute exempted a volunteer's services from the limit but not the expenses they might incur. 548 U.S. at 259. Measure B is similar except that it exempts a volunteer's travel expenses. Oxnard Cal., Mun. Code § 2-241; Cal. Gov't Code § 82015. This is not enough.

Besides travel expenses, *Randall* considered expenses such as the use of a volunteer's home along with providing snacks and beverages for neighbors to meet

a candidate. 548 U.S. at 259-60. Under both the Vermont statute and Measure B, "volunteers would need to keep meticulous track of [expenses]" with a risk that carelessness could be costly, harming a candidate with damning headlines like "Campaign laws violated." *Randall* at 260. With higher limits, this is less of an issue. The district court did not consider this issue.

**There is no "special justification" that might warrant a contribution limit so low or so restrictive.**

This is an important consideration, and the district court did not even mention it as a factor let alone address it. Here, the $500 limit is so low it should be declared unconstitutional *per se*. If a limit this low is seriously considered, then there must be an extraordinarily special justification. Failing to mention, let alone address this factor was another district court error.

## ii. A $500 contribution limit should be unconstitutional *per se*.

Plaintiff struggles to imagine any special justification that might support limits as low as those Oxnard has imposed. The limits are so far below anything the Supreme Court has approved, have a miniscule connection to relevant anti-corruption interests, and impose such a significant burden on candidates' ability to communicate their message that the limit is unconscionably low.

41

In early contribution limit cases, the Supreme Court stated that it "cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives" and has left this to the Legislature to make "such empirical judgments, as legislators have 'particular expertise' in matters related to the costs and nature of running for office." *Randall*, 548 U.S. at 248 (discussing *McConnell v. Fed. Elec. Comm'n*, 540 U.S. 93, 137 (2003) overruled by *Citizens United*, 558 U.S. at 365 & *Buckley*, 424 U.S. at 30). Legislative bodies have seized on this and have crafted limits that are lower and lower, manifesting concerns that limits might serve to "magnify the reputation-related or media-related advantages of incumbency and thereby insulate them from effective electoral challenge." *Randall* at 248 quoting *Shrink*, 528 U.S. at 403-04 (Breyer, J., joined by Ginsburg, J., concurring) (cleaned up).

Based on these concerns, the Supreme Court has already stated that courts "must recognize the existence of some lower bound" because limits that are too low cause more harm than good. *Randall*, 548 U.S. at at 247-48. This might not be the case that precisely defines what that lower limit must be, but it is the case where the Court can conclude that the limits must be greater than those Measure B provides. Aside from the lack of evidence supporting Defendant's contentions, this conclusion is also supported by Justice Stewart's oft-repeated rule to identify

42

obscenity: "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964), Stewart, J., concurring. This test has applied in other circumstances, and it can apply here to conclude that Measure B's limits are so low that they cannot withstand any level of scrutiny. *See*, *e.g.*, *Unzueta v. Ocean View Sch. Dist.*, 6 Cal. App. 4th 1689, 1698-99 (Cal. App. 1992) ("I know it when I see it" applied to absurdity); *In re Mariah T.*, 159 Cal. App. 4th 428, 437 (Cal. App. 2008) (injuries under Cal. Pen. Code § 12022.7); *In re Scheer*, 819 F.3d 1206, 1210 (9th Cir. 2016) (ability to discharge certain debts in bankruptcy); *Mendler v. Winterland Production, Ltd.*, 207 F.3d 1119, 1122 (9th Cir. 2000) (copyright).

Otherwise, continued judicial deference to limits that are creeping lower and lower is to ignore the judiciary's essential check-and-balance function where, at some point, it has a duty to draw the line between limits that fulfill sufficiently important government interests and limits that seek to take money out of politics (under the guise of preventing corruption). Indeed, the limits in Oxnard are so low that they reinforce a conclusion that the City's true motivation is what it campaigned on: reducing the amount of money spent on campaigns in the city. That interest is the only possible explanation for limits so low. And this is inadequate justification because the expenditure of large sums of money on

campaigns does not equate to quid pro quo corruption. *McCutcheon*, 572 U.S. at 208.

This is a problem because it has the practical effect of inhibiting a public right to participate in politics by limiting it only to those who are wealthy enough to fund their own campaigns.

### iii. Measure B limits a candidate's right to spend his or her personal funds on a campaign.

Appellant attacked Measure B's contribution limit because it applies, by its plain terms, to a candidate's use of personal funds to finance their campaign. *See, e.g.*, 2-ER-183:07-07. The district court disagreed with this argument, concluding that Measure B "limits contributions made by other persons to the candidate." 1-ER-6. It relied upon the following language: "No ***person*** shall make, and no ***candidate*** for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount ***contributed by that person to that candidate*** … to exceed five hundred dollars ($500) for any election." 1-ER-6-7 quoting Oxnard, Cal. Mun. Code § 2-243 (emphasis in district court order); *see also* Oxnard Cal., Mun. Code § 2-244 (same as to the $750 limit).

