U.S. Court of Appeals Docket No. 21-56295
Lower Court Docket No. 2:20-cv-04122-CBM-AFM

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

### MOVING OXNARD FORWARD, INC.,
*Plaintiff/Appellant,*

vs.

### MICHELLE ASCENSION, in her official capacity as City Clerk for the City of Oxnard,
*Defendant/Appellee,*

and

DOES, 1 through 25, inclusive,
*Defendant.*

_____

## RESPONDENT'S BRIEF

_____

On Appeal from Judgment of the United States District Court for the
Central District of California
The Honorable Consuelo B. Marshall, Judge

_____

HOLLY O. WHATLEY, State Bar No. 160259
HWhatley@chwlaw.us
LILIANE M. WYCKOFF, State Bar No. 293519
LWyckoff@chwlaw.us
**COLANTUONO, HIGHSMITH & WHATLEY, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109
Telephone: (213) 542-5700
Facsimile: (213) 542-5710
Attorneys for Michelle Ascencion, in her official capacity as City
Clerk for the City of Oxnard

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................... 7

Statement of The Case ...................................................................... 8

    A.    Public Perceptions of Corruption
           Lead to Election Reform ...................................................... 8

    B.    Relevant Provisions of Measure B ..................................... 11

    C.    Measure B's Campaign Contribution Limits
           are Reasonable ..................................................................... 13

    D.    Procedural History .............................................................. 15

Summary of the Argument ................................................................ 16

Standard of Review ........................................................................... 17

Argument ........................................................................................... 18

    A.    The District Court Correctly Entered Summary
           Judgment for the Clerk on Measure B's
           Individual Limit .................................................................. 18

           1.    The District Court Correctly Found that the
                City has a Sufficiently Important Interest .............. 19

                A.    The District Court Correctly Applied
                        the Relevant Substantive Law ........................ 19

                B.    The City Presented Unrebutted
                        Evidence of a Sufficiently Important
                        Government Interest ....................................... 22

           2.    The District Court Correctly Held that
                Measure B's Limits were Closely Drawn ............... 30

A.   The District Court Correctly Applied
     the Relevant Substantive Law......................... 30

B.   The City Presented Unrebutted
     Evidence that the Limits were
     Closely Drawn.................................................. 37

3.   Plaintiff's Claim that a $500 Contribution
     Limit Should be "Unconstitutional Per se"
     is Contrary to Supreme Court Precedent .............. 42

4.   Measure B Does Not Limit a Candidate's
     Right to Fund Their Own Campaign...................... 45

5.   Disclosure is Insufficient to Address a
     Public Perception of Corruption............................. 48

6.   There is No Established Right for
     a Candidate to Solicit Funds ................................... 50

B.   The District Court Correctly Entered Summary
     Judgment for the Clerk on Measure B's
     Aggregate Limit................................................................ 51

C.   The District Court Correctly Denied
     Plaintiff's Motion for Summary Judgment........................ 53

Conclusion ............................................................................................. 54

Statement of Related Cases................................................................... 56

Certificate of Compliance ..................................................................... 57

Certificate of Service.............................................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.C.L.U. of Nevada v. City of Las Vegas,*
466 F.3d 784 (9th Cir. 2006) ................................................... 17

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................. 25

*BNSF Ry. Co. v. Oregon Dep't of Revenue,*
965 F.3d 681 (9th Cir. 2020) ................................................... 18

*Buckley v. Valeo,*
424 U.S. 1 (1976) ........................................................... *passim*

*Citizens Against Rent Control/Coal. for Fair Hous. v.*
*City of Berkeley, Cal.,*
454 U.S. 290 (1981) ............................................................. 33

*Citizens United v. Federal Election Com'n,*
558 U.S. 310 (2010) ............................................................. 20

*Credit Suisse First Boston Corp. v. Grunwald,*
400 F.3d 1119 (9th Cir.2005) ................................................... 46

*Federal Election Commission v. Cruz,*
142 S. Ct. 1638 (2022) .......................................................... 50

*Gutierrez v. Mun. Ct. of Se. Jud. Dist., Cnty. of Los Angeles,*
838 F.2d 1031 (9th Cir.1988), cert. granted ...................................... 52

*Marable v. Nitchman,*
  511 F.3d 924 (9th Cir. 2007)................................................................. 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ............................................................................ 25

*McCutcheon v. Federal Election Com'n*
  572 U.S. 185 (2014) ................................................................. 22, 49, 51

*Montana Right to Life Ass'n v. Eddleman,*
  343 F.3d 1085 (9th Cir. 2003)........................................................ *passim*

*Mun. Ct. of Se. Jud. Dist., Cnty. of Los Angeles v. Gutierrez,*
  490 U.S. 1016 (1989) .......................................................................... 53

*Nixon v. Shrink Missouri Gov't PAC,*
  528 U.S. 377 (2000) ....................................................................... *passim*

*Thalheimer v. City of San Diego,*
  645 F.3d 1109 (9th Cir.2011)........................................................ 20, 28

*Thalheimer v. City of San Diego*
  (S.D. Cal., Jan. 20, 2012, No. 09-CV-2862-IEG BGS) 2012
  WL 177414 ........................................................................................ 32

*Thompson v. Hebdon,*
  140 S. Ct. 348 (2019) ...................................................... 32, 34, 37, 44

**State Cases**

*State Farm Mut. Auto. Ins. Co. v. Garamendi,*
  32 Cal.4th 1029 (2004)....................................................................... 46

**State Statutes**

Cal. Code Regs., Title 2, § 18545 ............................................................. 41

Cal. Gov. Code, § 85301 ................................................................. 34, 35

Cal. Gov. Code, § 85702.5, subd.(a) ........................................................ 35

Cal. Gov. Code, § 85702.5, subd.(d) ........................................................ 35

Cal. Stat. Chapter 556 (Cal. 2019) .......................................................... 34

Cal. Stat. Chapter 556, § 1(g) (Cal. 2019) ................................................. 35

## INTRODUCTION

Plaintiff and Appellant Moving Oxnard Forward ("Plaintiff") challenges the campaign contribution limits approved by 82 percent of the City of Oxnard's ("City") voters. With no factual or legal support, Plaintiff claims the contribution limits are so low that candidates in City elections cannot raise enough money to wage effective campaigns. Plaintiff further challenges the facially neutral contribution limits, claiming the limits discriminate against candidates who also support or challenge ballot measures.

