No. 21-56295

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MOVING OXNARD FORWARD, INC.,

*Plaintiff-Appellant*,

v.

MICHELLE ASCENCION,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-04122-CBM-AFM
Hon. Consuelo B. Marshall

---

### APPELLANT'S REPLY BRIEF

---

**Chad D. Morgan, Esq.**
LAW OFFICE OF CHAD MORGAN, APC
P.O. Box 1989 PMB 342
40729 Village Drive #8
Big Bear Lake, CA 92315
Tel: 951-667-1927
Fax: 866-495-9985
Email: chad@chadmorgan.com

*Attorneys for Appellant*
Moving Oxnard Forward, Inc.

## TABLE OF CONTENTS

**Page**

**Table of Contents** ............................................................................. 2

**Table of Authorities** ........................................................................ 4

**Reply** .................................................................................................. 5

    I.     THERE IS NO UNCONTROVERTED FACT THAT SUPPORTS JUDGMENT IN THE CITY'S FAVOR. ................................. 6

          A.    The District Attorney's report does not support contribution limits. ...................................................................... 6

          B.    Dr. Kousser's analysis is flawed on its face in a way that is apparent to any lay person without need for an expert rebuttal. ......................................................................... 10

                    *i.*    *Dr. Kousser misrepresented his data to show that Oxnard's contribution limits are close to the median when they were not.* ....................................................... *11*

                    *ii.*   *Dr. Kousser's analysis supports Plaintiff's contention that Measure B was targeted at Aaron Starr.* ........................... *14*

          C.    The City Attorney's impartial analysis is not evidence. .......... 15

          D.    Plaintiff's President has not complained of quid pro quo corruption in Oxnard. ............................................................ 16

          E.    The resident satisfaction survey and Measure B's election results are irrelevant. .................................................... 19

    II.    THE CITY'S INDIVIDUAL CONTRIBUTION LIMIT IS UNCONSTITUTIONALLY LOW. ..................................... 22

          A.    Oxnard has not demonstrated a sufficient interest in preventing quid pro quo corruption. ........................................................ 23

B.    Oxnard's limits are not closely drawn to any interest in preventing quid quo pro corruption. ......................................26

       i.    *There are sufficient danger signs to warrant further review.*26

       ii.    *All but one of the five Randall factors weigh against Measure B's constitutionality.*..........................................................28

C.    Other considerations weigh on Measure B's tailoring to an interest in combating quid pro quo corruption. .......................32

       i.    *Modern Supreme Court precedents recognize disclosure as a viable alternative to limits.* ..............................................32

       ii.    *A candidate's right to raise money is an issue of first impression which distinguishes this case from everything prior.* ...................................................................................32

III.   THE CITY'S AGGREGATE LIMIT IS DISTINGUISHABLE FROM *MCCUTCHEON V. FEC.* ............................................. 33

IV.   JUDGEMENT SHOULD HAVE BEEN ENTERED FOR PLAINTIFF. ........................................................................... 34

Conclusion .........................................................................35

Certificate of Compliance.....................................................37

Certificate of Service ...........................................................38

# TABLE OF AUTHORITIES

**Cases**

*Almond All. of Cal. v. Fish & Game Com.*, 79 Cal. App. 5th 337 (2022) ................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................... 6

*Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) ..... 22

*Buckley v. Valeo*, 474 U.S. 1 (1976) ................................................... passim

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .............. 22, 23, 24, 25

*Denny v. Arntz*, 55 Cal. App. 5th 914 (2020) ......................................... 15

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ...................................24, 25

*Jobs & Hous. Coal. v. City of Oakland*, 73 Cal. App. 5th 505 (2021) ........................ 16

*Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015) ........................................ 28

*Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) .........22, 24, 28

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ...............................23, 25, 31

*People ex rel. Breuning v. Berry*, 147 Cal. App. 2d 33 (1956) .................................... 15

*Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006) ....................................................23

*Thompson v. Hebdon*, 909 F.3d 1027 (2018) .............................................................5

*Thompson v. Hebdon*, 140 S. Ct. 348 (2019) ................................................ 5, 23, 24

*Thompson v. Hebdon*, 7 F.4th 811 (2022) ........................................................passim

**Constitutions**

Cal. Const., art. II, § 8 ...................................................................... 22

**Statutes**

Cal. Elec. Code § 9280........................................................................ 16

Cal. Gov't Code § 12463......................................................................... 20

Cal. Gov't Code § 12519 ...................................................................... 16

**REPLY**

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Thompson v. Hebdon*, 7 F.4th 811, 818 (2022) (*Thompson II*).[1] Not only does the City fail to satisfy this burden, it tries to shift that burden to Plaintiff as if Measure B's limits are valid until proven otherwise. The government does not have that much power.

Looking at this case from a broad perspective, the City complains that Plaintiff asks this Court to "ignore binding Supreme Court precedent and seek to change law, not apply it." Recognizing that the Supreme Court has inched closer to overruling *Buckley*[2] in every relevant case since *Randall*,[3] this is not a stretch. But Plaintiff does not ask this Court to go that far not only because it cannot, but also because it does not need to. Measure B is unconstitutional under existing authority.