According to the district court, "[i]f Measure B was intended to limit a candidate's own contributions to his/her own campaign, the term 'candidate' in

44

addition to the term 'person' would have been used." 1-ER-7. Measure B's plain terms do not support this interpretation of the statute. Measure B defines "person" as "an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, limited liability company, association, committee, and any other organization or group of persons acting in concert." Cal. Gov't Code § 82047; *see also* Oxnard Cal., Mun. Code § 2-241 (incorporating that definition into Measure B). Candidates are also defined and include not only candidates who will be on the ballot and write-in candidates but also elected officials, even if they will not run for reelection. *See* Cal. Gov't. Code § 82007(a). Together, this results in an overbroad application of Measure B's limit.

Indeed, the definitions in question are not mutually exclusive: candidates are persons too and fit into both definitions. Thus, if "[n]o ***person*** shall make, and no ***candidate*** for elective … shall solicit or accept, any contribution [in excess of the limit]," then candidates may not exceed the limit when contributing personal funds to their own campaigns. The idea that candidates are not people might save Measure B if limited to candidates' own campaigns. But the proffered interpretation has another application: If candidates are not people, then a candidate should be able to contribute unlimited amounts of money to other candidates because that contribution would not be from a "person" to a

45

"candidate." This overbroad application of Measure B's limits cannot be what Defendants intended.

The solution to this problem, implemented in California state law and many other municipalities, is to exclude from the definition of "contribution" contributions of a candidate's personal funds for the benefit of his/her own campaign. Cal. Gov't Code § 82015(b)(1); *see also* Cal. Code Regs., tit. 2, § 18215(b)(2).[10] This is the only rational solution to the problems discussed above, but for some reason, Oxnard did not do this. The best explanation lies in its true intent, which is to limit the amount of money candidates (especially Aaron Starr) will spend on political campaigns in the City.

### iv. An interest in preventing quid pro quo corruption is better served by disclosure.

Plaintiffs argued that legitimate anti-corruption interests are better served by disclosure. Defendant's expert countered that contribution limits are necessary in addition to disclosures because "when a candidate discloses a very large contribution from a single source, this could leave voters reasonably concerned that

---

[10] *See also*, *e.g.*, L.A. County Cal., Code § 2.190.060(A); Santa Clara County Cal., Code § A35-2(f); San Fernando, Cal., Mun. Code § 2-2909(c); Kern County Cal., Code § 2.130.050(D).

the donor may exert undue influence on that candidate," and "[t]he content of what is disclosed matters." (3-ER-433.) This might be Dr. Kousser's opinion, but it is contrary to established legal principles where the Supreme Court has already concluded that large contributions do not evidence quid pro quo corruption. *See*, *e.g.*, *McCutcheon*, 572 U.S. at 208.

For this reason, Dr. Kousser is wrong as a matter of law. But he is also wrong a matter of fact because, if Dr. Kousser's evidence is credited, large contributions "leave voters reasonably concerned that the donor may exert undue influence on that candidate." So what? Contribution limits cannot be justified to alleviate voters' concern that donors might "exert undue influence on that candidate." This is because exerting undue influence is not quid pro quo corruption, and preventing quid pro quo corruption is the only interest that might justify Measure B's limit.

Dr. Kousser bases his opinion on studies concluding that "disclosure alone does not alleviate concerns about corruption" and "[w]hen members of the American public learn that a few donors have made large contributions to a campaign supporting a candidate, their trust in that campaign and support for that candidate can decline" (3-ER-436). Using these studies to justify such significant First Amendment restrictions, starts to look like scenarios where oppressive

majorities unconstitutionally impose their will on minority views. *See*, *e.g.*, *Bennett*, 564 U.S. at 754; *Citizens United*, 558 U.S. at 339-40.

Even if the public actually holds the sentiment Dr. Kousser describes, it cannot justify the First Amendment burdens Measure B imposes. If it is true that public trust in a candidate erodes in candidates who receive large campaign contributions, then disclosure better serves an anti-corruption interest without Measure B's burdens on the First Amendment because, if trust is compromised, then voters concerned about those contributions can vote for someone else. This is the democratic solution the First Amendment requires.

It is true that *Buckley* saw disclosure as "only a partial measure" to achieve the stated objective. *See McCutcheon*, 572 U.S. at 224 quoting *Buckley*, 424 U.S. at 28. However, close to a half-century has passed since *Buckley*, and the world has changed. Today, "[w]ith modern technology, disclosure now offers a particularly effective means of arming the voting public with information." *McCutcheon* at 224. To this end, "disclosure offers much more robust protections against corruption" than it ever has. *Id*. These modern developments distinguish present times from those *Buckley* considered and are a distinguishing factor that justify any court's departure from its outdated conclusion.