None of Plaintiff's arguments are based in fact or law. Plaintiff failed to provide evidence at the District Court level to support its constitutional challenges to the campaign contribution limits because none exists. The City has an important interest in preventing corruption within its municipal elections, and the voters have made their desire for this accountability measure clear. The District Court agreed with the City, and the Court's judgment in favor of the City must be upheld.

## STATEMENT OF THE CASE

### A. PUBLIC PERCEPTIONS OF CORRUPTION LEAD TO ELECTION REFORM

Public trust in the City's government was shaken in 2010 when the City was investigated by the Ventura County District Attorney's Office for serious allegations of corruption involving both elected and non-elected officials. 2-ER-214. As part of the investigation, District Attorney investigators raided City Hall pursuant to a search warrant on August 13, 2010. 2-ER-216. The investigation resulted in the comprehensive District Attorney's report issued in 2012 detailing the close relationships between city officials and private individuals conducting business with the City. 2-ER-214–215. The investigation revealed that several officials within the City failed to follow the City's published ethics standards by accepting large gifts from persons doing business with the City. 2-ER-223. These gifts included vacations, meals, and event tickets — significant gifts that created a public perception of favoritism and corruption. 2-ER-214, 2-ER-276–

8

278. The gift givers included property owners then engaged in multi-million-dollar property sales with the City. 2-ER-293–305.

Despite the significant nature of the allegations, the District Attorney filed no charges against any involved officials due to the expiration of the statute of limitations and lack of recordkeeping to prove some allegations. 2-ER-214–215. However, the report pulled no punches in detailing the pervasive nature of the misconduct, and criticized the City for its failure to enforce its own stated ethics policies. 2-ER-309–310. The continued lack of trust in the wake of the investigation was a consideration in the decision to place Measure B before the voters, rather than have the City Council adopt contribution limits and a gift ban on its own authority. 3-ER-487, ¶¶ 7–8.

In Fall 2019, the City commissioned a Resident Satisfaction and Community Priorities Survey to solicit feedback from the community on several issues, including government accountability measures. 3-ER-447–449; 3-ER-486, ¶ 3; SER-35. The City sought input from the

voters regarding the appropriate steps to eliminate the perception of corruption. 3-ER-447 ("The City highly values the varied perspectives of the public it serves and seeks to continue to earn the community's trust and confidence in City practices, including institutionalizing good government provisions related to fiscal accountability, ethics, and transparency."); SER-35. The survey results indicated 52 percent of those surveyed definitely supported limits on campaign contributions and gifts to eliminate the perceived influence of special interests on the City government, while another 23% would "probably" support such a measure. 3-ER-447–449; SER-35. The City developed Measure B to address the public's stated desire to institutionalize good government practices, including prohibiting elected officials and planning commissioners from accepting gifts from lobbyists or city contractors, and imposing the City's first campaign contribution limits. 3-ER-486, ¶ 4; 3-ER-447 ("The current City administrative is working to overcome a decades-long record of mismanagement and have made significant strides in reforming key

10

areas of government."); 3-ER-448 ("The City's interests are to … deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions.").

On October 15, 2019, the City Council adopted Resolution No. 15,271 to call an election on March 3, 2020 to put adoption of the Oxnard Government Accountability and Ethics Act ("Measure B") before the voters. 3-ER-451–467. On March 3, 2020, the voters overwhelmingly approved Measure B, with 82% voting "yes." 3-ER-473–475. The County Clerk certified the election results to the City Council on April 21, 2020. *Ibid*. Measure B took effect on May 1, 2020. 3-ER-444, ¶ 9.

## B. RELEVANT PROVISIONS OF MEASURE B

Measure B contains the following relevant provisions. Section 2-250 is the "gift ban" and prohibits elected City officials or members of the Planning Commission from receiving any gift from persons "seeking to contract with the City" or persons who, during the prior 12 months, "knowingly attempted to influence an elected City official

11

or member of the Planning Commission in any legislative or administrative action." 3-ER-477, § 2-250(A). The section also prohibits any person from making a gift with the intent to influence an elected City official or member of the Planning Commission in the performance of an official act. 3-ER-477, § 2-250(B). It also prohibits elected City officials or members of the Planning Commission from receiving gifts for performing services rendered in the regular course of his or her City duties. 3-ER-477, § 2-250(C).

Section 2-243 is the contribution limit for city council candidates, who are elected by district; it prohibits such candidates from accepting or soliciting donations from individuals that exceed $500 per election, or from political action committees that exceed $1000 per election. 3-ER-479, § 2-243(A). Section 2-244 applies to candidates for city-wide offices, and increases the contribution limit to $750 for individuals and $1,500 for political action committees. 3-ER-479, § 2-244(A). This limit applies to the total amount contributed to the candidate directly, political committees controlled by the

12

candidate, and in-kind donations. 3-ER-479, §§ 2-243(A) & 2-244(A).

Both city council candidates and city-wide office candidates are also

subject to a $500 limit on loans. *Ibid*. The limits are adjusted every two

years to account for inflation. 3-ER-480, § 2-245. Per the City

Attorney's impartial analysis of Measure B, the limits do not apply to

contributions made to independent expenditure committees, or to

committees that raise money to support or oppose a City ballot

measure. 3-ER-469–471.

### C.   MEASURE B'S CAMPAIGN CONTRIBUTION LIMITS ARE REASONABLE

The Clerk presented uncontradicted expert testimony that

Measure B's contribution limits are consistent with the limits in other,

similar cities in California. Oxnard's estimated population in 2019

was 208,881, and the number of registered voters in 2020 was 92,333.

3-ER-421, Table 1. The City's $750 contribution limit for citywide

offices is just above the median limit of $720 in comparably sized

California cities. 3-ER-421, Table 1 & ¶ 14. The same holds true for the

13

$500 contribution limit for city council seats. 3-ER-422, Table 2 & ¶ 15. Oxnard has approximately 34,814 people in each district, of which 15,389 are registered voters. 3-ER-422, Table 2. The City's $500 limit is slightly below the median limit of $515 when compared to comparable cities with similar districts. 3-ER-422, Table 2 & ¶ 15.