---

[1] Plaintiff continues the labeling used in its opening brief. *Thompson I* is the Supreme Court's opinion in *Thompson v. Hebdon*, 140 S. Ct. 348 (2019), and *Thompson II, supra*, is this Court's second *Thompson* opinion. While Plaintiff occasionally refers to this court's first *Thompson* opinion, that opinion was overruled for all purposes relevant to this case and is not cited outside this footnote. See *Thompson v. Hebdon*, 909 F.3d 1027 (2018).

[2] *Buckley v. Valeo*, 474 U.S. 1 (1976) (*per curiam*).

[3] *Randall v. Sorrell*, 548 U.S. 230, 265-66 (2006) (Thomas, J., concurring).

I.  **THERE IS NO UNCONTROVERTED FACT THAT SUPPORTS JUDGMENT IN THE CITY'S FAVOR.**

The theme of the City's Answering Brief is that uncontroverted evidence supports summary judgment in its favor. In this section, Plaintiff looks at the five pieces of evidence the City relies upon to support its arguments. In the context of the City's summary judgment motion, Plaintiff's evidence must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, Plaintiff focuses primarily on justifiable inferences that must be drawn in its favor because the City failed to satisfy its burden of proof. *See, e.g.*, *Thompson II*, 7 F.4th at 818 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). Those inferences preclude summary judgment in the City's favor because the City's defense is defective on its face. Crediting Plaintiff's evidence reinforces this conclusion.

### A. The District Attorney's report does not support contribution limits.

The City gives significant weight to the District Attorney's report, which it discusses over two full pages of its Answering Brief (AAB 8-9) as well as in other references. The City's use of this report is misleading and warrants a deeper

discussion to see beyond its superficial claims. A more careful review shows that the report does not support Measure B's contribution limits.[4]

A starting point is the City's reliance on the report to support its claim that "Public trust in the City's government was shaken in 2010 when the City was investigated by the Ventura County District Attorney's Office for serious allegations of corruption involving both elected and non-elected officials." 2-ER-214." AAB 8. To the extent there were allegations of corruption, they did not involve campaign contributions or quid pro quo corruption. Additionally, the report focused largely on staff, particularly the City Manager and Public Works Director. 2-ER-214.

If the City wants to use the District Attorney's report to justify Measure B's contribution limit, it is important to consider exactly what the District Attorney looked at. The first set of allegations related to misappropriation of public funds. 2-ER-217, 242-271. The second considered officials' failure to disclose gifts. 2-ER-220, 272-285. The third looked at conflict of interest. 2-ER-220, 286-293. There

---

[4] In its Opening Brief, Plaintiff conceded that the District Attorney's report might support Measure B's gift restrictions. AOB 31. But the trial court's judgment on Measure B's gift provisions issue is not the subject of this appeal. *See also id*. at 31, fn. 5. In context, the evidentiary support for Measure B's gift restrictions must be different from evidentiary support for its contribution limits.

were no allegations relating to campaign contributions or their corrupting influence. Rather than focusing on quid pro quo corruption, the report's *gravamen* was corruption arising from the officials' misuse of public funds for their own benefit. This is a different type of corruption and is not the type of corruption contribution limits might reasonably prevent. If Measure B was intended to prevent the type of corruption the District Attorney's report describes, then its enactment was arbitrary and capricious.

Reading the City's brief, one might conclude that the only reason why the District Attorney's office found no evidence of corruption is expired statutes of limitation[5] and poor recordkeeping. *See* AAB 9. It is true that poor record keeping hampered the investigation but not with respect to any allegation that comes close to quid pro quo corruption. Poor record keeping was a problem with respect to

---

[5] A statute of limitation prevented prosecution of the City Manager for the illegal loan to himself (2-ER-218-19), his illegal expansion of his retirement benefit (2-ER-219), and allegations that he illegally entered into contracts on the City's behalf (2-ER-263-64). A statute of limitations also applied to anyone involved in the unlawful expenditure of public funds on the grand opening celebration (2-ER-219-20), prosecution for failing to report gifts (2-ER-274; 2-ER-285), and to any potential prosecution of the giver for unlawfully giving the gifts (2-ER-291). However, the District Attorney gave serious consideration to conflict of interest allegations and concluded that they were unfounded without qualification by the statute of limitations or any other consideration. 2-ER-287.

allegations of misappropriation of public funds where the District Attorney could not prove who benefited from expensive City meals, used City credit cards to pay personal expenses, and took personal trips on the City's dime. 2-ER-237-39; *see also* 2-ER-243-71. To a lesser extent, this is also true for allegations relating to officials' failure to report gifts. 2-ER-240-41; see also 2-ER-272-85. But the report cited no such evidentiary impediment that effected its failures to find conflict of interest violations. As to those allegations, the District Attorney found sufficient evidence to conclude that they were unsupported. 2-ER-287. This was true even with respect to the possibility of an "indirect conflict of interest." *Id*.