**v. Measure B's limits infringe on a candidate's right to solicit funds.**

In the district court, Plaintiff argued that Measure B infringes on a candidate's right to raise money for his or her own campaign. *See* 2-ER-189. Even if the Supreme Court has not expressly made this declaration, its authorities support that conclusion so much so that the existence of this First Amendment right should be obvious.

For example, in *Williams-Yulee v. Florida Bar*, 575 U.S. at 444, the Supreme Court applied strict scrutiny to regulations restricting a candidate's right to raise money for a political campaign. Additionally, the Supreme Court has repeatedly asserted an unlimited right to spend money on political campaigns. *See*, *e.g.*, *Bennett*, 564 U.S. at 745. Together, these concepts invoke the most basic right in our democracy, participating in electing our political leaders by, among other options, running for office oneself. *McCutcheon*, 572 U.S. at 191.

Looking at this from the candidate's perspective is a little different from precedents that have considered a limit's impact on the donor. *See*, *e.g.*, *Randall*, 548 U.S. at 241. Perhaps, based on those precedents, limits are more reasonable from a donor's perspective because courts have observed that contribution limits still allow donors to associate with candidates in other ways.

But what about candidates who depend upon contributions to fund their campaigns? They need money to effectively campaign, and when limits are too low, those who are unable or unwilling to fund their own campaigns are excluded from the process. It is, as Aaron Starr declared, that limits as low as Measure B's allow candidates time for campaigning or fundraising, but they cannot realistically do both. Consider a campaign budget of $30,000: Under Measure B, it requires 60 individual donors whereas under the state's default rules, it requires just 6.7. Aaron Starr is fortunate enough that he could overcome this burden with personal funds, but we are long past the times where wealth was a requirement to run for office.

Put a little differently, contribution limits in this context also serve as an end-around expenditure limits because limits this low serve to "reduce the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *McCutcheon* 572 U.S. at 917 (cleaned up). As stated previously, this is consistent with the City's most prominent justification for Measure B — reducing money in political campaigns. Limits for this purpose is not a constitutionally tenable position.

For these reasons, the Court should distinguish Measure B and its focus on candidates from precedents that focus on donors and apply strict scrutiny to the limits imposed by Measure B.

II.    **SECOND CAUSE OF ACTION: MEASURE B INCLUDES AN
       UNCONSTITUTIONAL AGGREGATE LIMIT.**

Plaintiff complains that the application of Measure B's so-called "base limit" to all committees a candidate controls, regardless of purpose, becomes an aggregate limit on how much candidates can raise. This serves to prohibit candidates from engaging in advocacy on matters other than their own campaigns. For example, under Measure B's plain terms, a city council candidate who also sponsors a ballot measure can only raise $500 from each donor and must decide how to apportion that $500 between the two committees. *See* Oxnard Cal., Mun. Code § 2-243(A) (3-ER-479). Candidates who do not sponsor other committees can raise the entire $500 for their campaign, and ballot measure proponents who are not candidates are not subject to any limit at all.

Defendant argued and the district court agreed that Measure B does not apply in this manner. According to the district court, "evidence" supporting this interpretation was the City Attorney's impartial analysis, where he opined that that Measure B would not apply to ballot measure committees. 3-ER-470; see also 1-ER-12. To the extent the City Attorney's analysis is "evidence," the best evidence of Measure B's effect is its language itself. To this end, the City Attorney's analysis is wrong because it is inconsistent with Measure B's plain terms. Thus, the district

51

court was wrong to rely on that analysis. For the City, this obfuscation of Measure B's true meaning is the only way it can defend the unconstitutional aggregate limit.

The City argued that Measure B's limit is expressly authorized by *McCutcheon*. 1-ER-10:28-11:02. The district court accepted that argument. 1-ER-13 (citing *McCutcheon*, 472 U.S. at 192-93). However, *McCutcheon* did not directly address the issue Plaintiff complains of.

The statute at issue in *McCutcheon* addressed two types of limits: (1) base limits (how much a donor can contribute to an individual candidate); and (2) a donor aggregate limit (limiting how much a donor may contribute in total to all candidates). 472 U.S. at 192. However, while *McCutcheon* acknowledged prior precedents upholding base limits, that was not an issue it considered, so it neither approved nor disapproved a base limit. *Id*. at 192-93. Instead, *McCutcheon* struck down an aggregate limit that governed the total amount individual donors may contribute to campaigns. *Id*. at 193.