Even when compared to larger cities in California, Measure B's limits are reasonable. The $750 citywide limit comes to approximately $0.0036 per resident, and $0.0081 per registered voter. 3-ER-421, Table 1 & ¶ 14. This accords with the median amounts for California cities with populations over 100,000 of $0.0046 per resident and $0.0075 per registered voter. 3-ER-423, Table 3, p. 246, ¶ 17. The $500 city council limit is approximately $0.0144 per district resident, and $0.0325 per district registered voter, which accords with the median amounts for all California cities with populations over 100,000 of $0.0193 per district resident and $0.0394 per district registered voter. *Ibid*.

Nor are these limits overly restrictive when compared to actual fundraising from previous comparable elections. In 2018 the City

held its first district-based election. 3-ER-424, ¶ 19. Before then, city council members were elected at large. In the 2018 election, during which there were no contribution limits, very few candidates received contributions that would have exceeded the Measure B contribution limits. Candidates on average received only 15.5% of their contributions from donors that would have exceeded the limits, and 24.1% of total funding from amounts that would have been prohibited. 3-ER-429, ¶ 25. One candidate who would have been most affected by Measure B in 2018 was Aaron Starr, president of Plaintiff Moving Oxnard Forward, who unsuccessfully ran for mayor. 3-ER-428, Table 3. Of the funds Mr. Starr raised in that election, 57.6% would have been prohibited under Measure B's contribution limits. *Ibid*.

### D.   PROCEDURAL HISTORY

Plaintiff filed this lawsuit against Michelle Ascencion, in her official capacity as City Clerk for the City of Oxnard ("Clerk"), on

15

May 5, 2020. 3-ER-517. In November 2020 Rose Chaparro was elected City Clerk, replacing Michelle Ascencion. 3-ER-443.

The Parties filed cross-motions for summary judgment. 1-ER-2. The District Court heard oral argument on the motions on May 25, 2021. 2-ER-53. On August 5, 2021, the District Court granted the Clerk's motion for summary judgment and denied Plaintiff's motion for summary judgment. 1-ER-20–21. Also on August 5, 2021, the Court entered Judgment in favor of the Clerk. 1-ER-32.

Plaintiff filed a motion for new trial on September 2, 2021. The District Court construed the motion for new trial as a motion for reconsideration. 2-ER-36–37. Whether construed as a motion for new trial or a motion for reconsideration, the motion was denied on November 29, 2021. 2-ER-43–44. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court correctly applied the relevant Supreme Court precedent governing review of campaign contribution limits in granting summary judgment to the Clerk. The Clerk presented

16

unrebutted evidence that the City has an important government interest in preventing quid pro quo corruption or the appearance of quid pro quo corruption in its municipal elections. The Clerk also presented unrebutted evidence that the campaign contribution limits were narrowly tailored, in line with the limits imposed in other cities of the same size, and would not significantly impact a candidate's ability to wage an effective campaign. Plaintiff's arguments to the contrary on appeal ignore binding Supreme Court precedent and seek to change the law, not apply it.

## STANDARD OF REVIEW

This Court reviews cross-motions for summary judgment *de novo*. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007). Each motion must be evaluated separately, giving the nonmoving party on each motion the benefit of all reasonable inferences. *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). Where, as here, no material facts are disputed, the Court of Appeal asks only "whether the district court correctly applied the relevant substantive

17

law." *BNSF Ry. Co. v. Oregon Dep't of Revenue*, 965 F.3d 681, 685 (9th Cir. 2020).

## ARGUMENT

### A. THE DISTRICT COURT CORRECTLY ENTERED SUMMARY JUDGMENT FOR THE CLERK ON MEASURE B'S INDIVIDUAL LIMIT

Plaintiff first challenges the district court's ruling granting the Clerk summary judgment on the per-candidate contribution limits in Measure B. These limits are found in Sections 2-243 and 2-244. Section 2-243 applies to City Council candidates, while Section 2-244 applies to candidates for the city-wide positions of Mayor, City Clerk, and City Treasurer. See 3-ER-479–480.

The law on the constitutionality of campaign finance restrictions in this Circuit is, by this point, well established. "[S]tate campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn"—i.e., if they (a)

18

focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003).

### I. THE DISTRICT COURT CORRECTLY FOUND THAT THE CITY HAS A SUFFICIENTLY IMPORTANT INTEREST

### A. THE DISTRICT COURT CORRECTLY APPLIED THE RELEVANT SUBSTANTIVE LAW

The first question in analyzing a campaign contribution limit is whether "there is adequate evidence that [the contribution] limitation[s] further[ ] ... [the] important state interest" of preventing actual or perceived quid pro quo corruption. *Eddleman*, 343 F.3d at 1092. The District Court's ruling cites to both *Eddleman* and *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 393-94 (2000) in holding the Clerk met her evidentiary burden of demonstrating a "sufficiently important government interest in contribution limits." 1-ER-6.

The government interest in preventing corruption is a significant governmental interest more than sufficient to justify

candidate contribution limits. *Buckley v. Valeo*, 424 U.S. 1, 25–26 (1976). The Supreme Court has since clarified that "[w]hen *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 359 (2010). The Court rejected the broader "influence" standard: "Reliance on a 'generic favoritism or influence theory … is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'" *Ibid*. (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 296 (2003) (Kennedy, J., concurring)). This Circuit has also recognized that *Citizens United* "narrowed the scope of the anti-corruption rationale to cover quid pro quo corruption only, as opposed to money spent to obtain influence over or access to elected officials." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1119 (9th Cir.2011) (quoting *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 694, fn. 5 (9th Cir.2010)).

20

In *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), the Supreme Court defined "corruption" broadly, explaining that "corruption" is "not confined to bribery of public officials, but extend[s] to the broader threat from politicians too compliant with the wishes of large contributors." *Id.* at 389. The Supreme Court further clarified there is no requirement that governments enacting contribution limits must "demonstrate that the recited harms are real, not merely conjectural[.]" *Shrink Missouri*, 528 U.S. at 391–392. Mere conjecture has never been adequate to carry a First Amendment burden. *Id.* at 392. However, evidence of public perception of corruption, generally accepted inferences of impropriety, and recent news accounts of corruption will meet the government's evidentiary burden. *Id.* at 393–394. So too, is a majority vote enacting campaign finance reform. *Id.* at 394.