Notably, the City cites to a portion of the report that looked at four "high-cost transactions" and their connection to individuals who gave gifts to city officials. AAB citing 2-ER-293-305. As to these transactions, the District Attorney found no evidence of criminality. 2-ER-293. Additionally, it is significant that these transactions were not the subject of allegations in the initial complaint that gave rise to the investigation. *See* 2-ER-225. Instead, they came about as part of a sweeping investigation into broad swaths of city activity, rising to the top not because of any specific allegation or evidence but because of their size. *See* 2-ER-231 (describing how the investigation developed and focused on many broad subjects rather than

9

one narrow subject). This diminishes those allegations' importance as they relate to contribution limits or anything else.

In addition, an ultimate conclusion that the City failed to enforce its own stated ethics policies (see AAB 9 citing 2-ER-309-10), which generally overlapped with state law, reinforces Measure B's arbitrary nature. New laws do not necessarily solve problems remedied by existing laws. If problematic conduct is already illegal, believing that new and additional laws will solve the problem is wishful thinking. Even if those new laws make a majority of voters feel like they are doing something, those good feelings do not justify serious First Amendment intrusions that cannot reasonably fulfill their stated objective.

## B. Dr. Kousser's analysis is flawed on its face in a way that is apparent to any lay person without need for an expert rebuttal.

The City also gave significant weight to the expert opinion of Dr. Thad Kousser. To buttress its argument based on Dr. Kousser's report, the City focuses on the fact that Plaintiff designated than withdrew two experts as if that is relevant for something. AAB 25-26. If the City has the burden of proving that Measure B's contribution limits are valid and it failed to satisfy that burden, Plaintiff did not need to present any evidence at all, expert or otherwise. On that point, it is up to the City to show that Measure B passes constitutional muster, and it failed to do so.

More significantly, it does not take expert testimony to discredit Dr. Kousser's opinions. That is evident from the face of his report, based on his own admissions. Superficially, his report might support the City's argument. However, careful scrutiny shows that his carefully worded opinion found a way for him to remain technically true while giving the City the misleading conclusion it paid for. For this reason, his opinion should be disregarded in its entirety.

### i. Dr. Kousser misrepresented his data to show that Oxnard's contribution limits are close to the median when they were not.

The crux of Dr. Kousser's conclusion is that Measure B's limits are consistent with limits in similar cities. AAB 14-15. In its Opening Brief, Plaintiff attacked Dr. Kousser's report as flawed because he "only compared Oxnard's limit to cities that also had limits." AOB 36 citing 2-ER-353 (Kousser Decl. ¶ 11). The City dodges this, arguing that Dr. Kousser considered comparable cities."[6]

Paragraphs nine through 11 of Dr. Kousser's declaration, as well as his Tables 1 and 2 best illustrate Plaintiff's argument. In paragraph nine, Dr. Kousser starts by considering every California city having a population between 100,000

---

[6] The City argues: "The Clerk presented uncontradicted expert testimony that Measure B's contribution limits are *consistent with the limits in other, similar cities in California.*" AAB 13 (emphasis added).

and 300,000 without concern for any contribution limit. 2-ER-83. These are the cities he deemed comparable to Oxnard. In paragraph 11, Dr. Kousser describes those cities: 21 plus Oxnard have a citywide limit; 20 plus Oxnard have a district limit; and 33 have no limit at all. 2-ER-83-84. As some cities have only a citywide or district limit but not both, there are 29 cities with one limit or the other. *Id.* Paragraph nine was the first and only time Dr. Kousser considered the 33 cities without a limit.

Dr. Kousser's Table 1 looks at Oxnard's citywide limit as compared to other cities with a citywide limit. 2-ER-85. As presented, Oxnard is in the middle. *Id.* But when compared to all 62 cities, it is the 12th lowest. *Id.* Table 2 tells a similar story. As presented, Oxnard's district limit is in the middle. 2-ER-86. But when compared to all 62 cities, it is tied for 6th lowest. *Id.* In terms of ranking, both Oxnard's citywide limit and its district limit are in the bottom 20th percentile, far from the median.[7] Dr. Kousser also considered the limits on a per capita basis, trying to support the City's argument that Measure B provides candidates with the

---

[7] Twelve of the 62 cities have a citywide limit equal to or lower than Oxnard's. Just 19.4 percent of the cities have a limit this low. Eleven of the 62 cities have a district limit equal to or lower than Oxnard's. This is just 17.7 percent of the cities. This is middle school math, not expert testimony.

12

funding they need, rather than the funding the First Amendment allows. This supports Plaintiff's argument that Measure B is intended to serve more as a means to limit spending than to limit contributions.

Between the time Dr. Kousser prepared his report and today, the California Legislature amended Government Code section 85301 to apply the statewide limit as a maximum default for all local offices. This does not change the analysis in any meaningful way except that, at the time of Dr. Kousser's report, a majority of comparably sized cities had no limit whatsoever. Today, that majority is subject to the statewide default.

Curiously, the City focuses on the Legislature's recognition that the statewide default is not tailored to the needs of individual cities. Under state law, cities are free to consider their needs and impose different limits. AAB 34-35. The City's argument suggests that cities without a lower local limit should be disregarded because they have yet to take the step of considering their local needs. On this point, the City is wrong. Cites that have no limit (or the default limit) *have* considered their local needs. The only difference is that they have decided the issue differently. As a constitutional question, the fact that the majority of cities decided they need limits that are much larger than Oxnard is a danger sign that Oxnard's limits are so low they serve an improper purpose.