The instant case is a little different. Because Measure B's limit applies to the total amount candidates may receive across multiple committees, it is somewhere between a true base limit and a *McCutcheon*-like aggregate limit. But Measure B's effect is more like the *McCutcheon* limit than a base limit that does not apply across multiple committees. Here, aggregating the limit to multiple committees serves to

punish candidates who also sponsor ballot measure committees. *See* 472 U.S. at 205; *Davis*, 554 U.S. at 739. It also serves to reduce the total quantity of political speech in a manner comparable to expenditure limits. *See McCutcheon* at 197.

For these reasons, the district court should have granted summary judgment in Plaintiff's favor on this cause of action.

### III. THE DISTRICT COURT SHOULD HAVE GRANTED PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.

Until now, the focus has been on Defendant's motion for summary judgment. For Plaintiff, that is the easier standard because, as it relates to Defendant's motion, the district court should have credited Plaintiff's evidence in its favor along with favorable inferences from defects in Defendant's evidence. Under the standard applicable to Defendant's motion, the district court's judgment was plainly wrong.

The error of summary judgment for Defendant is magnified by recognition that summary judgment should have been entered for Plaintiff. One reason, discussed above, is that Measure B is unconstitutional *per se*. Maybe there are situations where limits as low as Measure B could be supported — those would

arise out of the "special justification" *Randall* contemplated — but there is nothing special about the City of Oxnard that justifies limits so low.[11]

Other concerns, like Measure B's application to contributions of a candidate's personal funds help demonstrate its overbreadth. That application, clearly arising from the City's interest in reducing the amount of money in City campaigns, starts to show that Measure B was intended to address interests other than preventing quid pro quo corruption.

To the extent the City's argument gives lip service to an interest in preventing quid pro quo corruption, there is no evidence to support it. When providing sworn evidence, Defendant's witnesses stop short of declaring interests in preventing quid pro quo corruption, focusing instead on nebulous ideas like contributions' coercive influence and concerns about "trust." Concerns about contributions' coercive influences are inherent in the process and are an issue, but that issue not sufficiently important to justify contribution limits because it is less severe than the harmful impact of restricting First Amendment speech. However, Dr. Kousser's concerns about trust have no place in this discussion because those

---

[11] The City presented no evidence on this point, and the district court made no findings that there was a "special justification."

concerns can be resolved at the ballot box without imposing contribution limits that will severely limit the number of candidates Oxnard voters can hear from.

For any and all of these reasons, judgment in Plaintiff's favor is proper because the City did not intend for Measure B to serve a sufficiently important governmental interest.

## CONCLUSION

Neither the Ninth Circuit nor the Supreme Court has found the absolute lowest limit applicable to a contribution limit that restricts the amount of money a candidate can raise for his or her campaign. Whatever that limit is, Measure B is lower. Measure B might not state the maximum candidates can raise, but its limits are so low it has that effect. For this and other reasons discussed above, Measure B is unconstitutional *per se*, and judgment should be entered for Plaintiff.

Alternatively, Defendant failed to adequately support her summary judgment motion, and the district court erred when it failed to credit evidence and inferences that supported Plaintiff. If the Court is not ready to enter judgment in Plaintiff's favor, it should vacate the judgment for Defendant and remand this case to the district court for trial.

Date: May 11, 2022                LAW OFFICE OF CHAD D. MORGAN

                                  By: */s/ Chad D. Morgan*
                                  Chad D. Morgan
                                  *Attorneys for Appellant,*
                                  *Moving Oxnard Forward, Inc.*

## STATEMENT OF RELATED CASES

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)**: **21-56295**

The undersigned attorney or self-represented party states the following:

[XXX]    I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** _/s/Chad Morgan_____ **Date** May 11, 2022

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**: **21-56295**

I am the attorney or self-represented party.

**This brief contains 10,113 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XXXXX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __/s/Chad D. Morgan_____ **Date** May 11, 2022

# CERTIFICATE OF SERVICE

**9th Cir. Case Number(s)**: **21-56295**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[XXXXX] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

**Signature** __/s/Chad D. Morgan_____ **Date** May 11, 2022

59

**ADDENDUM**

I.    **ARTICLE VII OF CHAPTER 2 OF THE OXNARD MUNICIPAL CODE.**

### SEC. 2-240. PURPOSE.

The purpose of this article is to advance compelling city interests by limiting large contributions from single sources to candidates for mayor, members of city council, city clerk and city treasurer, and by imposing reporting and accounting procedures for local campaigns. The city's interests are to provide a representative government which is accessible to all citizens, to deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions, and to inform the electorate as to the sources and uses of political contributions.

### SEC. 2-241. DEFINITIONS.

For the purposes of this article, unless the contrary is stated or clearly appears from the context, the definitions set forth in Chapter 2 of Title 9 of the Cal. Gov't Code (commencing at Section 82000) shall govern the construction, meaning, and application of words and phrases used in this article.