Evidence of actual corruption is not required. "Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public

21

awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Buckley*, 424 U.S. at 27. A public entity is "surely entitled to conclude that disclosure [is] only a partial measure, and that contribution ceilings [are] a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed." *Id*. at 28.

### B. THE CITY PRESENTED UNREBUTTED EVIDENCE OF A SUFFICIENTLY IMPORTANT GOVERNMENT INTEREST

The risk of actual or perceived quid pro quo corruption that prompted the City to place Measure B before the voters is more than "mere conjecture." *Shrink Missouri*, 528 U.S. at 392; see also *McCutcheon v. Federal Election Com'n* 572 U.S. 185, 210 (2014) (reiterating the "mere conjecture" standard). The City is not required to show any instances of actual quid pro quo corruption. See *Thalheimer*, 645 F.3d at 1121. It must show "only that the perceived

22

threat [is] not ... 'illusory.'" *Eddleman*, 343 F.3d at 1092 (quoting

*Buckley*, 424 U.S. at 27). To require the government to demonstrate

more than just a general perception of corruption, a plaintiff

challenging a contribution limit must provide sufficient evidence to

overcome the general presumption that "there is little reason to

doubt that sometimes large contributions will work actual corruption

of our political system." *Shrink Missouri*, 528 U.S. at 395. This could

include evidence that the contribution limitations have a dramatically

adverse effect on campaign funding, or that the limitations prevent

candidates from "amassing the resources necessary for effective

advocacy." *Id*. at 395–396.

The District Court identified three key pieces of evidence the

Clerk submitted that met *Shrink Missouri's* evidentiary standard. 1-

ER-6. First, City residents have recent and significant reason to be

concerned about corruption because several elected officials were

investigated in 2010 by the Ventura County District Attorney for

receiving gifts of vacations, meals, and event tickets from companies

23

doing significant business with the City. 2-ER-214. The investigation was prompted by reporting in the local newspaper, the Ventura County Star, and included a very public search of City Hall on August 13, 2010. 2-ER-216. Although no charges were ever filed, in 2012, the District Attorney released a report detailing the evidence of corruption uncovered by the investigation. 2-ER-206. This investigation and report played a prominent role in the debates on Measure B leading up to the March 2020 election. 3-ER-438–439.

Second, the City conducted a survey of City residents to determine what residents thought the City's legislative priorities should be. 3-ER-486, ¶ 3; SER-35. That survey indicated that more than three-quarters of City voters favored a government accountability measure. *Ibid*.

Third, 82% of the City's voters voted yes on Measure B. *Shrink Missouri,* 528 U.S. at 394 (74% yes vote was evidence of a perception of corruption).

24

In contrast, Plaintiff presented no evidence on whether the City has a governmental interest in preventing the perception of corruption, either in its own Motion for Summary Judgment or in opposition to the City's Motion for Summary Judgment. By failing to counter the City's evidence, Plaintiff was unable to meet its burden in opposing the City's motion. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). "[T]he requirement is that there be no *genuine* issue of material fact.... Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Plaintiff's failure to present any evidence on the issue of corruption is even more significant given that Plaintiff initially designated two expert witnesses on that issue. Plaintiff produced no written report from either of its designated experts and in response to

25

the City's notices to depose the two experts, withdrew their designation rather than submit them to cross-examination. 2-ER-145, ¶¶ 2, 4. Plaintiff's argument at trial, and again here on appeal, against the presence of corruption in Oxnard is further perplexing because Plaintiff's president, Aaron Starr, posted on social media in February 2020 and September 2020 alluding to alleged corruption in Oxnard. 3-ER-439–440.

Because Plaintiff presented no evidence on this issue to the District Court, its arguments on appeal can do little more than quibble with terminology. Plaintiff complains the District Court focused on whether the interest was "important" rather than "sufficiently important." Dkt. 10 at 24. But the District Court's ruling expressly found that the Clerk's governmental interest was "sufficiently important" to meet her "evidentiary obligation. 1-ER-6. That the heading in the ruling omitted the word "sufficient" is not dispositive. 1-ER-5:21.

26

Plaintiff next complains that Measure B does not contain the phrase "quid pro quo corruption." Dkt. 10 at 27. Instead, the Measure lists as one of its three purposes the prevention of "corruption caused by the coercive influence of large financial contributions." The City's motion for summary judgment, in turn, presented evidence demonstrating that Oxnard voters had a perception of quid pro quo corruption due to the City's history. The City was not required to prove actual corruption, as Plaintiff incorrectly argues. Dkt. 10 at 29.

Plaintiff's argument on this point is heavy on rhetoric and light on citations. Dkt. 10 at 27–29. It provides no basis to overrule the District Court's well-reasoned holding that the Clerk presented sufficient evidence to meet her burden of demonstrating a sufficiently important government interest in addressing the public perception of quid pro quo corruption.

The Supreme Court has accepted as sufficient evidence of public perception of corruption generally accepted inferences of impropriety, recent news accounts of corruption, and the majority

27

vote to approve the campaign finance reform measure, each of which is present here. *Shrink Missouri,* 528 U.S. at 393–394. The City need not show any instances of actual quid pro quo corruption. See *Thalheimer,* 645 F.3d at 1121. It must show "only that the perceived threat [is] not ... 'illusory.'" *Eddleman,* 343 F.3d at 1092 (quoting *Buckley v. Valeo,* 424 U.S. 1, 27 (1976)).

As the Supreme Court has acknowledged, "there is little reason to doubt that sometimes large contributions will work actual corruption of our political system." *Shrink Missouri,* 528 U.S. at 395. There is a growing perception among voters in California that municipal elections, in particular, are ripe for corruption. A recent study performed to support AB 571 (a bill in the California Legislature that proposed a uniform contribution limit ceiling for municipal elections) discovered that some candidates for local office in California received campaign contributions as high as $50,000, $100,000, and even $244,000 from donors with business before that local government. 3-ER-495. City residents specifically have recent

28

and significant reason to be concerned about corruption following the 2010 District Attorney investigation and 2012 report. 2-ER-214. This investigation and report played a prominent role in the debates on Measure B leading up to the March 2020 election. 3-ER-438–439.