Using this distinction as a basis to exclude a majority of cities from its analysis indicates that the City's true motivation is improper. Arguing that only cities with contribution limits have considered their local needs requires a presupposition that contribution limits are inherently good. The Supreme Court has never gone that far. However, the unconstitutional interest in reducing the amount of money in politics has been real since *Buckley* (474 U.S. at 18), and the universal downward creep of contribution limits evidences that objective. See AAB 34-36 (supporting an inference that this is the City's true objective). Cities like Oxnard have gone too far.

### ii. Dr. Kousser's analysis supports Plaintiff's contention that Measure B was targeted at Aaron Starr.

In its opening brief, Plaintiff argued that the Court should consider evidence that Measure B's actual intent was to reduce the amount of money *Aaron Starr spent* on City politics. AOB 24, fn. 4. The City's argument, based on Dr. Kousser's analysis, reinforces that contention: "Of the funds Mr. Starr raised, 57.6% would have been prohibited under Measure B's contribution limits." AAB 15 citing 3-ER-428, Table 3. This adds to a conclusion that Measure B is more about reducing the amount of money in city campaigns than anything that might resemble corruption.

### C. The City Attorney's impartial analysis is not evidence.

In several instances, the City makes arguments based on the City Attorney's impartial analysis of Measure B as if the City Attorney (rather than this Court) gets to decide what Measure B means. See AAB 13, 52. Except in circumstances where an impartial analysis is used to ascertain voter intent with respect to an ambiguous measure, Plaintiff has not found any case where a reviewing court considered the persuasive value of such an analysis.

The impartial analysis is provided for under section 9280 of the California Elections Code. It shall be "an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure" and is limited to 500 words. Superficially, Plaintiff imagines an impartial analysis's comparison to an opinion of the California Attorney General. *See* Cal. Gov't Code § 12519. California courts have recognized that these opinions are not binding but do give them great weight. *Almond All. of Cal. v. Fish & Game Com.*, 79 Cal. App. 5th 337, 358 (2022). They receive deference because they have a "quasi-judicial character and entitled to great respect." *People ex rel. Breuning v. Berry*, 147 Cal. App. 2d 33, 37 (1956). In contrast, the impartiality of an "impartial analysis" is subject to challenge and review in the trial court (*see, e.g., Denny v. Arntz*, 55 Cal. App. 5th 914, 921-22 (2020); *Jobs & Hous. Coal. v. City of Oakland*, 73 Cal. App. 5th 505, 512

(2021)) in a way that is not permitted with respect to an Attorney General opinion. For this reason, the impartial analysis should be disregarded in its entirety because its utility is limited only to situations where a statute's plain language is ambiguous. That is not the case here.

### D. Plaintiff's President has not complained of quid pro quo corruption in Oxnard.

In two instances, the City argues that Aaron Starr, Plaintiff's President, has "complained publicly about corruption in the City." AAB 54 (this instance did not include a record citation); *see also* AAB 26 ("Plaintiff's President, Aaron Starr, posted on social media in February 2020 and September 2020 *alluding to* alleged corruption in Oxnard. 3-ER-439-440." [emphasis added]).

The City's support for this assertion comes from Dr. Kousser's rebuttal expert report. According to Dr. Kousser, there was a February 28, 2020 community forum relating to Measure L (a financial transparency measure on the City's November 3, 2022 ballot) at which someone asked "if there was any proof of a problem at city hall and wanted to know if Measure L is a solution in search of a problem." 3-ER-439:07-09. Dr. Kousser referred to a report of the forum that presented Starr's response: "We had a District Attorney's report a while back that said there is lots of corruption at city hall." 3-ER-439:09-10. Dr. Kousser's report

included another of Starr's statements from the forum: "Today, you won't find corruption at city hall because it won't reach the light of day. You need this because it is going to create an important check and balance." 3-ER-439:10-12.

Context is important here. The District Attorney's Report focused primarily on financial corruption — misappropriation of public funds by the City Manager and other staff — which was Measure L's target.[8] Rather than admitting that campaign contributions are a corrupting influence in the City, Starr's comments focused on the crux of the real concern the District Attorney's report raised, the lack of systems to monitor staff and their expenditures of city funds. Here, rather than demonstrating a concern that elected officials will trade campaign contributions for official favors, Starr was demonstrating his concern that lackadaisical oversight perpetuates an environment which makes it easy for high level city employees to spend City funds for their own benefit.

Dr. Kousser's rebuttal report also identified a social media post he describes as including the following statement attributable to Starr:

---

[8] *See* Coalition for Moving Oxnard Forward, *Official Ballot Argument Supporting Measure L* (2020), accessed from https://www.cfmof.org/yes_on_financial_transparency.

> Imagine if City Hall hosted a voter forum and invited only one side to the debate. You'd think something so corrupt could never happen … but we're talking about Oxnard City Hall. …. However, a keen observer asked Alex Nguyen why Measure B prohibits only gifts to elected officials, but not the City Manager and staff — those who actually make most of City Hall's spending decisions. Nguyen became defensive, claiming such a prohibition was unnecessary because they are 'professional staff' — not elected officials. As if he and his staff are somehow immune to corruption.