### SEC. 2-242. APPLICATION TO ELECTIONS FOR MAYOR, MEMBERS OF THE CITY COUNCIL, CITY CLERK, AND CITY TREASURER.

This article shall apply to all elected offices within the city.

### SEC. 2-243. CONTRIBUTION LIMITATIONS FOR MEMBERS OF THE CITY COUNCIL.

(A) **Contributions**. No person shall make, and no candidate for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount contributed by that person to that candidate, including contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed $500 for any election. No political action committee shall make, and no candidate for elective office, or campaign treasurer, shall solicit or accept any contribution which would cause the total amount contributed by that political action committee to that candidate, including contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed $1,000 for any election. For purposes of section 2-243 a "political action committee" shall mean any "general purpose committee" or "city general purpose committee" as those terms are defined by Cal. Gov't Code, Section 82027.5. The limits set forth in this subsection shall be adjusted every two years by resolution of the city council pursuant to section 2-245.

(B) **Loans**. No person shall make, and no candidate for elective office or campaign treasurer shall solicit or accept, any loan which would cause the candidate, including loans to all political committees or broad-based political committees controlled by the candidate, to exceed $500 for any election. The limit set forth in this subsection shall be adjusted every two years by resolution of the city council pursuant to section 2-245.

(C) **Anonymous contributions**. No person shall make an anonymous contribution or contributions to a candidate, political committee or broad-based political committee or any other person totaling $100 or more for any election period. An anonymous contribution of $100 or more received by a candidate or such a committee shall not be kept by the intended recipient, but instead shall be

61

paid promptly to the California Secretary of State for deposit in the general fund of the State. This limit on single source anonymous contributions shall not be adjusted except for relevant changes in State law.

(D) **Extension of credit**. No person shall extend credit, and no candidate for elective office, or campaign treasurer, or political committee or broad-based political committee controlled by the candidate shall solicit or accept, any extension of credit which will extend beyond 90 days from the date upon which the debt is incurred by the candidate, or political committee controlled by the candidate.

## SEC. 2-244. CONTRIBUTION LIMITATIONS FOR MAYOR, CITY CLERK AND CITY TREASURER.

(A) **Contributions**. No person shall make, and no candidate for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount contributed by that person to that candidate, including contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed $750 for any election. No political action committee shall make, and no candidate for elective office, or campaign treasurer, shall solicit or accept any contribution which would cause the total amount contributed by that political action committee to that candidate, including contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed $1,500 for any election. For purposes of section 2-244 a "political action committee" shall mean any "general purpose committee" or "city general purpose committee" as those terms are defined by Cal. Gov't Code, Section 82027.5. The limit set forth in this subsection shall be adjusted every two years by resolution of the city council pursuant to section 2-245.

62

(B) **Loans**. No person shall make, and no candidate for elective office, or campaign treasurer, shall solicit or accept any loan which would cause the candidate, including loans to all political committees or broad-based political committees controlled by the candidate, to exceed $500 for any election. The limit set forth in this subsection shall be adjusted every two years by resolution of the city council pursuant to section 2-245.

(C) **Anonymous contributions**. No person shall make an anonymous contribution or contributions to a candidate, political committee or broad-based political committee or any other person totaling $100 or more for any election period. An anonymous contribution of $100 or more received by a candidate or such a committee shall not be kept by the intended recipient, but instead shall be paid promptly to the California Secretary of State for deposit in the general fund of the State. This limit on single source anonymous contributions shall not be adjusted except for relevant changes in State law.

(D) **Extension of credit**. No person shall extend credit, and no candidate for elective office, or campaign treasurer, or political committee or broad-based political committee controlled by the candidate shall solicit or accept, any extension of credit which will extend beyond 90 days from the date upon which the debt is incurred by the candidate, or political committee controlled by the candidate.

### SEC. 2-245. ADJUSTING FOR COST OF LIVING CHANGES.

(A) **Adjustment**. The campaign contribution limits and loan limits set forth in sections 2-243 and 2-244, shall be adjusted by the city in February at two year intervals beginning in 2023 to reflect annual changes in the consumer price index (CPI) over the previous two-year period. The city clerk shall use the annual percent change in the consumer price index for all urban consumers (CPI-U) for the

63

selected area that includes Ventura County to determine the appropriate rate of increase. The city clerk shall compute the adjustment for each year separately, adding the adjustment for each year to the prior year's limit. The city clerk shall then adjust the total amount for the two-year period as specified in subsection (B). The new limit representing the rounded total adjustments for the previous two-year period shall be presented to the city council for approval by resolution.

(B) If the last two digits of the total adjusted limit under subsection (A) for the two-year period is a number between one and 49, then the limit shall be rounded down to the next lowest multiple of 100. If the last two digits of the total adjusted limit for the two-year period is a number between 50 and 99, then the limit shall be rounded up to the next highest multiple of 100.