As the District Court correctly recognized, the City has at least as much evidence to support its significant interest in preventing the perception of corruption as Missouri had in *Shrink Missouri*. 1-ER-6. Indeed, the City's position is stronger than Missouri's because it does not merely have evidence of a perceived threat of corruption, it has actual evidence that City elected officials have engaged in misconduct and unethical behavior in the last decade. This remains a real concern for voters as evidenced by the survey conducted by the City before the election on Measure B. SER-35. And the overwhelming "yes" vote (82%) on the measure (3-ER-474) is the clearest evidence possible that voters believed Measure B was necessary and appropriate to curb corruption. *Shrink Missouri*, 528 U.S. at 394 (74% yes vote was evidence of a perception of corruption).

29

Plaintiff has shown no error in the District Court's ruling on this issue.

### 2. THE DISTRICT COURT CORRECTLY HELD THAT MEASURE B'S LIMITS WERE CLOSELY DRAWN

#### A. THE DISTRICT COURT CORRECTLY APPLIED THE RELEVANT SUBSTANTIVE LAW

The second step of the analysis examines whether the limits are closely drawn, focusing narrowly on addressing the state's interest while allowing a candidate to amass sufficient resources to wage an effective campaign. *Eddleman*, 343 F.3d at 1092. To determine whether a contribution limit is narrowly drawn, the Supreme Court in *Randall v. Sorrell* articulated a two-part test. A court first looks for the following "danger signs" that the limits prevent candidates from raising enough money to be heard and challengers from raising enough to compete against incumbents: "(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below

30

those we have previously upheld." *Randall v. Sorrell*, 548 U.S. 230, 249–52 (2006).

The District Court correctly found none of these danger signs was present. 1-ER-8. The record supports this holding. Measure B's contribution limits are per election, not election cycle. 3-ER-479, §§ 2-243(A) & 2-244(A). Higher limits apply to contributions from political action committees, and no contribution limit applies to political parties. *Ibid*. And the limits are not unusually low. To the contrary, Measure B's limits are precisely in line with those imposed by other California cities of comparable size. 3-ER-421–422, ¶¶ 14–15. The $500 limit on contributions to city council candidates is just below the median limit of $515, and the $750 limit on contributions to city-wide office candidates is just above the median limit of $720. 3-ER-421–422, Tables 1 and 2. Even when compared to larger cities on a per voter basis, Measure B remains at the center of the pack, neither unusually high nor unusually low. 3-ER-423, Table 3. Courts have also upheld similar limits, such as San Diego's contribution limits of $500 per

31

candidate per election. *Thalheimer v. City of San Diego* (S.D. Cal., Jan. 20, 2012, No. 09-CV-2862-IEG BGS) 2012 WL 177414, at \*8–\*9.  And San Diego has a population 5 times larger than Oxnard's. 2-ER-111–112.

Plaintiff questions the District Court's holding on two grounds. First, Plaintiff argues that *Randall* requires a comparison, not to campaign contribution limits approved by any court, but only to those limits approved by the United States Supreme Court. Dkt. 10 at 35. But such a rule would be absurd. The Supreme Court cannot address every possible type or level of contribution limit. Rather, as the Supreme Court explained in *Thompson v. Hebdon*, 140 S. Ct. 348, 351 (2019), the question of whether a limit is lower than one previous upheld by the Court is only one of the *Randall* factors. *Id*. at 350–351. Another, equally weighted factor is whether the limits are substantially lower than those in similar jurisdictions. *Id*. at 351, citing *Randall*, 548 U.S. at 253.

32

The Supreme Court has never addressed whether a city's contribution limits are narrowly tailored. In fact, the Supreme Court has taken a case involving city contribution limits exactly once, and then only to declare that no limitation on contributions to ballot measure committees is constitutional. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290 (1981). No comparable Supreme Court precedent can be used to address whether Measure B's limits are lower than any previously upheld by the Supreme Court. The limit in *Shrink Missouri* that Plaintiff cites was a statewide limit placed on an election for state office. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 382 (2000). The limits appropriate for a statewide election are not identical to the limits appropriate for a city election. Moreover, Plaintiff's assertion that *Shrink Missouri* provides an absolute floor for permissible contribution limits is directly contradicted in the text of that opinion. The Supreme Court "specifically rejected the contention that $1,000,

33

or any other amount, was a constitutional minimum below which legislatures could not regulate." *Shrink Missouri*, 528 U.S. at 397.

The other factor discussed in *Thompson v. Hebdon*, whether the limit is "substantially lower" than others in similar jurisdictions, is a more accurate bellwether for the reasonableness of a contribution limit here, where the Supreme Court has not addressed similar limits. *Thompson v. Hebdon*, 140 S. Ct. at 253. And Measure B's limits are not substantially lower than those in other California cities of comparable size. Rather, the limits are right at the median, neither higher nor lower than comparable jurisdictions. 3-ER-421–422, Tables 1 & 2.

Plaintiff, of course, disputes this factor too, arguing the uncontradicted expert testimony presented by Dr. Thad Kousser was insufficient. Dkt. 10 at 36. Plaintiff argues Dr. Kousser failed to account for the recently enacted default contribution limits in California Government Code section 85301. Government Code section 85301 was amended by Assembly Bill 571, 2019-2020 Reg. Sess., 2019 Cal. Stat. ch. 556 (Cal. 2019) effective January 1, 2021 to

34

impose the same contribution limits applicable to statewide elections on city and county elections. But the Legislature acknowledged that this default limit is not tailored to the needs of individual cities. A.B. 571, 2019-2020 Reg. Sess., 2019 Cal. Stat. ch. 556, § 1(g) (Cal. 2019). Thus, any existing contribution limit already enacted by a city remained in effect even after AB 571 took effect. Cal. Gov. Code, § 85702.5, subd. (d). And even after AB 571 took effect, cities remain free to set their own contribution limits that differ from those in California Government Code section 85301. Cal. Gov. Code, § 85702.5, subd. (a). The statewide limits are therefore akin to "background noise" in that the California Legislature did not purport to address the needs of individual cities. Those limits apply only when a city has taken no action at all to determine a narrowly tailored contribution limit.