3-ER-439:15-40:01. This begs an important question about Measure B's tailoring to concerns raised in the District Attorney's report: Why exactly did it focus on elected officials and ignore staff, who were the most corrupt out of everyone the District Attorney identified. This is significant because even the District Attorney recognized that elected officials have very little power in the City. Elected officials are limited to "policy and legislative decisions," but the City Manager "is the highest-ranking full-time city official and is responsible for the day-to-day operation of city government." 2-ER-227. To this end, the City Council might establish the budget, but the City Manager has effective control over the checkbook. Thus, if there were ever to be an interest in preventing corruption, it stands to reason that the efforts to do so should start with the City Manager and other high level staff members. This is the context of Starr's statement, which is best interpreted as a complaint about Measure B's lack of tailoring than an

admission that quid pro quo corruption is a problem among Oxnard's elected officials.

Dr. Kousser's third and final assertion that Starr admitted to corruption in the City was a social media post where Starr described City finances as "corrupt" for failing to timely report salaries and benefits to the California State Controller, as required by state law. 3-ER-440:01-04. That law, established after the City of Bell scandal (see Cal. Gov't Code § 12463), is intended to identify problems similar to the Oxnard City Manager's unilateral extension of his retirement benefit, an issue in the District Attorney's report. If the City failed to report its current salaries and benefits, perhaps it was hiding something similar, as Starr's comment alluded to.

Starr's concern has been the appearance that City staff might be able to corruptly misappropriate city funds for their own benefit. Contrary to the City's suggestion, there is absolutely no evidence in the record to indicate that he has ever complained about quid pro quo corruption, the only kind of corruption that justifies campaign contribution limits.

### E. The resident satisfaction survey and Measure B's election results are irrelevant.

With its Answering Brief, the City provided a supplemental record excerpt that included an exhibit to the Declaration of Rose Chaparro. *See* SER-030 *et seq.* In

the trial court, Plaintiff objected to that evidence, which was a presentation relating to a survey the City conducted. 2-ER-070. The trial court sustained a hearsay objection that exhibit. 1-ER-028:13-14. Here, the City refers to this excluded evidence without explanation or argument that it was wrongfully excluded. Accordingly, this Court should disregard it. *See* AAB 10, 24-25 (citations to this exhibit).

Relating to the survey, the City relies upon an assertion that "52 percent of those surveyed supported limits on campaign contributions and gifts" while another 23 percent would "probably" support such a measure. AAB 10. Record citations for this statement are 3-ER-447-49 and SER-35. AAB 10. SER-35 is part of the excluded evidence discussed above. 3-ER-447-49 is a report of the City Manager.

The City Manager's report, 3-ER-447-49, does not include the percentages the City relies upon. The presentation includes the percentage but describes it only as supporting "government accountability" with no reference to gifts or campaign contributions. SER-35. To the extent the trial court relied upon the survey results, that was an error because it excluded that evidence and the City's argument misstates that record.

The City's argument on this issue is comparable to its misuse of Dr. Kousser's data. Under the circumstances, based partly on the City's failure to include the survey itself, it is reasonable to infer that the survey was so intentionally vague that it could stand for anything City staff wanted it to stand for. This builds on Plaintiff's argument about the District Attorney's report, where residents are concerned about staff misappropriation of City funds.

Separate from the survey results, the record does show that 82 percent of Oxnard voters voted to approve Measure B. See AAB 11 citing 3-ER-473-74. This is admittedly clearer than the nebulous "issues survey" the City refers to, but it is similarly irrelevant and reinforces the argument above. Measure B did much more than limit campaign contributions. It also prohibited certain types of gifts; set term limits; required the posting of certain contracts on the city website; and more. 3-ER-456-64. Nothing in the record suggests that 82 percent of voters voted for it for any one of these provisions over the others. Looking at the election results, it is as impossible to conclude that voters adopted it because of its contribution limits as it is to conclude that they were so enamored by term limits that they adopted it despite its contribution limits. While not at issue here, this is a large part of the rationale behind California's single subject rule that ordinarily applies to ballot measures. *See* Cal. Const., art. II, § 8.

21

Nonetheless, even if the City had shown that voters adopted Measure B because of its contribution limit, that evidence would not be relevant. A law is not constitutional merely because its popular. *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 754 (2011).

## II. THE CITY'S INDIVIDUAL CONTRIBUTION LIMIT IS UNCONSTITUTIONALLY LOW.

Arguing in favor of Measure B's constitutionality, the City cites this Court's *Eddleman* opinion: "State campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn" — *i.e.*, if they (a) focus narrowly on the state's interest, (b) leave the contributor to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." AAB 18-19 citing *Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003).

On the first factor there is only one interest that is sufficiently important to pass constitutional muster: combating "actual quid pro quo corruption or its appearance." *Thompson II*, 7 F.4th at 817; *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359 (2010). On the second, *Eddleman* is no longer good law. After *Eddleman*, the Supreme Court decided *Randall v. Sorrell*, 548 U.S. 230 (2006).