### SEC. 2-246. COMMERCIAL LOANS.

The provisions of this article regarding loans shall not apply to loans made by a commercial lending institution in the lender's regular course of business on terms available to members of the general public and for which the loan recipient is personally liable.

### SEC. 2-247. CAMPAIGN DISCLOSURE.

(A) **Campaign bank account**. The notice and filing requirements of Cal. Gov't Code, Sections 81000 et seq. regarding the campaign bank account shall also be made to the city clerk at the same time and in the same manner as reporting is made to the fair political practices commission for the State of California.

(B) **Committee registration**. Every political committee and broad-based political committee involved in a municipal election which files campaign reports

shall file also with the city clerk in the same form, content, and procedure as set forth in Cal. Gov't Code, Sections 81000 et seq.

(C) **Electronic filing of campaign disclosure statements**. Pursuant to Cal. Gov't Code, Section 84615, the City of Oxnard hereby finds that online or electronic filing will facilitate the efficient and secure filing of required campaign reports, and that such system will operate securely and effectively and will not unduly burden filers.

(1) Whenever any elected officer, candidate, or committee is required to file a campaign statement under the Political Reform Act or the Regulations with the city clerk, the elected officer, candidate, or committee shall file the statement in an electronic format prescribed by the city clerk.

(2) Any statement, report, or other document filed electronically or online pursuant to this section will be accepted as an original statement and need not be filed in paper format. To ensure reporting continuity, once a statement, report, form, or other document is filed electronically on behalf of any elected officer, candidate, or committee, all future statements, reports, forms, and other documents filed on behalf of that officer, candidate or committee must be filed electronically. An elected officer, candidate, committee or other person may choose not to use the electronic filing system by filing all original statements, reports, forms, or other documents in paper format with the city clerk, until such time as the city council determines that electronic filing is mandatory for all filers.

(3) The date of filing for a statement, report, or other document that is filed online or electronically shall be the day that it is received by the local filing officer, and the electronic system will provide confirmation with a timestamp ensuring that the statement, report, or other document was received.

65

(4) If access to online filings has not been prescribed in a timely manner, the elected city officer, candidate, or committee may file an original statement by paper, at the discretion of the filing officer.

(5) The provisions of this subsection shall apply only to persons or combinations of persons who qualify as a committee under Section 82013 of the Political Reform Act.

(6) The city clerk is authorized to adopt such administrative policies and procedures as deemed necessary to implement this chapter.

### SEC. 2-248. DUTIES OF CITY CLERK.

The city clerk shall administer the provisions of this article. In addition to other duties required of the city clerk under the terms of this chapter, the city clerk shall:

(A) Supply appropriate forms and manuals prescribed by the fair political practices commission. These forms and manuals shall be furnished to all candidates and committees, and to other persons required to file reports.

(B) Determine whether required documents have been filed and, if so, whether they conform on their face with the requirements of this article and State law.

(C) Notify promptly all persons and known committees who have failed to file a document in the form and at the time required by State law, and promptly notify a person, candidate, campaign treasurer, political committee or broad-based political committee of any violations of this article. The city clerk shall inform the person, candidate, campaign treasurer, political committee or broad-based political committee that they shall have two weeks to correct the violation, after which the

66

violation shall be made known to the city council, other candidates, and be made available as a public record.

(D) Compile and maintain a current list of all statements or parts of statements filed with the city clerk's office pertaining to each candidate and each measure.

(E) Review reports and statements filed by candidates and committees supporting or opposing candidates for city council as required by State law and this article.

(F) Initiate the adjustment of the campaign contribution limits as specified in section 2-245 to reflect the CPI change for the prior 24-month period.

### SEC. 2-249. VIOLATION; PENALTY.

Any person violating any of the provisions of this article relating to campaign contributions and disclosure is guilty of a misdemeanor and subject to punishment in accordance with section 1-10 of this code. Individuals violating this article by failing to timely file the documents required by this article and State law shall also be subject to the fines specified in Cal. Gov't Code, Section 91013, as that section may be amended or renumbered from time to time.

## II.   CAL. GOV'T. CODE § 82015 — DEFINITION OF CONTRIBUTION

(a) "Contribution" means a payment, a forgiveness of a loan, a payment of a loan by a third party, or an enforceable promise to make a payment, except to the extent that full and adequate consideration is received or if it is clear from the surrounding circumstances that the payment is not made for political purposes.

(b) "Contribution" includes all of the following:

67

(1) The purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events; the candidate's own money or property used on behalf of the candidate's candidacy, other than personal funds of the candidate used to pay either a filing fee for a declaration of candidacy or a candidate statement prepared pursuant to Section 13307 of the Elections Code; the granting of discounts or rebates not extended to the public generally or the granting of discounts or rebates by television and radio stations and newspapers not extended on an equal basis to all candidates for the same office; the payment of compensation by any person for the personal services or expenses of any other person if the services are rendered or expenses incurred on behalf of a candidate or committee without payment of full and adequate consideration.