Moreover, Plaintiff is simply incorrect in stating that, if Government Code section 85301 statewide limits are taken into account, Measure B is "substantially lower" than limits in comparable

35

jurisdictions. Of the comparably sized cities that have enacted contribution limits, eleven cities have lower citywide limits than Measure B. 3-ER-421. Even among the largest cities in the state, Measure B's limits are higher than the limits in Oakland (population 433,031) and San Francisco (population 881,549), and nearly equivalent to the limits in Long Beach (population 462,628). 2-ER-111–112; 3-ER-423. Measure B's $750 citywide limit, when evaluated at a per resident and per registered voter level, is almost identical to Santa Ana, a city with a population of 332,318 that imposes a $1,000 city wide limit. Compare 3-ER-423 and 2-ER-111. Similarly, despite imposing lower citywide limits overall, Measure B is more generous, on a per resident and per registered voter basis, than the limits in San Diego (population 1,423,851), San Jose (population 1,021,795), and Los Angeles (population 3,979,576). 2-ER-112; 3-ER-423. Measure B's limits are not particularly low when compared to other California cities, and there is no "inference" to the contrary that could or should have been drawn in Plaintiff's favor.

36

The City's unrebutted evidence is more than sufficient to demonstrate that none of the *Randall* "danger signs" are present. The District Court's holding on this point was correct and well supported by the evidence.

### B.    THE CITY PRESENTED UNREBUTTED EVIDENCE THAT THE LIMITS WERE CLOSELY DRAWN

The second part of the *Randall* test directs that if a court finds "danger signs" exist, it must then assess "five sets of considerations" to determine whether the statute was closely drawn: (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by exactly the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are ... adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive." *Randall* at 253–262, see also *Thompson v. Hebdon*, 140 S. Ct. 348, 351 (2019).

Plaintiff argues the second step of the *Randall* test demonstrates that the Measure B limits were not closely drawn. Dkt. 10 at 38. The District Court did not examine most of these factors because it determined that there were no danger signs warranting a closer examination of the limits. 1-ER-8, fn. 1.  However, the District Court did address Plaintiff's argument that Measure B prevents candidates from soliciting sufficient funds to mount a successful campaign. 1-ER-8–9. It held that Plaintiff's reliance on the testimony of Aaron Starr was insufficient to demonstrate Measure B's limits significantly restricted the amount of funding available in light of the Clerk's evidence that Mr. Starr is an outlier among candidates. 1-ER-9.

The party challenging the limits "must show that limiting donations prevents candidates from amassing the resources necessary for effective advocacy, making a donee candidate's campaign to be not merely **different** but **ineffective**." *Eddleman*, 343 F.3d at 1095 (emphasis added). The city in turn may support its limits by providing evidence that even before the challenged limits went

into effect, a majority of contributions were less than the contribution limits. *Shrink Missouri*, 528 U.S. at 396 ("The plausibility of these conclusions is buttressed by petitioners' evidence that in the 1994 Missouri elections (before any relevant state limitations went into effect), 97.62 percent of all contributors to candidates for state auditor made contributions of $2,000 or less.").

Aaron Starr, Plaintiff's president, declared he gave up on fundraising because he had to comply with Measure B's limits. 2-ER-168, ¶ 10. In his deposition, he testified he did not "pursue" donors as he had in prior campaigns and estimated he spent not much more than ten hours total fundraising in 2020 during his campaign for a seat on the City Council. 3-ER-186 [11:2-24]. Mr. Starr's testimony does not prove an effective campaign is impossible, and the Clerk's evidence established to the contrary. For example, the 2018 election demonstrates that most candidates already raised the majority of their funds from contributions below Measure B's limits. Just as in *Shrink Missouri*, where 97.62% of all contributors made contributions

39

below the limit before the limit was enacted, in the City's 2018 election 93.7% of all contributors made contributions that would have been below the applicable Measure B limit. 3-ER-429–430. Put another way, only 18 of the 287 donors would have needed to reduce their contributions to comply with Measure B. *Ibid*.

Mr. Starr's outlier status is even more stark when compared to other candidates' fundraising in the 2018 election. In the 2018 mayoral election, Mr. Starr's opponent, Tim Flynn, would have lost less than 10% of the funds he raised if Measure B had been in effect. 3-ER-428. Only one of Mr. Flynn's 76 donors made a contribution that would have exceeded Measure B's limits. *Ibid*. Bert Perello, who was elected to the District 1 City Council seat, received only one contribution from his 10 donors over Measure B's limit. *Ibid*. Carmen Ramirez, elected to the District 2 City Council seat, received three contributions over Measure B's limit out of a total of 95 donors. *Ibid*. Gabriela Basura, elected to the District 5 City Council seat, received only one contribution over Measure B's limits from her 11 donors.

40

*Ibid*. And Vianey Lopez, elected to the District 6 City Council seat, received only two such contributions from her 27 donors. *Ibid*.

The election information for 2018 also demonstrates how absurd the current statewide limit of $4,900 (Cal. Code Regs., tit. 2, § 18545) would be if applied to Oxnard elections. Four candidates did not even raise a total of $4,900 in the entire election cycle, including Mr. Perello, who won his election. 3-ER-428. In the entire 2018 election, the only contribution that exceeded the $4,900 limit Plaintiff would apply here was a $7,500 contribution to Ken Oplinger, who did not even win his election. 2-ER-130. The $4,900 limit is not narrowly tailored to the circumstances of the City of Oxnard.

Mr. Starr prefers to raise large sums of money from a small number of donors. 2-ER-168, ¶ 10; 3-ER-394–395 [36:20–37:1]. Measure B will force him to change this practice, and reach out to a broader base for smaller donations. *Ibid*. That he must fundraise differently does not prove he can no longer campaign effectively. *Eddleman*, 343 F.3d at 1095. The Clerk's evidence proved the fallacy of

41

Plaintiff's theory. And Plaintiff failed to provide any evidence that a campaign would be ineffective under Measure B's limits. The District Court correctly ruled in the Clerk's favor on this issue.