*Randall* sets forth the test to determine whether a contribution limit is "closely drawn" to the government's interest in combating quid pro quo corruption. (*Thompson v. Hebdon*, 140 S. Ct. 348, 350 (*Thompson I*) [reversing the 9th Cir. for following *Eddleman* rather than *Randall*].) For this reason, Plaintiff applies *Randall* and disregards the City's *Eddleman* argument.

### A. Oxnard has not demonstrated a sufficient interest in preventing quid pro quo corruption.

A constitutional question of fact, such as whether the government has established a sufficiently important governmental interest in a First Amendment restriction is reviewed *de novo*. *Thompson II*, 7 F.4th at 819 citing *Prete v. Bradbury*, 438 F.3d 949, 960 (9th Cir. 2006). As discussed above, the City did not create a sufficient evidentiary record to substantiate its interest in combating quid pro quo corruption.[9] Instead, it tries to shift its burden to Plaintiff as if it is somehow

---

[9] In 2014, the Supreme Court clarified that quid pro quo corruption is limited to the exchange of political favors for campaign contributions. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 291 (2014). Relying on outdated precedent, the City disregards this authority, arguing instead that corruption might include "the broader threat from politicians too compliant with the wishes of large contributors." AAB 21 citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391-92 (2000). Subsequent to *Shrink*, the Supreme Court has held that gratitude, ingratiation, and access are not corruption. *Citizens United*, 558. U.S. at 360.

Plaintiff's obligation to prove a negative. AAB 25. The City's interest in limiting campaign contributions is not a presumption Plaintiff must rebut.

When *Buckley* looked at this interest, it considered it broadly. Overtime the Supreme Court has held that "mere conjecture" is insufficient to carry First Amendment burdens. (*See, e.g., Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2022). Generalized fears are far too speculative.

Looking at this burden, the Ninth Circuit has acknowledged that its pre-*McCutcheon* precedents, requiring minimal evidence to justify a legitimate state interest, might be wrong. *Thompson I*, 140 S. Ct. at 349 (quoting *Eddleman*, 343 F.3d at 1092) (cleaned up). Nonetheless, in its first *Thompson* opinion, the Ninth Circuit continued to follow its prior authority. *Thompson I*, 140 S. Ct. at 349-50. Tracking *Eddleman* to this Court's first *Thompson* case then to its second *Thompson* case and reconciling them with *McCutcheon* and *Citizens United*, a conclusory and generalized fear about corruption is not enough to justify a contribution limit.

As such, the City's evidence does not meet its burden. Indeed, the City's generalized fear is evidenced by a District Attorney's report that does not even

24

relate to quid pro quo corruption.[10] Oxnard residents might fear corruption, but the corruption they fear is city staff taking luxurious trips, eating expensive dinners, and padding their pensions without any public oversight. From that report, Oxnard residents have no fears whatsoever relating to the so-called corrupting influence of campaign contributions, where substantiating the corrupting influence is becoming a higher and higher burden. *Cruz*, 142 S. Ct. at 1652-53 ("few if any contributions to candidates will involve quid pro quo arrangements"); *Citizens United*, 558 U.S. at 357 (same).

Contrary to the interest the City purports to have, the record includes evidence that it had other interests in mind when it proposed and adopted Measure B. Those interests, providing a representative government that is accessible to all citizens, leveling the playing field, limiting special interest influence, and the like, do not justify Measure B's serious intrusion into First Amendment rights.

---

[10] This is different from the evidence relied upon in *Shrink*, 528 U.S. at 393–94 where campaign contributions were directly linked to political favors. Oxnard provided nothing comparable. See AAB 28-29. Even the vote *Shrink* considered is different from Measure B because Measure B considered at least five different subjects, any one of which could have been the real impetus behind its adoption.

### B. Oxnard's limits are not closely drawn to any interest in preventing quid quo pro corruption.

The *Randall* analysis starts with looking for "danger signs." *Thompson II*, 7 F. 4th at 818; *Randall* at 249. If a danger sign is present, the Court must consider the *Randall* factors to determine whether the limit is closely drawn to the government's interest in combating quid pro quo corruption. *Thompson II* at 818; *Randall* at 249, 253.

### i. There are sufficient danger signs to warrant further review.

The trial court erred because it concluded that danger signs did not exist. The City defends the error. It argues that Measure B's limits "are precisely in line with those imposed by other California cities of comparable size"; that courts have upheld similar limits, including a district court ruling allowing a $500 limit in San Diego; and that it is absurd to consider only limits the Supreme Court has approved. AAB 31-32. The City is wrong on all counts.

Looking to *Randall*'s exact words, two danger signs are: "In sum, Act 64's contribution limits are substantially lower than both the limits *we have* previously upheld and comparable limits in other States." *Randall*, 548 U.S. at 253 (emphasis added). There is no rational reading of *Randall* other than to conclude that the danger sign exists in connection to limits the Supreme Court has approved. If the

High Court wanted lower courts to consider their own decisions, it would have said so. Far from absurd, this passes the commonsense test because the Supreme Court is the final arbiter of what is and is not constitutional. Additionally, focusing on the dollar value itself, only the lowest of limits will get the court's attention on this very issue, and that makes sense too because the lowest limits are those that impose the greatest First Amendment burdens.