(2) The transfer of anything of value received by a committee from another committee, unless full and adequate consideration is received.

(3) The payment of public moneys by a state or local governmental agency for a communication to the public that satisfies both of the following:

(A) The communication expressly advocates the election or defeat of a clearly identified candidate or the qualification, passage, or defeat of a clearly identified measure, or, taken as a whole and in context, unambiguously urges a particular result in an election.

(B) The communication is made at the behest of the affected candidate or committee.

(4) A payment made by a person to a multipurpose organization as defined and described in Section 84222.

(5)(A) A payment made by a lobbyist or a cohabitant of a lobbyist for costs related to a fundraising event held at the home of the lobbyist, including the value of the use of the home as a fundraising event venue. A payment described in this paragraph is attributable to the lobbyist for purposes of Section 85702.

68

(B) A payment made by a lobbying firm for costs related to a fundraising event held at the office of the lobbying firm, including the value of the use of the office as a fundraising event venue.

(c) "Contribution" does not include any of the following:

(1) Amounts received pursuant to an enforceable promise to the extent those amounts have been previously reported as a contribution. However, the fact that those amounts have been received shall be indicated in the appropriate campaign statement.

(2) Except as provided in paragraph (5) of subdivision (b), a payment made by an occupant of a home or office for costs related to any meeting or fundraising event held in the occupant's home or office if the costs for the meeting or fundraising event are five hundred dollars ($500) or less.

(3) Volunteer personal services or payments made by any individual for the individual's own travel expenses if the payments are made voluntarily without any understanding or agreement that they will be, directly or indirectly, repaid to the individual.

(4) A behested payment, as defined in Section 82004.5, but only as to the behesting committee, elected officer, or member of the Public Utilities Commission.

## III.  Cal. Gov't Code § 82047— Definition of "Person"

"Person" means an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, limited liability company, association, committee, and any other organization or group of persons acting in concert

## IV.  Cal. Gov't Code § 82007 — Definition of "Candidate"

(a) "Candidate" means any of the following:

(1) Anyone who is listed on a ballot or is qualified to have write-in votes cast on their behalf counted by elections officials for nomination or election to any elective office.

69

(2) Anyone who receives a contribution, makes an expenditure, or gives their consent for another person to receive a contribution or make an expenditure, to bring about the person's nomination or election to an elective office, even if any of the following apply:

(A) The specific elective office for which the person will seek nomination or election is unknown at the time the contribution is received or the expenditure is made.

(B) The person has not announced the candidacy or filed a declaration of candidacy.

(3) An elected officer, including any elected officer who is the subject of a recall.

(b) Anyone who becomes a candidate retains candidate status until that status is terminated under Section 84214.

(c) "Candidate" does not include any candidate, as defined in Section 30101(2) of Title 52 of the United States Code, for federal office, as to the person's activities related to seeking nomination or election to that federal office.

## V.   CAL. CODE. REGS., TIT. 2, § 18215 — REGULATORY DEFINITION OF CONTRIBUTION

(a) A contribution is any payment made for political purposes for which a donor does not receive full and adequate consideration. A payment is made for political purposes if it is:

(1) For the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure; or

(2) Received by or made at the behest of the following or any agent thereof:

(A) A candidate;

(B) A controlled committee;

(C) An official committee of a political party, including a state central committee, county central committee, assembly district committee, or any subcommittee of such committee; or

(D) An organization formed or existing primarily for political purposes, including, but not limited to, a political action committee established by any membership organization, labor union, or corporation.

(b) The term "contribution" includes:

(1) Certain Payments to Multipurpose Organizations, including Nonprofit or Tax-Exempt Organizations and Federal or Out-of-State Political Organizations Active in California Elections. A payment made by a person to a multipurpose organization as defined in Section 84222 and Regulation 18422 that is used for a contribution or expenditure. A donor to such a multipurpose organization shall be identified and reported as provided in Section 84222 and Regulation 18422.

(2) Candidate's Own Money. A candidate's own money or property used on behalf of the candidate's candidacy.

(3) Discounted Goods or Services. Any goods or services received by or behested by a candidate or committee at no charge or at a discount from the fair market value, unless the discount is given in the regular course of business to members of the public.

(4) Payments From Lobbyists For Fundraising Costs. A payment made by a lobbyist or a cohabitant of a lobbyist for costs related to a fundraising event held at the home of the lobbyist, including the value of the use of the home as a fundraising event venue. This payment cannot be reimbursed by any person and is attributable to the lobbyist for purposes of the prohibition against a lobbyist making a contribution to specified candidates and elected officers under Section 85702.