### 3. PLAINTIFF'S CLAIM THAT A $500 CONTRIBUTION LIMIT SHOULD BE "UNCONSTITUTIONAL PER SE" IS CONTRARY TO SUPREME COURT PRECEDENT

Plaintiff argues that a $500 limit should be declared "unconstitutional per se" because it imposes such a significant burden on candidates so as to be "unconscionably low." Dkt. 10 at 41. First, this argument is contrary to the undisputed evidence that most Oxnard City Council candidates, those candidates subject to the $500 limit, did not receive contributions in excess of $500 even before the limit was enacted. Measure B's limits place a very small burden on most candidates because those limits would have affected less than 7% of the contributions made in the 2018 election. This is neither significant, nor "unconscionably low."

Second, and more importantly, the Supreme Court has consistently declined to impose a per se cap on contribution limits. In

42

*Shrink Missouri* the Supreme Court "specifically rejected the contention that $1,000, **or any other amount**, was a constitutional minimum below which legislatures could not regulate." *Shrink Missouri*, *supra*, 528 U.S. at 397 (emphasis added). Notably, the contribution limits upheld in *Shrink Missouri* were based on population, and ranged from "$275 for contributions to candidates for state representative or for any office for which there were fewer than 100,000 people represented" to "$1,075 for contributions to candidates for statewide office". *Id*. at 383. Oxnard has a registered voting population of less than 100,000, and a total population of just over 200,000. 3-ER-421, Table 1. That population is further divided into districts for City Council elections, with approximately 34,814 people in each district, of which 15,389 are registered voters. 3-ER-422, Table 2. It does not take as much money to effectively campaign in a municipal district of less than 35,000 residents than in, for example, an entire state when campaigning for statewide office. Thus, it is entirely appropriate, under *Shrink Missouri*, for Measure B

43

to take population into account when setting campaign contribution limits. And Measure B's limits are, per capita, higher than the $275 limit approved in *Shrink Missouri*.

Nor does *Randall* allow for any specific limit to be declared unconstitutional per se. Dkt. 10 at 42. In striking down Vermont's contribution limits, the Supreme Court did not suggest that there is any "per se" floor for contribution limits. Rather, it created a two-part test (applied by the District Court here) to guide the federal courts in evaluating contribution limits based on the specific circumstances surrounding the enactment of that limit. *Randall*, 548 U.S. at 248–252. *Randall*'s two-part test is binding precedent on this Court. *Thompson v. Hebdon*, 140 S. Ct. 348, 351, 205 L. Ed. 2d 245 (2019). This is the test that must be applied, not the vague "I know it when I see it" test Plaintiff proposes. Dkt. 10 at 42–43.

### 4. MEASURE B DOES NOT LIMIT A CANDIDATE'S RIGHT TO FUND THEIR OWN CAMPAIGN

As Plaintiff correctly states, the Supreme Court in *Buckley* rejected any limitation on a candidate's expenditure of his own personal funds on a political campaign. *Buckley*, 424 U.S. at 53. Thus, Measure B cannot apply to limit a candidate's contribution of funds to his or her own campaign for office. The City has never argued otherwise. Nor did the District Court hold that such a limitation is permissible. Rather, the District Court held that Measure B does not contain any restriction on a candidates' contributions to their own campaign. 1-ER-7.

Measure B section 2-243(A) states "[n]o **person** shall make, and no **candidate** for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount contributed by that **person** to that **candidate** … to exceed five hundred dollars ($500) for any election." 3-ER-479 (emphasis added). Section 2-244(A) contains identical language, but places a limit of $750 on the contribution. *Ibid*. The ordinance's language clearly

45

applies the limitations to contributions made by a "person" to a "candidate" and does not address contributions made by a "candidate." A contribution from a candidate to his or her own campaign is not a transaction between a person and a candidate, and therefore is not subject to the limits in Sections 2-243 and 2-244. If the City had intended to prohibit such contributions, it would have done so separately, just as it separately limits contributions from a "person" and a "political action committee."

Plaintiff claims that this definition will lead to absurd results, such as candidates being able to contribute unlimited amounts to other candidates. Dkt. 10 at 45. When addressing a question of pure statutory interpretation, this court "look[s] to California principles of statutory construction." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir.2005). California courts look first to the text of the statute, "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." *State Farm Mut.*

46

*Auto. Ins. Co. v. Garamendi*, 32 Cal.4th 1029, 1043 (2004) (internal quotation marks and citations omitted). The District Court's interpretation gives significance to every word in Sections 2-243 and 2-244, whereas Plaintiff's interpretation requires this Court to ignore Measure B's intentional distinction between a "person" and a "candidate."

Plaintiff, the Clerk, and the District Court all agree that binding precedent does not permit restrictions on the amount of money a candidate may contribute to their own campaign. *Buckley*, 424 U.S. at 53. Plaintiff's complaint here is merely how Measure B phrases its application of this undisputed law. The City has acted consistently with this interpretation of Measure B. Although Mr. Starr contributed more than $500 to his own campaign in 2020, the City took no enforcement actions against him. 3-ER-389 [14:15–14:22]. Nor did the City take any enforcement action against any of Plaintiff's members. SER-16 [41:1–41:18]. That Plaintiff would prefer different language to

accomplish the same effect is not grounds for summary judgment on this issue.

### 5. DISCLOSURE IS INSUFFICIENT TO ADDRESS A PUBLIC PERCEPTION OF CORRUPTION

Plaintiff asserts the existing statewide campaign contribution disclosure laws are sufficient to address the public perception of corruption. Dkt. 10 at 46. But he cites no evidence on this point. In contrast, the Clerk provided expert testimony explaining that recent, peer-reviewed research shows that while voters value transparency, disclosure requirements alone cannot address the perception that large contributions carry a risk of corruption. 3-ER-434. Survey respondents are consistently less likely to trust candidates who receive large contributions, and less likely to see those candidates as credible. 3-ER-435. Thus, as the Supreme Court held in *Buckley*, "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the

48

limited effect upon First Amendment freedoms" caused by a reasonable contribution limit. *Buckley*, 424 U.S. at 29.