Because Measure B's limits are lower than anything the Supreme Court has ever approved, this danger sign exists.[11] If the danger sign relating to comparison to other states is read as comparing Measure B to similarly sized cities, that danger sign exists as well. It is on this point that the City's argument has been most disingenuous. By manipulating Dr. Kousser's data to exclude cities with higher limits, the City deceived the trial court into believing that Measure B's limits are close to the median for similarly sized cities. As discussed above, Oxnard's limits are in the bottom 20th percentile — at the time of Dr. Kousser's analysis, more than 80 percent of similarly sized cities had higher limits. This is a second danger sign, and that is enough.

---

[11] Even if the Court looks to limits lower courts have approved, the Measure B limit is lower than anything Ninth Circuit has approved. This Court should disregard the *Thalheimer* decision, which is unpublished and not binding.

### ii. All but one of the five *Randall* factors weigh against Measure B's constitutionality.

Plaintiff's opening brief addressed the five Randall factors. See *Lair v. Bullock*, 798 F.3d 736, 743 (9th Cir. 2015) (summarizing the factors). Of them, one weighs in Measure B's favor (the fact that Measure B's limit is adjusted for inflation). Another relates to political parties and does not apply. Each of the other three weigh against Measure B's validity. Of those, the City only addressed one, whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns." Plaintiff responds to that argument then addresses the City's failure to consider whether there is a "special justification" for limits as low as Measure B's. There is not.

**Measure B prevents challengers from running effective campaigns.**

Plaintiff presented evidence from Aaron Starr that Measure B limited the amount of funding available for challengers to run competitive campaigns. Aside from looking at campaign finance reports, the City did nothing to rebut this. Significantly, in opposition to the City's summary judgment motion, Plaintiff's evidence should have been credited.

Related to this factor, the City looks to *Eddleman* to support its contention: "The party challenging the limits 'must show that limiting donations prevents

candidates from amassing the resources necessary for effective advocacy, making a donee candidate's campaign to be not merely different but ineffective." AAB 38 quoting *Eddleman*, 343 F.3d at 109 (emphasis removed). *Eddlemen* is not authoritative and provides little guidance because it preceded *Randall*. As discussed above, *Thompson I* generally disapproved of (if not overruled) the *Eddleman* test. Moreover, this is another of the City's attempts to shift its burden onto Plaintiff.

Looking to *Randall*, the test is whether "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns." 548 U.S. at 232. Based on the City's own evidence, Measure B deprived Aaron Starr, a challenger, of nearly 60 percent of his campaign funds. 2-ER-92. But for spending his own money, this would have deprived Starr of the ability to run an effective campaign. *See* AAB 39 citing 2-ER-168, 3-ER-186. If any evidence in this case is unrebutted, this is it. The City's argument otherwise focuses primarily on incumbents who were not adversely impacted by Measure B's limits. AAB 40-41. Indeed, that is another of Measure B's problems because that argument unwittingly acknowledges Measure B's effect to protect incumbents. This is exactly what *Randall* sought to avoid.

**There is no "special justification" to warrant limits as low as Measure B.**

Of importance, the Supreme Court specifically called-out the "special justification" factor as a problem for the exceptionally low limit in the Ninth Circuit's first *Thompson* opinion. *See Thompson II*, 7 F.4th at 818 citing *Thompson I*, 140 S. Ct. at 351. That was this Court's focus in *Thompson II* and should be the focus here.

Measure B's limit is obscenely low. If the Court gets here, it presumably decided that the City has a sufficiently important governmental interest in contribution limits. If it does, then the "closely drawn" requirement requires a relationship between the limit and the interest. If the limit is exceptionally low, then there must be a very "special justification" to warrant such a low limit. Here, the City does not even try to make that showing, and the weakness in its interest do not justify such an absurdly low limit.

The arbitrary nature of the Measure B limit undermines the entirety of the City's evidence and argument. If $500 is corrupting influence why are mayoral candidates allowed to accept $750? And if $750 is enough to run in a city comprised of six districts, why do council candidates get $500 instead of $125? Inversely, if city council candidates need $500, why isn't the citywide limit $3,000? The City either arbitrarily selected these numbers or it decided to set a limit that

30

will provide what it thinks is an appropriate amount of funding for a campaign. The latter looks more like a spending limit than a contribution limit and neither is constitutional. On balance, Starr's testimony that Measure B was targeted at him is looking more and more credible.

With respect to tailoring, Measure B's tailoring to an interest in combatting quid pro quo corruption is deficient to such a degree that it supports Plaintiff's argument that Measure B is unconstitutional *per se*. The corrupting influence of either a $500 or $750 contribution is so miniscule that a limit so low can never be closely drawn to an interest in preventing quid pro quo corruption, not in Oxnard nor anywhere else. The only plausible justification for limits this low is an interest in limiting campaign spending and those limits cannot stand.[12]

---

[12] *Shrink* recognized that *Buckley* refused to impose a minimum below which legislatures could not regulate. 528 U.S. 377. This does not prevent subsequent courts from doing so. Following the City's logic, it might argue that a limit of $1.00 is constitutional. That is absurd. If governments continue to test the limit of how low of a limit the First Amendment will tolerate, the time will come when a court must say "no more." Measure B's limits are below that threshold.