(5) Payments From Lobbying Firms for Fundraising Costs. A payment made by a lobbying firm for costs related to a fundraising event held at

71

the office of the lobbying firm, including the value of the use of the office as a fundraising event venue.

(c) Notwithstanding any other provision of this section, the term "contribution" does not include:

(1) An expenditure made at the behest of a candidate in connection with a communication directed to voters or potential voters as part of voter registration activities or activities encouraging or assisting persons to vote, if the expenditure does not constitute express advocacy.

(2) Volunteer personal services or payments made by a person for the person's own travel expenses, if such payments are made voluntarily without any understanding or agreement that the person will be repaid.

(3) A payment made by an occupant of a home or office, other than a lobbyist or lobbying firm, for costs related to any meeting or fundraising event held in the occupant's home or office, if the total cost of the meeting or fundraising event is $500 or less, exclusive of the fair rental value of the premises.

(4) A payment made at the behest of a candidate for a communication by the candidate or any other person that meets all of the following:

(i) Does not contain express advocacy;

(ii) Does not make reference to the candidate's candidacy for elective office, the candidate's election campaign, or the candidate's or opponent of the candidate's qualifications for office; and

(iii) Does not solicit contributions to the candidate or to third persons for use to support the candidate or oppose the candidate's opponent.

(5) A payment made by a candidate or committee for another candidate to attend the paying candidate's or committee's fundraiser.

(6) A payment made by a candidate for a communication publicizing the candidate's endorsement by another candidate, provided that the

72

communication does not expressly advocate the nomination or election of the endorsing candidate or the defeat of an endorsing candidate's opponent.

(7) A payment made by a ballot measure committee for a communication in which the ballot measure supported or opposed by the committee is endorsed or opposed by a candidate, and the communication does not expressly advocate the nomination or election of the endorsing candidate or the defeat of the endorsing candidate's opponent.

(8) A payment made by any broadcasting station (including a cable television operator, programmer or producer), website, or a regularly published newspaper, magazine, or other periodical of general circulation, including any Internet or electronic publication, that routinely carries news and commentary of general interest, for the cost of covering or carrying a news story, commentary, or editorial.

(9) A payment by an organization for its regularly published newsletter or periodical, if the circulation is limited to the organization's members, employees, shareholders, other affiliated individuals and those who request or purchase the publication. This exception applies only to the costs regularly incurred in publication and distribution. Any additional costs incurred are contributions, including, but not limited to, expanded circulation; substantial alterations in size, style, or format; or a change in publication schedule, such as a special edition.

(10) A payment for a debate or other forum sponsored by a nonpartisan organization in which at least two candidates appearing on the ballot for the same elective office were invited to participate.

(11) A payment for a debate or other forum in which the proponent of a ballot measure and at least one opponent, or their respective representatives, were invited to participate in equal numbers.

(12) A payment for a debate or other forum sponsored by a political party or affiliated committee in which a majority of the candidates for that party's nomination were invited to participate.

73

(13) A payment made by a bona fide service, social, business, trade, union or professional organization or group for reasonable overhead expenses associated with the organization's regularly scheduled meeting at which a candidate or an individual representing either side of a ballot measure speaks, if the organization pays no additional costs in connection with the speaker's attendance.

(14) A payment received by, directed by, or made at the behest of a candidate for personal purposes. However, these payments may constitute gifts, income, or honoraria, and may be limited or prohibited, under other provisions of the Act.

(15) A payment made by a candidate for a communication in support of or opposition to a ballot measure, if the communication features the endorsing candidate or clearly identifies the candidate as the sponsor of the communication. This exception does not include a monetary contribution from a candidate or the candidate's controlled committee to a ballot measure committee.

(16) A payment by a sponsor for the establishment and administration of a sponsored committee, as defined in Section 82048.7, provided such payments are reported. Any monetary payment made under this subdivision to the sponsored committee shall be made by separate instrument. "Establishment and administration" means the cost of office space, phones, salaries, utilities, supplies, legal and accounting fees, and other expenses incurred in setting up and running a sponsored committee.

(17) A payment by a non-partisan organization not affiliated with any candidate, political party, or committee, that has not endorsed or contributed to candidates or measures in the election, to create and operate a website that posts political information. This website must be designed to encourage individuals to vote or to register to vote, and must present any candidate or measure-related content in a nonpartisan manner, giving reasonably equal treatment to candidates for the same office or to both sides of a measure.

(18) Uncompensated Internet activity by an individual supporting or opposing a candidate or measure as stated in Regulation 18215.2.

74

(d) A contribution made at the behest of a candidate for a different candidate or to a committee not controlled by the behesting candidate is not a contribution to the behesting candidate.