*McCutcheon* does not require a different outcome. While disclosure requirements provide "robust protections against corruption", the Supreme Court recognized in the very next paragraph that not all entities are subject to disclosure requirements. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 224 (2014). And later in the opinion, the Supreme Court reiterated that "[t]he Government has a strong interest, no less critical to our democratic system, in combatting corruption and its appearance." *Id*. at 227. Disclosure requirements are one tool governments may use to combat corruption, but Plaintiff overstates its case to argue that disclosure alone may substitute for reasonable campaign contribution limits.

### 6. THERE IS NO ESTABLISHED RIGHT FOR A CANDIDATE TO SOLICIT FUNDS

Plaintiff finally seeks to "distinguish" Measure B from all existing Supreme Court precedent on campaign contribution limits by arguing that Measure B infringes on a candidates' right to solicit funds. Dkt. 10 at 49–50. This argument has little basis in law, and would require this Court to overturn decades of Supreme Court precedent that expressly allows for campaign contribution limits. If a candidate has an unlimited First Amendment right to solicit funds, there can logically be no constitutional grounds to impose campaign contribution limits. And yet, starting with *Buckley* in 1976 and recently reiterated in *Federal Election Commission v. Cruz*, 142 S. Ct. 1638, 1652 (2022), the Supreme Court has repeatedly held that the prevention of quid pro quo corruption or its appearance is a permissible, constitutional ground for campaign contribution limits. Plaintiff asks the Court to ignore this precedent and instead to reframe the issue to focus on the effect on candidates rather than

50

donors. The Clerk urges the Court to decline Plaintiff's invitation to do so.

## B. THE DISTRICT COURT CORRECTLY ENTERED SUMMARY JUDGMENT FOR THE CLERK ON MEASURE B'S AGGREGATE LIMIT

Next, Plaintiff briefly challenges the District Court's ruling granting the Clerk summary judgment on the aggregate contribution limits in Measure B. Plaintiff asserts the application of Measure B's limits serves to "prohibit candidates from engaging in advocacy on matters other than their own campaigns." Dkt. 10 at 51. As the District Court correctly found, Plaintiff's argument is counter to the Clerk's uncontradicted evidence.

No case law holds that a contribution limit that includes contributions made to a committee controlled by a candidate violates the First Amendment. To the contrary, *McCutcheon v. Federal Election Com'n*, 572 U.S. 185 (2014), found no constitutional flaw in "base limits" that govern all contributions to a particular candidate, including contributions to a committee controlled by the candidate.

51

*Id*. at 194, 201-202. That Measure B's limits, like those in *McCutcheon*, apply to both direct contributions and contributions made to a committee controlled by a candidate is not grounds for invalidation. *Ibid*.

The District Court analyzed the language in Measure B and found "Measure B does not place any limits on the contributions that can be made to a committee formed to support or oppose a ballot measure. The plain language of Measure B's aggregate contribution limits provision applies to contributions "to that candidate," and do not reference a ballot measure." 1-ER-12. This reading was supported by the City Attorney's impartial analysis, which stated Measure B places no limit on the contributions that can be made to independent expenditure committees or to committees that raise money to support or oppose a City ballot measure." 3-ER-469–470. Thus, to the extent there was any ambiguity in Measure B's language, the impartial analysis is relevant to determine the intent of the voters. *Gutierrez v. Mun. Ct. of Se. Jud. Dist., Cnty. of Los Angeles*, 838 F.2d 1031, 1044 n.17

52

(9th Cir.1988) ["Where a measure is enacted by the voters rather than the legislature, the ballot materials are recognized as important guides for determining legislative intent."], cert. granted, judgment vacated as moot sub nom. *Mun. Ct. of Se. Jud. Dist., Cnty. of Los Angeles v. Gutierrez*, 490 U.S. 1016 (1989). This evidence, again, was unrebutted by Plaintiff.

## C. THE DISTRICT COURT CORRECTLY DENIED PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff finally argues that the District Court erred not only in granting the Clerk's motion for summary judgment, but also in denying Plaintiff's concurrently filed motion for summary judgment. Dkt. 10 at 53. Plaintiff asserts again that Measure B is unconstitutional per se, and claims the City failed to demonstrate a valid governmental interest in preventing the appearance of quid pro quo corruption. Dkt. 10 at 53–54.

For all the reasons set forth above, Plaintiff's arguments fail. There is no authority to support Plaintiff's claim that any

53

contribution limit can be declared "unconstitutional per se." The Clerk presented significant, unrebutted evidence showing historical evidence of corruption within Oxnard that continues to influence the public's perception of City politics. Plaintiff's own president, Mr. Starr, has complained publicly about corruption in the City. Plaintiff could provide no evidence, either in his own motion for summary judgment or in opposition to the City's motion, countering the public perception of quid pro quo corruption, or that Measure B was designed to address that perception.

## CONCLUSION

Measure B imposes reasonable limits on campaign contributions within the City of Oxnard designed to address public perception of quid pro quo corruption. The Clerk presented unrebutted evidence sufficient to demonstrate that Measure B complies with all applicable First Amendment precedent. Plaintiff's disagreement with that precedent is not grounds to reverse the District Court and grant Plaintiff summary judgment.

54

55

For the foregoing reasons, the judgment of the District Court should be upheld.

DATED: July 11, 2022          **COLANTUONO, HIGHSMITH & WHATLEY, PC**


s/ Holly O. Whatley
HOLLY O. WHATLEY
LILIANE M. WYCKOFF
Attorneys for Respondent
MICHELLE ASCENCION, in her
official capacity as City Clerk of
the City of Oxnard

55

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 21-56295

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

◯ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◯ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Holly O. Whatley   **Date** | July 11, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form08instructions.pdf](http://www.ca9.uscourts.gov/forms/form08instructions.pdf)

**9th Cir. Case Number(s)** | 21-56295

I am the attorney or self-represented party.

**This brief contains** | 7,906 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Holly O. Whatley      **Date** | July 11, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at [forms@ca9.uscourts.gov](forms@ca9.uscourts.gov)

**Form 8**      *Rev. 12/01/2018*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system on July 11, 2022.

I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the appellate CM/ECF

system.


Dated: July 11, 2022


*s/ Holly O. Whatley*
HOLLY O. WHATLEY