### C. Other considerations weigh on Measure B's tailoring to an interest in combating quid pro quo corruption.

#### i. Modern Supreme Court precedents recognize disclosure as a viable alternative to limits.

It is true that there was a time that the Supreme Court held that disclosure requirements were inadequate as compared to contribution limits. However, part of the evolution of campaign finance law is increasing recognition that disclosure might be a better tool for combatting corruption than limits. It is, as the Supreme Court recognized, that "disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech." *McCutcheon*, 572 U.S. at 223. Nearly 10 years ago, *McCutcheon* recognized that "modern technology" has enabled disclosure to be "a particularly effective means of arming the voting public with information," where, thanks to the Internet, "disclosure offers much more robust protections against corruption" than limits. *Id.* It is within common knowledge that this is truer today than it was eight years ago.

#### ii. A candidate's right to raise money is an issue of first impression which distinguishes this case from everything prior.

The City is right that no court has directly established a right to raise money for campaigns. However, Plaintiff has found no case denying that right and the City has not cited one. It is an issue of first impression. Assuming the City is correct

32

about the authoritative value of *Buckley* and its progeny on this question, Plaintiff makes this argument to preserve the issue. Furthermore, this argument is interconnected to the *Randall* factors, discussed above, where recognition of this right supports Plaintiff's argument that Measure B's limits are so low they are unconstitutional *per se*.

## III. The City's Aggregate Limit is Distinguishable from *McCutcheon v. FEC*.

The *McCutcheon* aggregate limit "restricts how much money a donor may contribute in total to all candidates or committees." *McCutcheon*, 572 U.S. at 192. Plaintiff looks at Measure B's aggregate from a slightly different perspective. The aggregate limit Plaintiff complains of is how the limit applies to how much a candidate may receive across each of his or her committees. While candidates would have one campaign for their own election, they might reasonably have other committees for ballot measures or other issues in the City. The City contends Measure B does not apply this way, but that is not how they drafted it.[13] To this

---

[13] The City Attorney's analysis reads more into Measure B than is actually there and should be disregarded. Even if the City Attorney correctly described the drafters' intent, Measure B's plain terms are clear. Therefore, if the drafters' failed to craft legislation that reflected their true intent, then they should remedy that

end, it is a simple question of statutory construction. Also, if Measure B's limit is invalidated, this question would become moot.

## IV. Judgement Should Have Been Entered for Plaintiff.

Going back to the Measure B's limits and the Randall test, Plaintiff considers its own summary judgment motion. Can the Court credit the City's evidence and all reasonable inferences therefrom to preclude summary judgment in Plaintiff's favor? That answer is no. The trial court should have entered summary judgment in Plaintiff's favor.

On the first element, there is neither evidence nor inference which, if credited to the City's favor, supports the governmental interest it claims. The City's conclusory arguments to this fact are not evidence. The only evidence that might be relevant to this question is the District Attorney's report, the survey results, and the election results. None of this is relevant as a matter of law. As such, the uncontroverted evidence is that the City completely failed to substantiate its interest.

---

error by amending the legislation rather than creating shadow legislation whereby the laws of the City are enforced differently from how they are written.

On the second element, there are several bases upon which the Court may order summary judgment for Plaintiff. The first is to recognize the arbitrary nature of the limits where the district limit undermines the validity of the citywide limit and vice versa. Rather than tailoring the limit to a governmental interest, the City seems to have invented them out of thin air. This and every other consideration discussed above serves to both support Plaintiff's motion and preclude the City's.

Perhaps the only disputed fact is whether Measure B allows candidates to raise enough money to wage an effective campaign. Plaintiff says no, and its evidence is credited in opposition to the City's motion. The City says yes, and its evidence might be credited in opposition to Plaintiff's motion. This might warrant trial on that question except that the City does not directly offer this evidence. Instead, it relies on inferences from campaign finance reports. Those inferences are not sufficiently reasonable to be credited.

## CONCLUSION

This Court can invalidate Measure B for several reasons. The most significant among them is the fact that Measure B has no logical connection to an interest in combating quid pro corruption or its appearance. It will take a lot more than $500 or $750 to have a corrupting influence and the City's district limit has no logical connection to its citywide limit. This suggests that both were created from

whole cloth for the purpose of limiting campaign spending in the City rather than combatting corruption. This fails constitutional scrutiny, and summary judgment should be entered in Plaintiff's favor.

Date: May 11, 2022    LAW OFFICE OF CHAD D. MORGAN

By: */s/ Chad D. Morgan*
Chad D. Morgan
*Attorneys for Appellant,*
*Moving Oxnard Forward, Inc.*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**: **21-56295**

I am the attorney or self-represented party.

**This brief contains 6,998 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XXXXX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __/s/Chad D. Morgan_____ **Date** Aug. 31, 2022

37

## CERTIFICATE OF SERVICE

**9th Cir. Case Number(s)**: **21-56295**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[XXXXX] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

**Signature** _/s/Chad D. Morgan_____ **Date** Aug. 31, 2022