U.S. Court of Appeals Docket No. 21-56295
Lower Court Docket No. 2:20-cv-04122-CBM-AFM

December 20, 2024 panel decision:
D. Collins and M. Bennett, Circuit Judges and S. Murphy III, District Judge

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

───────────────────────────

## MOVING OXNARD FORWARD, INC.,
*Plaintiff and Appellant,*

vs.

## MICHELLE ASCENSION, in her official capacity as City Clerk for the City of Oxnard,
*Defendant and Appellee.*

───────────────────────────

## **Petition for Rehearing En Banc**

───────────────────────────

On Appeal From Order Of The United States District
Court For The Central District of California
The Honorable Consuelo B. Marshall, District Judge

───────────────────────────

Holly O. Whatley
Liliane M. Wyckoff
**COLANTUONO, HIGHSMITH & WHATLEY, PC**
790 E. Colorado Boulevard, Suite 850
Pasadena, California 91101-2109
Telephone: (213) 542-5700

Attorneys for Defendant and Appellee Michelle Ascencion, in her
official capacity as City Clerk for the City of Oxnard

# TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 35(b)(1) STATEMENT..........................6

FACTUAL AND PROCEDURAL SUMMARY ..................................... 10

    A.    Oxnard voters approve campaign finance and
gift limits by a 64 percent margin-of-victory ................... 10

    B.    Plaintiff sues, and the trial court grants
summary judgment in the Clerk's favor............................ 13

    C.    In a published decision, a divided Ninth Circuit
panel reverses and remands with direction to
enter judgment for Plaintiff and void the
voter-approved campaign limits ........................................ 14

ARGUMENT............................................................................. 16

I.    Rehearing should be granted because the divided panel's
"closely drawn" analysis introduced a motive inquiry
when evaluating the reasonableness of campaign
finance limits, contrary to this Court's and
Supreme Court precedent. ............................................... 16

    A.    The test to evaluate whether contribution limits
violate the First Amendment is well established. ............ 17

    B.    The panel erroneously veered from precedent and
introduced a motive inquiry to evaluate
Measure B's contribution limits. ........................................ 19

    C.    The majority misapprehended both law and fact
as the record contains no support for the panel's
creation of a fifth risk factor under *Randall v. Sorell*......... 24

II.     Even if a motive inquiry is permitted, rehearing should be
        granted to address the showing a defendant must make
        to establish its sufficiently important interest in a First
        Amendment Challenge to voter-approved contribution
        limits and that the limits are closely drawn. .............................. 28

CONCLUSION ............................................................................. 32

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Boardman v. Inslee,*
978 F.3d 1092 (9th Cir. 2020).................................................. 21

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................. 8, 17, 26, 27

*Daggett v. Webster,*
81 F. Supp. 2d 128 (D. Me.), *aff'd sub nom. Daggett v.
Comm'n on Governmental Ethics & Election Pracs.,*
205 F.3d 445 (1st Cir. 2000) ................................................. 21

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ............................................................. 21

*Lair v. Motl,*
873 F.3d 1170 (9th Cir. 2017)........................................ *passim*

*McCutcheon v. Fed. Election Comm'n,*
572 U.S. 185 (2014) ....................................................... 17, 20

*Montana Right to Life Ass'n v. Eddleman,*
343 F.3d 1085 (9th Cir. 2003)........................................ 19, 21

*Nat'l Comm. of Reform Party of U.S. v.
Democratic Nat. Comm.,*
168 F.3d 360 (9th Cir. 1999).......................................... 8, 27

*Nixon v. Shrink Missouri Gov't PAC,*
528 U.S. 377 (2000) ....................................................... 28, 29

*Randall v. Sorrell,*
548 U.S. 230 (2006) ....................................................... *passim*

*Schickel v. Dilger*,
  925 F.3d 858 (6th Cir. 2019)............................................................ 23, 29

*Thalheimer v. City of San Diego*,
  No. 09-CV-2862-IEG BGS, 2012 WL 177414
  (S.D. Cal. Jan. 20, 2012)......................................................................... 26

*Thompson v. Hebdon*,
  589 U.S. 1 (2019) ............................................................................ 18, 31

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................... 21

**Rules**

Fed. R. Evid. 201 ......................................................................................... 15

## PETITION FOR REHEARING EN BANC

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

In March 2020, Oxnard voters approved the Oxnard Government Accountability and Ethics Act ("Measure B") with 82% voting "yes." Measure B established campaign contribution limits, a gift ban and term limits. The contribution limits apply per election, not per cycle, and uncontradicted expert testimony established the limits are consistent with limits in other, similar cities in California. The limits do not apply to independent expenditure committees or to committees that raise money to support or oppose local ballot measures. And Measure B includes a biennial inflation adjustment.

Plaintiff Moving Oxnard Forward, Inc. sued, alleging Measure B's contribution and gift limits violated the First Amendment. The trial court granted the City's Motion for Summary Judgment and denied Plaintiff's. A divided panel reversed, significantly departing from Supreme Court precedent and creating an intra-circuit conflict. This Court should grant en banc review to address these issues.

6

1. *Evaluation of the actual content and effect of campaign contribution limits subject to a First Amendment challenge, not legislative motivation, is the proper analysis for the "closely drawn" test.* This Court's precedent does not consider legislative motivation when evaluating whether a campaign contribution limit violates the First Amendment. *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017). The panel here nevertheless evaluated the alleged subjective motivation of the City Council in putting Measure B before the voters, who overwhelmingly approved it. Based on its motive inquiry, the panel subjected Measure B to heightened scrutiny under a new "comparatively closer fit" test it created, requiring the contribution limits to fit more closely to the government's asserted interest than the allegedly improper motive advanced by Plaintiff. The panel's approach is inconsistent with *Lair* and the objective analysis outlined in *Randall v. Sorrell*, 548 U.S. 230 (2006). En banc review is warranted to cure the intra-circuit conflict and ensure consistency with Supreme Court authority.

2. *In a facial challenge to contribution limits based on the First Amendment where no equal protection claim is made, questions regarding legislative motive do not support creating a fifth danger sign under Randall v. Sorell.* Plaintiff did not challenge the per candidate contribution limits on equal protection grounds.  Nor did it claim any disparate treatment or introduce evidence of such in support of its motion for summary judgment.  Notwithstanding the lack of allegations or evidence regarding equal protection violations, the panel cited concerns of "invidious discrimination" as the basis for it creating a fifth danger sign under *Randall* and subjecting Measure B to stricter standards.  This conflicts with this Court's decision in *Nat'l Comm. of Reform Party of U.S. v. Democratic Nat. Comm.*, 168 F.3d 360, 366 (9th Cir. 1999).  There, this Court concluded that complaints that a minority party could not raise as much money as a majority one did not constitute a claim of "invidious discrimination" reserved for consideration in *Buckley v. Valeo*, 424 U.S. 1 (1976).  En banc review is warranted to cure this intra-circuit conflict or otherwise harmonize

this Court's precedent regarding the applicable First Amendment analysis of contribution limits in the absence of equal protection claims.

3. *Improper government motives, without more, do not invalidate otherwise objectively reasonable campaign contribution limits.* The uncontradicted evidence below established significant concerns regarding corruption of elected city officials and staff based on a 2012 report from the Ventura County District Attorney, which played an important role in the public debate of Measure B during the election. Voters overwhelmingly approved Measure B.  And the City's uncontradicted expert evidence demonstrated that 93.7% of contributions to citywide offices did not exceed Measure B's limits, demonstrating they did not restrict challengers from mounting effective campaigns. The panel gave little weight to any of this objective evidence, instead placing greater evidence on a declaration from the Plaintiff's president regarding the City's alleged motive, to which the trial court sustained an objection, and which evidentiary

ruling Plaintiff did not appeal.  The panel's decision contradicts

*Randall* on the factors to evaluate contribution limits and other

precedent regarding the hazards of evaluating legislative motive

when analyzing legislation that is objectively reasonable.

## FACTUAL AND PROCEDURAL SUMMARY

**A.    Oxnard voters approve campaign finance and gift limits by a 64 percent margin-of-victory**

Public trust in the City's government was shaken in 2010 when

the Ventura County District Attorney's Office investigated the City

for serious corruption allegations involving elected and non-elected

officials. 2-ER-214. District Attorney investigators raided City Hall

pursuant to a search warrant. 2-ER-216. The investigation resulted in

the comprehensive District Attorney's report issued in 2012 detailing

the close relationships between city officials and private individuals

conducting business with the City. 2-ER-214–215. The investigation

revealed many City officials failed to follow the City's published

ethics standards by accepting large gifts from persons doing business

with the City. 2-ER-223. These gifts included vacations, meals, and event tickets — significant gifts that created a public perception of favoritism and corruption. 2-ER-214, 2-ER-276–278. The gift givers included property owners then engaged in multi-million-dollar property sales with the City. 2-ER-293–305.

Despite the significant nature of the allegations, the District Attorney filed no charges, citing the expiration of the statute of limitations and lack of recordkeeping to prove some allegations. 2-ER-214–215. However, the report pulled no punches in detailing the pervasive nature of the misconduct, and criticized the City for its failure to enforce its own stated ethics policies. 2-ER-309–310. The continued lack of trust in the wake of the investigation was a consideration in the decision to place Measure B before the voters, rather than have the City Council adopt contribution limits and a gift ban on its own authority. 3-ER-487, ¶¶ 7–8.

In Fall 2019, the City commissioned a Resident Satisfaction and Community Priorities Survey to solicit feedback from the community

on several issues, including government accountability measures. 3-ER-447–449; 3-ER-486, ¶ 3; SER-35. The City sought input from the voters regarding the appropriate steps to eliminate the perception of corruption. 3-ER-447; SER-35. The survey results indicated 52 percent of those surveyed definitely supported limits on campaign contributions and gifts to eliminate the perceived influence of special interests on the City government, while another 23% would "probably" support such a measure. 3-ER-447–449; SER-35.

The City developed Measure B to address the public's stated desire to institutionalize good government practices, including prohibiting elected officials and planning commissioners from accepting gifts from lobbyists or city contractors, and imposing the City's first campaign contribution limits. 3-ER-486, ¶ 4; 3-ER-447.

On October 15, 2019, the City Council adopted a resolution calling an election on March 3, 2020 to put adoption of Measure B before the voters. 3-ER-451–467. On March 3, 2020, the voters overwhelmingly approved Measure B, with 82% voting "yes." 3-ER-

473–475. The County Clerk certified the election results to the City

Council on April 21, 2020. *Ibid*. Measure B took effect on May 1, 2020.

3-ER-444, ¶ 9.

## B. Plaintiff sues, and the trial court grants summary judgment in the Clerk's favor.

Plaintiff sued Michelle Ascencion, in her official capacity as

City Clerk for the City of Oxnard ("Clerk"),[1] alleging Measure B  was

unconstitutional.  Plaintiff's first cause of action claimed Measure B

violated the First Amendment because the per candidate limits were

not closely drawn to a sufficiently important governmental interest.

3-ER-521-524.  Its second cause of action alleged Measure B's

aggregate contribution limits violated the First and Fourteenth

Amendments by allegedly treating candidates who also may be

campaigning for or against a ballot measure differently than non-

candidates campaigning for or against ballot measures.  3-ER-524-

---

[1] Lourdes "Luly" Lopez was elected on November 5, 2024, and is the current City Clerk.

13

525.  The third cause of action alleged Measure B's gift ban violated

the First Amendment.  3-ER-525-527.

The Parties filed cross-motions for summary judgment. 1-ER-2.

Though Plaintiff's complaint alleged a facial and as-applied challenge

to Measure B, its Motion for Summary Judgment argued only the

facial challenge. 2-ER-170-201. The District Court granted the Clerk's

motion for summary judgment and denied Plaintiff's motion for

summary judgment. 1-ER-20–21. The Court entered Judgment in

favor of the Clerk. 1-ER-32.

**C.   In a published decision, a divided Ninth Circuit
      panel reverses and remands with direction to enter
      judgment for Plaintiff and void the voter-approved
      campaign limits**

On December 20, 2024, a split panel reversed the trial court and

remanded the matter with directions for the trial court to enter

judgment in Plaintiff's favor.  (Slip op. 27.)  The panel concluded that

the danger signs specified in *Randall v. Sorrell*, 548 U.S. 230, 249–52

(2006), were not exhaustive (Slip op. 15) and introduced a fifth

danger sign, holding Measure B presented "a sufficient constitutional

risk of invidious discrimination against [Plaintiff's president] Starr

and other outsiders like him" to warrant imposing a narrower

tailoring test. (Slip Op. 20).[2]  The panel evaluated the City Council's

motive in placing Measure B before the voters, and held Measure B's

limits were not closely drawn to the  legitimate interests advanced by

the City.  (Slip Op. 6).  Based on this ruling, the panel did not reach

the claim in Plaintiff's second cause of action regarding aggregate

limits.  Nor did the panel reach the third cause of action challenging

---

[2] Aaron Starr is Plaintiff's president.  This Court may take judicial
notice that while Measure B remained in place, Mr. Starr was elected
to the Oxnard City Council in the November 2024 election, defeating
an incumbent. See, Ventura County Clerk-Recorder & Registrar of
Voters November 5, 2024 Presidential General Election Results,
Oxnard City Council District 3 (Dec. 13, 2024),
https://results.enr.clarityelections.com/CA/Ventura/122837/web.345435/#/detail/42.  Fed. R. Evid. 201.

the gift limits because Plaintiff abandoned it on appeal. The panel

designated the decision for publication. (Slip op. 1).

Judge Bennett dissented, concluding the City met its

evidentiary burden to demonstrate its sufficiently important interest

in preventing the risk of actual or perceived quid pro quo corruption

to support limits.  The dissent also concluded that Measure B's voter-

approved limits are closely drawn and that the majority decision

improperly applied a motive test.  (Slip op. 28-54 (M. Bennett, J.,

dissenting.)

## ARGUMENT

**I.**     **Rehearing should be granted because the divided panel's "closely drawn" analysis introduced a motive inquiry when evaluating the reasonableness of campaign finance limits, contrary to this Court's and Supreme Court precedent.**

**A.    The test to evaluate whether contribution limits violate the First Amendment is well established.**

Contribution limits survive First Amendment review if the government demonstrates the limits further a sufficiently important state interest in preventing quid pro quo corruption or the appearance of such corruption and closely draws the limits to avoid unnecessarily abridging associational freedoms.  *Buckley v. Valeo*, 424 U.S. 1, 25 (1976);  *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 206 (2014).

The "closely drawn" analysis begins with a preliminary review of four danger signs the Supreme Court identified in *Randall*, 548 U.S. 230 to determine whether the limits are too low.  The "danger signs" that the limits prevent candidates from raising enough money to be heard and challengers from raising enough to compete against incumbents are: "(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in

the Nation; and (4) the limits are below those we have previously upheld." *Randall*, 548 U.S. at 249–52; also *Thompson v. Hebdon*, 589 U.S. 1, 4 (2019) (holding the standards to evaluate whether contribution limits violated the First Amendment are contained in the plurality opinion in *Randall*).

If any of the four danger signs is present, a court examines five additional considerations to determine whether the statute was closely drawn: (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by exactly the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are ... adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive." *Randall*, 548 U.S. 230; see also *Thompson*, 589 U.S. at 5.

If none of the danger signs are present, the analysis is limited to confirming the limits, (1) focus narrowly on the state's interest, (2) leave the contributor free to affiliate with a candidate, and (3) allow the candidate to amass sufficient resources to wage an effective campaign. *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003).

## B. The panel erroneously veered from precedent and introduced a motive inquiry to evaluate Measure B's contribution limits.

This Court has previously analyzed whether voter-approved campaign contribution limits violate the First Amendment when the challenger alleges an improper legislative motive. *Lair v. Motl*, 873 F.3d 1170, (9th Cir. 2017). In *Lair*, plaintiffs challenged Montana's voter-approved campaign contribution limits as violating the First Amendment. In the voter information pamphlet distributed to voters before the election, the measure's proponents argued "[t]here is just way too much money in Montana politics." *Id.* at 1183. They argued

the measure would prevent "[m]oney from special interests and the

wealthy" from "drowning out the voice of regular people." *Id.* at

1184. The district court concluded this demonstrated an improper

motive inconsistent with the holding in *McCutcheon*, 572 U.S. 185,

that only the prevention of quid pro quo corruption is a sufficient

government interest to support contribution limits. *Lair*, 873 F.3d at

1183.

This Court reversed. "The district court incorrectly cast the

narrow focus test as a motive inquiry that looks at the voters'

underlying intent when they enacted the limits. The narrow focus

test, however, is a tailoring test, not a motive test." *Lair*, 873 F.3d at

1184. The opinion expressly disapproved the district court's

reasoning, noting "[w]e are aware of no case looking to underlying

legislative or voter intent in making" such evaluation, and concluded

the applicable analysis is of "the actual content and effect of the limits

. . .." *Id.* It then analyzed the limits and concluded they passed

constitutional muster under both the *Eddleman* analysis and the

*Randall* test.  *Id.* at 1184–1187.

Lair is consistent with ample precedent that courts "will not

strike down an otherwise constitutional statute on the basis of an

alleged illicit legislative motive."  *United States v. O'Brien*, 391 U.S.

367, 383 (1968); see also, e.g., *Dobbs v. Jackson Women's Health Org.*,

597 U.S. 215, 253 (2022).  And this is especially so when the

challenged law was approved by voters, despite alleged "invidious

motivations" of the measure's sponsors.  See, *Boardman v. Inslee*, 978

F.3d 1092, 1119 (9th Cir. 2020)  "The search for legislative purpose or

motive is always dangerous; it is even more difficult in the case of an

initiative or referendum involving all the voters, where it is

impossible to know what the multitude read, heard or believed in

deciding how to vote." *Daggett v. Webster*, 81 F. Supp. 2d 128, 135,

n.18 (D. Me.), *aff'd sub nom. Daggett v. Comm'n on Governmental Ethics*

*& Election Pracs.*, 205 F.3d 445 (1st Cir. 2000).

Despite *Lair*'s precedent, the panel focused on Plaintiff's allegations regarding the City Council's subjective motive in placing Measure B before the voters. (Slip op. 16-21.) Instead of analyzing the fit of the contribution limits to the government's asserted interest, the majority fashioned a "comparatively closer fit" test, requiring the contribution limits to fit more closely to the government's asserted interest than the allegedly improper motive advanced by Plaintiff. (Slip op. 22.)

This newly fashioned test did not analyze the objective risks to challengers generally, but emphasized the City's alleged subjective motivation regarding Plaintiff's president, Aaron Starr. (Slip op. 16-21). The panel majority did not address *Lair*'s refusal to consider the alleged motive of the challenged limits in Montana. It cited *Lair* merely for the general rules applicable to evaluating constitutional challenges to contribution limits, with no analysis as to *Lair*'s refusal to consider legislative motives. (Slip op. 12-14).

The panel's new, comparative "closely drawn" standard is inconsistent with First Amendment precedent specific to campaign contribution limits and risks all contribution limit cases being subject to a motive inquiry provided a plaintiff simply alleges an improper motive. Importantly, other circuits have declined to apply any analysis stricter than the "closely drawn" analysis the Supreme Court has applied in First Amendment cases involving contribution limits, even when an equal protection claim was advanced. See *Schickel v. Dilger*, 925 F.3d 858, 877–878 (6th Cir. 2019) (collected cases). So too, this Court should decline to apply a stricter standard, as the panel's published comparative standard now does.

Rehearing en banc is warranted to harmonize this case with *Lair* and other precedent that decline to analyze legislative motive, particularly voter-approved legislation, or impose analysis stricter than "closely drawn" when evaluating whether contribution limits violate the First Amendment.

**C.** **The majority misapprehended both law and fact as the record contains no support for the panel's creation of a fifth risk factor under *Randall v. Sorell*.**

Rather than follow firmly established First Amendment doctrine to evaluate contribution limits, the panel created a fifth, new "danger sign" to support its heightened review under *Randall*. (Slip op. 15-16). As the dissent observed, "[t]he majority appears to be the first and only court to identify a danger sign other than the four listed in *Randall*. Such action is not barred by *Randall* or other Supreme Court cases, but the majority is the first court in more than eighteen years since *Randall* to do so." (Slip op. 36-37, n. 8.) The majority created this fifth danger sign based on its finding of a "sufficient danger of invidious discrimination" against "minority parties" or "independent candidacies." (Slip op. 16.) "[T]he record reflects a significant risk that the City may be engaged in 'invidious discrimination' against Starr and challengers like him." (Slip op. 6).

The panel appears to have added this fifth danger sign because none of the four established *Randall* danger signs were present. Measure B's contribution limits apply per election not per cycle (3-ER-479, §§ 2-243(A) & 2-244(A). Higher limits apply to contributions from political action committees, and no contribution limit applies to political parties. *Id.* Uncontradicted expert testimony established the limits are not the lowest in California, much less the nation, and are consistent with limits in other, similar cities in California. 3-ER-421–422, ¶¶ 14–15.[3] Courts have also upheld similar limits, such as San

---

[3] Even among the largest cities in the state, Measure B's limits are higher than the limits in Oakland (population 433,031) and San Francisco (population 881,549), and nearly equivalent to the limits in Long Beach (population 462,628). 2-ER-111–112; 3-ER-423. Measure B's $750 citywide limit, when evaluated at a per resident and per registered voter level, is almost identical to Santa Ana, a city with a population of 332,318 that imposes a $1,000 city wide limit. Compare 3-ER-423 and 2-ER-111. Similarly, despite imposing lower citywide limits overall, Measure B is more generous, on a per resident and per registered voter basis, than the limits in San Diego (population 1,423,851), San Jose (population 1,021,795), and Los Angeles (population 3,979,576). 2-ER-112; 3-ER-423.

Diego's contribution limits of $500 per candidate per election.[4]

*Thalheimer v. City of San Diego*, No. 09-CV-2862-IEG BGS, 2012 WL 177414, at *8–*9 (S.D. Cal. Jan. 20, 2012).

The panel's introduction of concerns of invidious discrimination erroneously imported an equal protection claim into Plaintiff's complaint that is not there.  Plaintiff did not challenge the per candidate contribution limits under an equal protection theory, and alleged no disparate impact on it, its president Starr or any other challenger.  3-ER-521-524.  Plaintiff introduced no evidence of discrimination against challengers as a class in support of its motion. 2-ER-159-165.

*Buckley* instructs that "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions."  *Buckley*, 424 U.S. 1.  This Court has found

---

[4] San Diego has a population five times larger than Oxnard's. 2-ER-111-112.

that a minority-party challenger's argument that it is prevented from raising as much money as majority parties is "not the kind of claim that the Supreme Court reserved for future consideration as invidious discrimination." *National Committee of Reform Party of U.S.*, 168 F.3d at 366.

Despite this Court's precedent construing the type of discrimination claims *Buckley* reserved, the panel erroneously applied rationale applicable to equal protection claims to its analysis of Plaintiff's facial First Amendment challenge to Measure B's per candidate limits. This error formed the base for its novel creation of a fifth risk factor under *Randall*, which no court has done, and which contradicts this Court's ruling in *National Committee of Reform Party of U.S.*, 168 F.3d 360. This Court should grant rehearing to review the panel's creation of a fifth danger sign under *Randall* and conform its precedent as to the applicable standard to apply to facial challenges to campaign contribution limits not based on equal protection claims.

**II.  Even if a motive inquiry is permitted, rehearing should be granted to address the showing a defendant must make to establish its sufficiently important interest in a First Amendment Challenge to voter-approved contribution limits and that the limits are closely drawn.**

The Supreme Court has set forth the burden the government must meet to establish that the threat of quid pro quo corruption is "real, not merely conjectural" when enacting contribution limits. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 393–394 (2000). Evidence of public perception of corruption, generally accepted inferences of impropriety, and news accounts of corruption will meet the government's evidentiary burden. *Id.* at 393–394. So too, is a majority vote enacting campaign finance reform. *Id.* at 394 (74% "yes" vote was evidence of a perception of corruption).

To require the government to demonstrate more than just a general perception of corruption, a plaintiff challenging a contribution limit must provide sufficient evidence to overcome the general presumption that "there is little reason to doubt that

sometimes large contributions will work actual corruption of our political system." *Shrink Missouri,* 528 U.S. at 395. This could include evidence that the contribution limitations have a dramatically adverse effect on campaign funding, or that the limitations prevent candidates from "amassing the resources necessary for effective advocacy." *Id.* at 395–396.

The panel here found the City failed to meet its evidentiary burden to support its sufficient interest in preventing quid pro quo corruption despite no evidence from Plaintiff to overcome the presumption. The panel disregarded the 2012 District Attorney report detailing the corruption uncovered. (Slip op. 24-25). It determined the 7-year gap between the 2012 report and initiating consideration of Measure B in 2019 was too great. *Id.*

But dismissal of the corruption report as not "recent" enough conflicts with precedent in other circuits finding recent scandals are not required to justify the government's interest in preventing corruption. *Schickel v. Dilger*, 925 F.3d 858, 874 (6th Cir. 2019) (citing

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 356 (2010))

(rejecting argument that only "recent scandals" may justify a

contribution ban). Such finding also conflicts with undisputed

evidence the City submitted establishing the 2010 corruption scandal

featured prominently in the debate over Measure B, anchoring its

importance even within the more "recent" period the panel deemed

necessary. 3-ER-438–439.

Moreover, the panel evaluated the City's expert evidence, not

for objective criteria on the effect on candidates, as the additional

considerations of *Randall* require, but instead only for its effect on a

single individual, Starr, despite that Plaintiff did not allege the per

candidate limits violated Equal Protection and made no disparate

impact claims. The City's expert evidence was undisputed as

Plaintiff introduced no expert evidence despite designating experts in

discovery.[5] The panel instead relied on a declaration from Starr

---

[5] Moving Oxnard Forward withdrew their designations after the City
issued deposition subpoenas during the expert discovery phase. 1-

regarding the City's alleged motive in putting Measure B before the

voters. (Slip op. 18.) But the district court sustained the City's

objection to this portion of the declaration, and Plaintiff did not

appeal that evidentiary ruling. 1-ER-30.

The panel's analysis creates significant confusion as to the

evidentiary showing a government must make to defend campaign

contribution limits in a First Amendment challenge. *Randall* outlined

the five additional factors a court should consider when one of the

four danger signs is present. *Randall* at 253–262; see also *Thompson*,

589 U.S. at 5. The panel's decision, however, renders uncontradicted

expert testimony that the contribution limits will not significantly

restrict the amount of funding for challengers to run competitive

campaigns (the first additional *Randall* factor) meaningless if a

plaintiff can overcome it by merely alleging in a declaration the

legislature acted with an improper motive (not among *Randall's*

---

ER-24-25.

31

additional factors).  Governments with existing campaign finance limits, and those contemplating their adoption, should have the benefit of an en banc consideration of the showing they must make if called upon to defend such limits against a First Amendment challenge.

To conform this case with this Court's and Supreme Court precedent, rehearing should be granted.

## CONCLUSION

The Court should grant rehearing en banc.


DATED:  January 3, 2025   **COLANTUONO, HIGHSMITH & WHATLEY, PC**


      s/ Holly O. Whatley
     HOLLY O. WHATLEY
     LILIANE M. WYCKOFF
     Attorneys for City Clerk for the City of Oxnard

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 21-56295

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

X Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** | 4,184 |.
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Holly O. Whatley | **Date** | January 3, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                                 *Rev. 12/01/24*

# NINTH CIRCUIT OPINION

# (ECF 42-1)

# filed December 20, 2024

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOVING OXNARD FORWARD, INC., | No. 21-56295 |
| *Plaintiff-Appellant*, | D.C. No. 2:20-cv-04122-CBM-AFM |
| v. | |
| MICHELLE ASCENSION, in her official capacity as City Clerk for the City of Oxnard, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted March 9, 2023
Pasadena, California

Filed December 20, 2024

Before: Mark J. Bennett[*] and Daniel P. Collins, Circuit

---

[*] Judge Paul J. Watford was a member of the panel at the time the case was argued and submitted. Following Judge Watford's resignation, Judge Bennett was randomly drawn as a replacement judge pursuant to

2          MOVING OXNARD FORWARD, INC. V. ASCENSION

Judges, and Stephen Joseph Murphy III,[**] District Judge.

Opinion by Judge Collins;
Dissent by Judge Bennett

### SUMMARY[***]

### First Amendment/Campaign Contribution Limits

The panel reversed the district court's grant of summary judgment to the City of Oxnard, California, and remanded with instructions to grant summary judgment to plaintiff, Moving Oxnard Forward ("MOF"), in a case in which MOF challenged certain campaign finance limitations in the Oxford City Code as a violation of the First Amendment.

The City adopted campaign finance limitations that would have little practical impact on any recent candidates for municipal elections except for one—Aaron Starr, the President of MOF, a nonprofit corporation whose purpose, according to Starr, is to ensure local government efficiency. Starr had, among other things, engineered recall efforts against a majority of the City Council and came in second in the Mayor's race, consistently relying on larger-dollar contributions. In 2019, the City Council placed

General Order § 3.2.h. Judge Bennett has reviewed the briefs, the record, and the video of the oral argument.

[**] The Honorable Stephen Joseph Murphy III, United States District Judge for the Eastern District of Michigan, sitting by designation.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Measure B on the ballot, limiting an individual's contributions to candidates for City Council and various other City offices. After voters approved Measure B, MOF challenged the campaign finance limitations as a violation of the First Amendment.

Although courts ordinarily should defer to the legislature in determining whether contribution limits are closely drawn to the legitimate governmental interest of avoiding quid pro quo corruption or its appearance, the panel held that the City's contribution limits presented sufficient danger signs of constitutional risks to the democratic electoral process to require the panel to examine the record independently and carefully. Specifically, the record showed a significant risk that the City may be engaged in invidious discrimination against Starr, who has repeatedly challenged the incumbent City government and its policies. The legislative record indicated that (1) Starr and his contributions were a target of the City Council when it proposed and promoted Measure B; (2) Starr was the person who would most be affected by Measure B's passage; and (3) there was a considerable history of antipathy between Starr and the City's elected officials over the years immediately preceding Measure B's adoption.

Reviewing the record independently and carefully, the panel concluded that Measure B's contribution limits were not narrowly tailored to match the City's interest in avoiding the reality or appearance of quid pro quo corruption. The City's asserted reliance on remedying problems identified in a 2010 City corruption scandal bore, at best, a weak and tenuous relationship to Measure B's contribution limits. On this record, Measure B's campaign finance limits were much more closely drawn to the prohibited objective of stopping Starr rather than remedying corruption concerns. The panel,

therefore, concluded that the challenged per-candidate aggregate contribution limitations violate the First Amendment.

Dissenting, Judge Bennett would hold that the City's contribution limits passed First Amendment scrutiny. The City's asserted interest in preventing actual or perceived quid pro quo corruption was fairly supported by the record and Measure B's limits were closely drawn to that interest. The majority's conclusion that the City may be engaged in invidious discrimination against Starr, even if it could be considered outside of the equal protection framework, lacked support in the record. Moreover, in assessing whether the contribution limits were closely drawn to match the City's interest, the majority contravened precedent by applying a motive test instead of a tailoring test.

---

## COUNSEL

Chad D. Morgan (argued), Law Office of Chad Morgan, Anaheim, California, for Plaintiff-Appellant.

Holly O. Whatley (argued) and Liliane M. Wyckoff, Colantuono Highsmith & Whatley PC, Pasadena, California, for Defendant-Appellee.

## OPINION

COLLINS, Circuit Judge:

In this case, Defendant City of Oxnard, California ("the City") adopted campaign finance limitations that, as explained in the City's supporting materials, would have little practical impact on any recent candidates for municipal elections except for one—Aaron Starr, the President of Plaintiff Moving Oxnard Forward, Inc. ("MOF"). Starr has been very active in Oxnard politics, and in doing so he has consistently relied on larger-dollar contributions that, as the City notes, made him a "stark" "outlier" among local candidates. The new campaign contribution limitations, which the City admits "will force [Starr] to change this practice," were proposed by the City the year after Starr engineered an ultimately unsuccessful recall effort against a majority of the City Council and came in second in the race for Mayor. And prior to that, Starr and MOF had successfully supported a ballot initiative that overturned an increase in certain fees that was passed by the City Council and that then became the subject of litigation between Starr and the City. MOF challenged these new campaign finance limitations as a violation of the First Amendment, but the district court granted summary judgment to the City. MOF now appeals.

We conclude that, on this record, the City's contribution limits present sufficient "danger signs" of "constitutional risks to the democratic electoral process" to require us to "examine the record independently and carefully to determine whether [the City's] contribution limits are 'closely drawn' to match" the asserted interest in avoiding the appearance of *quid pro quo* corruption. *Randall v.*

*Sorrell*, 548 U.S. 230, 248–49, 253 (2006) (plurality). Specifically, the record reflects a significant risk that the City may be engaged in "invidious discrimination" against Starr and challengers like him. *Buckley v. Valeo*, 424 U.S. 1, 31 (1976). And, upon conducting that independent and careful review, we conclude that the City's contribution limits are not "narrowly tailored." *Randall*, 548 U.S. at 261. Accordingly, we hold that the City's contribution limits violate the First Amendment.

# I

## A

Aaron Starr is a resident of Oxnard and the President of MOF. MOF is a nonprofit corporation whose purpose, according to Starr, "is to make local government more efficient and make sure that residents receive value for the taxes and fees they pay." Toward that end, "MOF engages in advocacy for and against proposed legislation and ballot measures in the City." In addition, several of MOF's members have run for local office or have supported the campaigns of local candidates.

The electoral efforts of MOF and its members have had mixed success. Starr unsuccessfully ran for a spot on the City Council in 2014, 2016, and 2020, and he came in second in the 2018 mayoral race. MOF, however, had greater success in sponsoring ballot initiatives. In 2016, Oxnard voters passed MOF-sponsored "Measure M," which repealed an increase in the City's wastewater fees.[1] In 2020,

---

[1] Measure M, however, was subsequently invalidated in state court on state-law grounds. *See City of Oxnard v. Starr*, 2020 WL 6042024 (Cal. Ct. App. 2020).

four MOF-supported initiatives were on the local ballot, and three of them were approved by the voters.[2]

In supporting these various campaigns, MOF's and Starr's preference has been, as the City puts it, "to raise large sums of money from a small number of donors." For example, in 2018, Starr raised $8,250 from just five contributors, and more than half of the money he raised involved contributions in excess of $500. However, in October 2019, the Oxnard City Council placed Measure B on the ballot to coincide with the March 2020 presidential primary election. Among other things, Measure B would limit an individual's contributions to City Council candidates to $500 per election and to citywide candidates (such as for Mayor) to $750. The voters approved Measure B, and it took effect on May 1, 2020.

**B**

Four days after Measure B took effect, MOF filed this § 1983 action against the Oxnard City Clerk in her official capacity.[3] The complaint seeks declaratory and injunctive relief against Measure B on behalf of MOF and its members. As relevant here, the complaint asserts two federal claims.

MOF's first cause of action alleges that the various per-candidate contribution limits imposed by Measure B violate the Free Speech Clause of the First Amendment, as made applicable to the States by the Fourteenth Amendment. Specifically, MOF challenges the following limits on

---

[2] The City challenged two of the three successful initiatives in state court and prevailed as to one on state-law grounds and lost as to the other. *City of Oxnard v. Starr*, 303 Cal. Rptr. 3d 819, 823–24 (Ct. App. 2023).

[3] Because the action against the Clerk in her official capacity is functionally against the City, *see Lewis v. Clarke*, 581 U.S. 155, 162 (2017), we will refer to the Defendant as "the City."

contributions that may be made by a "person" to a "candidate for elective office" under the provisions that Measure B added to a new Article VI of Chapter 2 of the Oxnard City Code:

- An aggregate limitation of $500 per election for any given individual's contributions to any one candidate for City Council. *See* OXNARD CITY CODE § 2-243(A).

- An aggregate limitation of $1,000 per election for contributions by any given "political action committee" to any one candidate for City Council. *Id*.

- Comparable aggregate contribution limits for candidates for Mayor, City Clerk, and City Treasurer, except that the contribution limitation for individuals to such candidates is $750 and the limit for political action committees is $1,500. *Id*. § 2-244(A).

- An aggregate limitation of $500 per election for any loan to any candidate for any elected City office. *Id*. §§ 2-243(B), 2-244(B).

These City Code provisions further specify that these numerical contribution limits "shall be adjusted every two (2) years by resolution of the City Council" in accordance

with a specified formula. *Id*. §§ 2-243(A), 2-244(A); *see also id*. § 2-245.[4]

MOF's second cause of action challenges an additional feature of the contribution limits enacted by Measure B. Specifically, in calculating the aggregate contributions made by an individual or by a political action committee for purposes of the measure's contribution limitations, these provisions include, not just contributions to the candidate, but also "contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions." OXNARD CITY CODE §§ 2-243(A), 2-244(A). MOF alleges that, as applied to a candidate for City office who simultaneously controlled a political committee supporting or opposing a City ballot initiative—as Starr had done—these provisions would force that candidate "to choose between receiving a maximum contribution to either his or her campaign or to the ballot measure committee or . . . to divide the maximum contribution in some way between the two." MOF alleges that, because an individual who is *not* a candidate for City office is not subject to any limits on how much he or she may

---

[4] In challenging these provisions, MOF claims that these limits on contributions by any "person" to a "candidate" also apply to contributions made by the *candidate* to his or her own campaign. The district court rejected this reading of Measure B, and we agree. By using the distinct terms "person" and "candidate," the measure's language is more naturally read as denoting that those individuals are not the same. And if we had any residual doubt on this score, the canon of constitutional avoidance would require us to reach that same conclusion, because, as the City concedes, a contrary reading would render Measure B patently unconstitutional. *See Buckley*, 424 U.S. at 53 (holding that a limitation on a candidate's expenditures on his or her own campaign would violate the First Amendment). Accordingly, we proceed on the understanding that Measure B does not apply to a candidate's contributions to his or her own campaign.

contribute to a ballot initiative campaign, the resulting asserted disparate treatment violates both the Free Speech Clause of the First Amendment as well as the Equal Protection Clause of the Fourteenth Amendment.[5]

In late April 2021, the parties filed cross-motions for summary judgment. The district court granted the City's motion, denied MOF's motion, and entered judgment for the City on all claims. MOF timely moved to alter or amend the judgment, and the district court denied that motion. MOF timely appealed the next day. We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo. *See Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

## II

We begin by addressing MOF's first cause of action, which asserts that Measure B's various contribution limits violate the First Amendment.

### A

Under *Thompson v. Hebdon*, 589 U.S. 1 (2019), the controlling standards for assessing whether a campaign contribution limit violates the First Amendment are set forth in Justice Breyer's plurality opinion in *Randall v. Sorrell*, 548 U.S. 230 (2006).[6]   Under *Randall*, "contribution

---

[5] Measure B also enacted additional provisions that limited gifts to certain City officials, *see* OXNARD CITY CODE §§ 2-250, 2-251, as well as provisions instituting term limits for City elected officials, *see id*. §§ 2-3, 2-4. Although MOF initially challenged the gift limitations in a third cause of action in its complaint, MOF has expressly abandoned any such challenge in this court.

[6] In *Thompson*, this court had declined to apply the *Randall* plurality opinion because no opinion in that case had "commanded a majority of

limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" 548 U.S. at 247 (plurality) (quoting *Buckley*, 424 U.S. at 25).

The Supreme Court has "identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *McCutcheon v. FEC*, 572 U.S. 185, 206–07 (2014) (plurality).[7] "Moreover, while preventing corruption or its

---

the Court." *Thompson*, 589 U.S. at 4 n.* (quoting *Thompson v. Hebdon*, 909 F.3d 1027, 1037 n.5 (9th Cir. 2018)). The Supreme Court unanimously reversed our decision, noting that 10 other circuits had "correctly looked to *Randall* in reviewing campaign finance restrictions." *Id*. Indeed, the settled rule is that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citations and internal quotation marks omitted). In *Randall*, Justice Breyer's plurality opinion for three Justices applied a form of lesser scrutiny rooted in *Buckley v. Valeo*, 424 U.S. 1 (1976), in striking down the contribution limitations at issue there, *see Randall*, 548 U.S. at 246–62 (Breyer, J., joined by Roberts, C.J., and Alito, J.), and two other Justices applied strict scrutiny in reaching the same result, *see id*. at 267–73 (Thomas, J., joined by Scalia, J., concurring in the judgment). The "lowest common denominator" between those two opinions, *see Nichols v. United States*, 511 U.S. 738, 745 (1994), is the plurality's narrower holding that the contribution limits were invalid even under a lesser form of scrutiny than strict scrutiny. *See Randall*, 548 U.S. at 272 (Thomas, J., concurring in the judgment) (noting that the plurality did not "err[] in concluding that these limits are too low to satisfy even *Buckley*'s lenient standard"). Accordingly, under both *Marks* and *Thompson*, the *Randall* plurality opinion is controlling.

[7] As in *Randall*, Justice Thomas concurred only in the judgment in *McCutcheon*, adhering to his view that campaign contribution limitations should be subject to strict scrutiny. *See McCutcheon*, 572 U.S. at 228

appearance is a legitimate objective, [a legislative body] may target only a specific type of corruption—'*quid pro quo*' corruption," a phrase that refers only to "a direct exchange of an official act for money." *Id*. at 192, 207 (reaffirming that "[i]ngratiation and access are not corruption" (simplified)); *see also Citizens United v. FEC*, 558 U.S. 310, 359 (2010) ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption."). "And because the Government's interest in preventing the *appearance* of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access." *McCutcheon*, 572 U.S. at 208 (emphasis added).

In order to justify *any* limit on campaign contributions based on this asserted interest, a legislative body cannot rely on "mere conjecture" and must instead point to some threshold evidentiary basis for concluding that voters in that jurisdiction "would tend to identify a big donation with a corrupt purpose." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391–92 (2000); *see also McCutcheon*, 572 U.S. at 218 (plurality) (holding that "speculation . . . cannot justify the substantial intrusion on First Amendment rights" involved in a limitation on campaign contributions); *Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017) (holding that the government must carry this "threshold" burden to show "whether *any* level of limitation is justified"). Our precedent

---

(Thomas, J., concurring in the judgment). Because the *McCutcheon* plurality's reasons for invalidating the limits at issue in that case reflect the "narrowest grounds" for sustaining that judgment, the *McCutcheon* plurality's opinion, like the *Randall* plurality's opinion, is binding on us. *See Marks*, 430 U.S. at 193; *see also supra* note 6.

has described this threshold burden as a low one that merely requires a showing that "the perceived threat" of corruption "is not illusory." *Lair*, 873 F.3d at 1178 (simplified); *but cf. Thompson*, 589 U.S. at 3 (noting that this court has also "acknowledged that '*McCutcheon* and *Citizens United* created some doubt as to the continuing vitality of [this] standard'" (citation omitted)).

If the government carries this threshold burden to "offer[] adequate evidence that its [contribution] limits further the important state interest of preventing quid pro quo corruption or its appearance," we must next consider whether the particular contribution limit at issue is "closely drawn" to this sole legitimate interest. *Lair*, 873 F.3d at 1180. With respect to this inquiry, the Supreme Court has cautioned that the courts are poorly positioned to "determine with any degree of exactitude the precise restriction necessary to carry out" this "legitimate objective[]." *Randall*, 548 U.S. at 248. Because legislative bodies are generally "better equipped to make such empirical judgments," *Randall* explained, the courts "ordinarily" should "defer[] to the legislature's determination of such matters." *Id*.

*Randall* also noted, however, that there will be circumstances in which a restrictive contribution threshold will present "constitutional risks to the democratic electoral process" that are "too great." 548 U.S. at 248. In such cases, deference is inappropriate, and the courts must exercise "independent judicial judgment." *Id*. at 249. Thus, "where there is strong indication in a particular case, *i.e.*, danger signs, that such risks exist (both present in kind and likely serious in degree), courts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward

assessing the proportionality of the restrictions." *Id*. In assessing a statute's tailoring when such danger signs are present, the courts must consider "the serious associational and expressive problems" presented by the statute and determine whether there is "any special justification" that would warrant upholding the statute's restrictions in light of those concerns. *Id*. at 261.

**B**

The parties here vigorously disagree as to whether the City carried its threshold burden to show that Measure B's individual contribution limitations "further the important state interest of preventing quid pro quo corruption or its appearance." *Lair*, 873 F.3d at 1180. We need not resolve this question. Even assuming that the City cleared that threshold, we conclude that (1) Measure B presents sufficient "danger signs" to warrant our "examin[ing] the record independently and carefully to determine whether [Measure B's] contribution limits are 'closely drawn' to match" the asserted interest in avoiding the appearance of *quid pro quo* corruption, *Randall*, 548 U.S. at 253; and (2) Measure B's individual contribution limits do not survive that independent scrutiny.

**1**

The City contends that, under *Randall*, the "danger signs" that would trigger independent scrutiny are limited to the following four specific danger signs that the Court identified in that case: (1) the contribution limits at issue apply "per election cycle, which includes *both* a primary and a general election"; (2) the "limits apply both to contributions from individuals and to contributions from political parties"; (3) the "limits are well below the limits th[e] Court upheld in *Buckley*" and "below the lowest limit

th[e] Court has previously upheld"; and (4) the limits are "substantially lower than . . . comparable limits in other States" and are not "indexed for inflation." *Randall*, 548 U.S. at 249–53, 261 (emphasis added). However, nothing in *Randall* suggests that this list of "danger signs" is exhaustive. On the contrary, *Randall* frames a general standard that asks whether a given set of limitations presents "*constitutional risks to the democratic electoral process*" that are "too great." *Id*. at 248 (emphasis added). An example would be, as in *Randall*, when the extremely restrictive nature of the contribution limit threatens to "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id*. at 249. But nothing in *Randall* suggests that that is the *only* manner in which a contribution limitation may be said to present "constitutional risks to the democratic electoral process." *Id*. at 248.

Moreover, *Buckley* itself underscored that its more lenient standard of review only applies "*[a]bsent record evidence of invidious discrimination* against challengers as a class" or against candidates with particular "present occupations [*e.g.*, non-incumbents], ideological views, or party affiliations." *Buckley*, 424 U.S. at 31 (emphasis added). Given that *Buckley* confirms that such invidious discrimination would preclude application of *Buckley*'s deferential scrutiny, it follows that, under *Randall*, such discrimination is also the sort of "constitutional risk[] to the democratic electoral process" that would require courts to assess the "tailoring" of the contribution limits "independently and carefully." *Randall*, 548 U.S. at 248–49, 253.

We have explained that, in this context, "invidious discrimination" includes discrimination on constitutionally suspect grounds, such as race or sex, as well as "discrimination that tends to harm or repress minority parties" or "independent candidacies." *National Comm. of the Reform Party of the U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 366 (9th Cir. 1999) (quoting *Buckley*, 424 U.S. at 34). Moreover, it is well settled that "invidious" discrimination includes "an effort to suppress the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc. v. City of Victorville*, 143 F.3d 1191, 1194 (9th Cir. 1998) (citation omitted), and that such discrimination may be present even with respect to ostensibly facially neutral laws, *see NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).

Under these standards, we conclude that the undisputed facts concerning Measure B raise a sufficient danger of invidious discrimination to warrant application of "independent[] and careful[]" scrutiny under *Randall*. 548 U.S. at 249, 253. In particular, there are "danger signs" in the record that Measure B, both in its formulation and in its operation, differentially targets Starr, who has repeatedly challenged the incumbent City government and its policies.

First, the legislative record indicates that Starr and his reliance on larger-size contributions were a target of the City Council when it proposed and promoted Measure B. In his declaration in the district court, City Manager Alexander Nguyen stated that, "to educate the voters about Measure B in advance of the March 3, 2020 election," his office "maintained a page on the City's website titled 'About Measure B—The Oxnard Government Accountability and Ethics Act.'" Among the materials uploaded onto that webpage was a PowerPoint slide deck that Nguyen used to

give a presentation in February 2020 to the "Inter-Neighborhood Council Organization," a group "made up of the chairpersons of each active neighborhood council." The PowerPoint, entitled "Measure B: The Oxnard Government Accountability and Ethics Act," provides an overview for voters of what Measure B would and would not do. The PowerPoint's 15 slides describe the measure's various provisions concerning gifts, term limits, and campaign contributions in largely general terms, with one notable exception. The last two slides consist of graphics devoted to showing a particular "[e]xample of the size and volume of campaign contributions for one candidate over [the] past several years." Although these two slides do not name who that "one candidate" is, there is no dispute that it is, in fact, Aaron Starr.

The first of these two slides consists of a map of the United States and a separate close-up map of California, with visual pins identifying each city from which Starr received a contribution, together with the amount of that contribution.[8] Many of the contributions listed are modest, but several are quite large, including a $12,000 contribution from someone in Woodland, California, and one for $8,000 from a resident of Austin, Texas. The slide contains, in the upper right, a large green banner stating "$70,000 RAISED OUTSIDE OF OXNARD." The second slide provides a pie chart and accompanying numbers summarizing the extent to which Starr relied on large contributions. The pie chart shows that, in terms of the number of contributions Starr had received, 68% of them were in an amount that was less than or equal to $750, and 32% were in amounts larger than $750. The slide also showed that, despite the smaller percentage of large contributions, the total *amount* raised from such

---

[8] The slides are attached as an Appendix to this opinion.

contributions was much larger: the total raised from contributions that were over $750 each was $102,400, whereas the total of the smaller-sized contributions was only $15,650.  Next to the pie chart, there is a depiction of a large cartoon of green dollar bills adjacent to the following statement written in bold-face, all-capitals type: "TOTAL CAMPAIGN DONATIONS: $118,050."   The number "$118,050" appears in oversized green font to match the dollar-bill color scheme.

In his declaration in connection with the summary judgment proceedings below, Starr expressly asserted that the record concerning Measure B's enactment demonstrated that it was proposed by the City Council "as a way to reduce the amount of money [Starr] spend[s] in the City, both on [his] personal campaigns and in support of ballot measures [he] ha[s] proposed."  In response, the City did not directly deny that Starr's fundraising practices had been a factor in the City Council's proposing of Measure B.  Instead, it simply stated that (1) its purpose was "to minimize the perception that the City's elected officials are indebted to those who can provide . . . large campaign contributions"; and (2) "[n]either Measure B, nor the associated ballot materials mention[ed] Aaron Starr" by name.

Second, the record makes clear that, in terms of its practical effect on then-existing fundraising practices within the City of Oxnard, Starr was the person who would most be affected by Measure B's passage and that few others would be significantly impacted.  *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("[T]he effect of a law in its real operation is strong evidence of its object.").  The City submitted an expert report that tallied the donations made in the 2018 election, which was the last election conducted before Measure B took effect and

the first that was held after the City's shift from an at-large to a district-based City Council.  The report concluded that "the sorts of large contributions that [Measure B] prohibits were quite rare even before its adoption."  As the report explained, "[o]nly 18 of the 287 donors (6.3% of the donors) giving in Oxnard elections that year contributed sums that would have exceeded the limits" of Measure B, and the total amount of the raised funds by all candidates that exceeded those limits (*i.e.*, \$25,200) represented 25.4% of the total raised (*i.e.*, \$99,168).  "For nearly all candidates," the report stated, "the proportions of their contributions that exceeded the limits were quite small."  But there were a few exceptions.  In particular, the report noted that "[o]nly two candidates raised the majority of their funds in contributions that . . . exceeded the limits," and "[o]ne was mayoral candidate Aaron Starr."  With respect to Starr's campaign, 57.6% of his total funds raised came from contributions exceeding Measure B's limits.  By contrast, as the City notes in its appellate brief, Starr's opponent—then-incumbent Mayor Tim Flynn—"would have lost less than 10% of the funds he raised if Measure B had been in effect," because "[o]nly one of Mr. Flynn's 76 donors made a contribution that would have exceeded Measure B's limits."  As the City aptly summarizes, "Starr is an outlier among candidates," and "Starr's outlier status is even more stark when compared to other candidates' fundraising in the 2018 election."

Third, the record reveals a considerable history of antipathy between Starr and the City's elected officials over the years immediately preceding Measure B's adoption.  Starr has been a sharp critic of the City's elected officials, and he was the "proponent of four recall petitions that triggered a special election" in May 2018 to decide whether to remove the Mayor and three other City Council members.

20    MOVING OXNARD FORWARD, INC. V. ASCENSION

These recall efforts all failed, however, and the four targets of the recall were still on the City Council when it unanimously decided to submit Measure B to the voters in October 2019.  Starr and MOF also successfully proposed Measure M in 2016, which then became the subject of litigation between Starr and the City, with the City prevailing in its efforts to invalidate that measure in state court.  *See supra* at 6 & note 1.  Starr also unsuccessfully ran for City office himself on multiple occasions, coming in second against incumbent Mayor Flynn in the 2018 election.  *See supra* at 6.  As noted, all but one of Flynn's campaign contributions complied with the limits later proposed in Measure B, while most of Starr's did not.  Less than a year after defeating Starr, Flynn voted in favor of Measure B, which the City notes "will force" Starr "to change" his fundraising practices and to "reach out to a broader base for smaller donations."

Taken together, these circumstances raise a sufficient constitutional risk of invidious discrimination against Starr and other outsiders like him.  Given the substantial history of political disagreement between Starr and the City's elected officials; the singular and disproportionate burden that the campaign finance restrictions placed on Starr; and the City's stark use of Starr as the poster child for why these limits should be adopted, there are ample danger signs here that the City's action in proposing Measure B may reflect "an effort to suppress the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc.*, 143 F.3d at 1194 (citation omitted), or to "harm or repress . . . independent candidacies," *National Comm. of the Reform Party*, 168 F.3d at 366 (quoting *Buckley*, 424 U.S. at 34).  Accordingly, under *Randall*, we do not apply

deferential review in examining Measure B's contribution limits.

**2**

We therefore proceed to "examine the record independently and carefully to determine whether [Measure B's] contribution limits are 'closely drawn' to match" the interest in avoiding the reality or appearance of *quid pro quo* corruption. *Randall*, 548 U.S. at 253.

As an initial matter, we reject the City's and the dissent's threshold contention that we are limited to considering *only* the particular "five sets of considerations" that the *Randall* Court evaluated. 548 U.S. at 261. Nothing in *Randall* suggests that the Court there was prescribing a mandatory checklist that must be mechanically applied in assessing narrow tailoring. Moreover, the "danger signs" that trigger independent scrutiny here are distinct from the specific concerns that were presented in *Randall*. Indeed, in addressing the issue of tailoring in *Randall*, the Court simply identified four case-specific features that presented particular concerns before asking, more generally, whether there was "any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that [the Court] ha[s] described." *Id*. Moreover, the Supreme Court has made clear that, with respect to tailoring, the overall issue remains whether there is "a substantial mismatch between the [City's] stated objective" of combating corruption "and the means selected to achieve it." *McCutcheon*, 572 U.S. at 199 (plurality). Accordingly, we are not limited to the specific considerations identified in *Randall* and must instead broadly consider whether, given the danger signs presented here, there is an unwarranted

mismatch between the City's chosen means and professed objective.

In addressing that issue, we begin by assessing whether Measure B's contribution limits are more "closely drawn" to fit (1) the City's asserted legitimate interest in avoiding actual or apparent *quid pro quo* corruption or (2) an alleged prohibited objective of squelching the political activities of Starr and others like him.**9**

---

[9] The dissent errs in suggesting that this amounts to nothing more than a subjective inquiry into legislative motivation. *See* Dissent at 50–54. Rather, the tailoring question is an objective one that asks whether the challenged measure is sufficiently closely drawn to the *legitimate* goal of avoiding the appearance or reality of *quid pro quo* corruption so as to dispel the particular "constitutional *risk*[]" that triggered the application of independent scrutiny, *Randall*, 548 U.S. at 248 (emphasis added)— which here is the risk of invidious discrimination aimed at "suppress[ing] the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc.*, 143 F.3d at 1194 (citation omitted). Insisting on sufficient tailoring to dispel the *risk* of invidious suppression of political opponents is not the same as finding the *reality* of such suppression.    Indeed, settled First Amendment doctrine regularly employs different levels of scrutiny and associated tailoring requirements to address the ultimate risk that "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial *risk* of excising certain ideas or viewpoints from the public dialogue." (emphasis added) (citation omitted)); *Leathers v. Medlock*, 499 U.S. 439, 447 (1991) (noting that "differential taxation of First Amendment speakers is constitutionally suspect when it *threatens* to suppress the expression of particular ideas or viewpoints," but that there was no indication that the tax challenged in that case was objectively "structured so as to raise *suspicion* that it was intended" to "interfere with [cable television's] First Amendment activities"

In asserting that Measure B's particular contribution limits are needed to combat the appearance of corruption in Oxnard specifically, the City relies heavily on a corruption scandal that occurred in Oxnard in 2010. After a May 2010 article in the *Ventura County Star* asserted that various City officials had improperly received significant gifts and failed to report them, the Ventura County District Attorney undertook an extensive investigation that included the execution of search warrants at City Hall and at the homes of several City officials. Although the District Attorney ultimately concluded that "the most serious allegations of criminal conduct [we]re unsupported by the evidence," his nearly 100-page report in April 2012 revealed at least the following five specific areas of concern: (1) a "clear pattern of fiscal waste by a small number of city officials" that allowed City officials to "spend excessively while traveling on city business"; (2) "an improper $10,000 personal loan of city funds" taken out by the then-City Manager, who also "implemented an improper retirement benefit for himself and other city management employees"; (3) improper use of funds regarding "a grand opening celebration at a city water facility"; (4) the fact that "several Oxnard officials received gifts of expensive meals, rounds of golf, and a small number of event tickets," and "did not publicly disclose the gifts as required by law"; and (5) the fact that "[c]lose relationships

(emphasis added)). Moreover, contrary to what the dissent suggests, *see* Dissent at 47 n.16, it is certainly not a point in the City's favor that the record evidence of the risk of invidious discrimination here may also suggest the reality of such discrimination. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992) (noting that the "*possibility*" that the challenged ordinance's content-based selectivity creates for "seeking to handicap the expression of particular ideas" is "alone . . . enough to render the ordinance presumptively invalid," even while noting that the record evidence "elevate[d] the possibility to a certainty" (emphasis added)).

existed between several city officials and private individuals conducting multi-million dollar transactions with the city." The District Attorney ultimately deferred to the judgment of others as to what changes in policies and practices should be made, but his report did indicate that some of these issues may be ones "requiring reform."

For several reasons, this 2010 corruption scandal and resulting investigation bear, at best, a weak and tenuous relationship to Measure B's contribution limits. First, as counsel for the City conceded at oral argument, the problems canvassed in the District Attorney's 2012 report had nothing to do with campaign contributions, or indeed with campaign financing at all. Campaign contributions were not identified as a source of corruption in the report, and the report does not recommend campaign contribution limits as a solution to any of the five problems it does identify. While Measure B's separate *gift* restrictions may well be closely drawn to the problems identified in the District Attorney's report, those restrictions are not at issue here. Second, the City waited until late 2019 before proposing Measure B's gift restrictions and campaign finance restrictions. That timing is a full seven years after the District Attorney's report, but only one year after (1) Starr had forced a recall election against the Mayor and three other members of the City Council; and (2) Starr himself had run against the Mayor, both at the recall election and in the 2018 general election. Third, the 2010 scandal and the 2012 report are not even mentioned as justifications for Measure B's campaign finance limitations in the City's explanatory PowerPoint; rather, that document focuses on Starr's receipt of campaign contributions in large dollar amounts and from out-of-State contributors. On this record, Measure B's campaign finance limits are much more "closely drawn" to the prohibited objective of stopping Starr

than they are to remedying the problems identified in the District Attorney's 2012 report.

The City also notes that, prior to proposing Measure B, the City commissioned a general "Issues Survey" and that survey showed that 77% of voters "would support a Government Accountability measure."  The City further observes that, when presented to the voters, Measure B passed with 82% of votes cast in favor.  But given that "Government Accountability" covers a number of different concerns and Measure B likewise contained a varied mix of provisions governing term limits, gift restrictions, and campaign finance limits, these points provide little, if any, basis for concluding that Measure B's *campaign finance restrictions*—as opposed to its other provisions—were specifically tailored to the public's concerns about local corruption.

The practical effect of Measure B's campaign finance limitations also underscores the comparatively closer fit between these restrictions and the objective of squelching Starr.  As the City's own expert and briefing repeatedly stress, Measure B's financing limitations would have little practical effect on anyone other than Starr, whom the City describes as a "stark" outlier.  Although the City emphasizes that its campaign finance restrictions are in line with those of other comparably sized jurisdictions, that does not mean that *Oxnard's* restriction is closely drawn to the legitimate interests invoked by those other jurisdictions.  As the City's PowerPoint makes clear, Measure B's contribution limits were knowingly set at a level that, in their practical operation, would seriously and differentially affect Starr, while having minimal, if any, effect on every other politician identified in the City's briefing.

We also note that these concerns about the practical effect of Measure B are exacerbated by the fact that its campaign finance limits lack an adequate mechanism to ensure that they will be "adjusted for inflation." *Randall*, 548 U.S. at 261. The City points to the fact that Measure B added § 2-245 to the City Code, which states that the City Clerk shall adjust the contribution limits every two years to account for "changes in the Consumer Price Index." OXNARD CITY CODE § 2-245(A). But rather than make such changes automatically effective according to the specified formula, the City Council expressly *reserved to itself* the authority to review and adopt these changes "by resolution."**[10]** *Id.* Given that a resolution of the City Council is required to make any change to the limits—just as would be required to formally amend them—Measure B, as a practical matter, provides insufficient assurance that the limits will be raised as warranted by inflation.

Finally, we discern no "special justification" in the record that might show that these contribution limits are warranted despite the significant concerns that we have described. *Randall*, 548 U.S. at 261. Accordingly, our "independent[] and careful[] review" of the record confirms that Measure B's contribution limits are not "'closely drawn' to match the [City's] interests" in avoiding the reality or appearance of *quid pro quo* corruption. *Id.* at 253. The challenged per-candidate aggregate contribution limitations in Oxnard City Code §§ 2-243(A)–(B), 2-244(A)–(B) therefore violate the First Amendment.

---

[10] The dissent accepts the City's argument that Measure B supposedly creates a "ministerial" duty that binds *future* City Councils to pass legislation approving the City Clerk's handiwork, *see* Dissent at 45 n.14, but nothing in the text of the measure says that.

## III

MOF's second cause of action challenges one specific feature of these same contribution limits, namely, that they assertedly include, as counting toward the amount of funds that may be contributed to a candidate, any contributions made to political committees supporting or opposing *ballot initiatives* if those committees are controlled by someone who is simultaneously a candidate for office.  The City contends that this claim is based on a misreading of Measure B and that such contributions to ballot initiative committees do *not* count towards the per-candidate aggregate contribution limits.  We need not resolve this issue.  Given that we have concluded that, even apart from this alleged feature, the challenged contribution limits are invalid, any dispute concerning this additional issue is moot.

## IV

For the foregoing reasons, we reverse the district court's grant of summary judgment to the City Clerk and remand with instructions to grant summary judgment to MOF holding invalid the per-candidate aggregate contribution limitations in Oxnard City Code §§ 2-243(A)–(B), 2-244(A)–(B).

**REVERSED AND REMANDED.**

28    MOVING OXNARD FORWARD, INC. v. ASCENSION

BENNETT, Circuit Judge, dissenting:

In 2020, 82% of Oxnard residents who voted on the City of Oxnard's Ballot Measure B approved per-candidate contribution limits for municipal elections by passing the measure. Under the limits, an individual may contribute up to $500 to a candidate for City Council and up to $750 to a candidate for Mayor, City Clerk, or City Treasurer in each election. Moving Oxnard Forward (MOF) challenges the constitutionality of these limits under the First Amendment.[1] Campaign contribution limits pass First Amendment scrutiny if the government (1) "demonstrates a sufficiently important interest" and (2) "employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam); *accord*

---

[1] MOF also challenges Measure B's "aggregate contribution limits," which impose a $1,000 limit on total contributions from political action committees to a candidate for City Council—"including contributions or loans to all political committees or broad-based political committees controlled by the candidate"—and a $1,500 limit on such contributions to candidates for Mayor, City Clerk, and City Treasurer. Interpreting candidate-controlled committees to encompass committees formed to support or oppose ballot measures, MOF argues that aggregate limits are unconstitutional because they "treat[] candidates who support or oppose ballot measures differently from other candidates and otherwise restrict[] their ability to both run for office and campaign for or against a ballot measure." But as confirmed by the City Attorney's "Impartial Analysis for Measure B," the aggregate limit provisions do not apply to committees formed to support or oppose ballot measures. Oxnard, Cal., Ordinance 2976, §§ 2-243(A), 2-244(A) (May 1, 2020). The majority does not reach MOF's challenge to the aggregate limits since it finds that "even apart from this alleged feature, the challenged contribution limits are invalid." Maj. at 27. I would affirm the district court's grant of summary judgment to the City on this claim.

MOF initially challenged Measure B's ban on gifts to elected city officials, but it abandons this challenge on appeal.

*Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality opinion).  Because I would find that the City's contribution limits satisfy this test, I respectfully dissent.**[2]**

## I

In determining the constitutionality of contribution limits, we first ask  "whether 'there is adequate evidence that [the government's] limitation[s] further[] . . . [the] important state interest' of preventing actual or perceived quid pro quo corruption."  *Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017) (alterations besides first in original) (quoting *Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003)).  The majority assumes without deciding that the City has demonstrated this important interest.  Maj. at 14.  I believe that the record shows that the City has so demonstrated.

## A

As the majority correctly notes, "preventing corruption or the appearance of corruption" is the "only . . . legitimate governmental interest for restricting campaign finances" that has been recognized by the Supreme Court.  *McCutcheon v. FEC*, 572 U.S. 185, 206 (2014) (plurality opinion); *accord Citizens United v. FEC*, 558 U.S. 310, 359 (2010).    The Court has narrowed this interest to the prevention of quid pro quo corruption, including "actual *quid pro quo* arrangements" and "'the appearance of [quid pro quo]

---

[2] On cross-motions for summary judgment, the district court granted summary judgment to the City.  Neither party argued below that disputed issues of material fact precluded the district court from ruling on the summary judgment motions.  Neither party argues on appeal that there are disputed issues of material fact precluding summary judgment.  And my review of the record does not reveal any disputed issues of material fact.

30    MOVING OXNARD FORWARD, INC. V. ASCENSION

corruption stemming from public awareness of the
opportunities for abuse inherent in a regime of large
individual financial contributions' to particular candidates."**3**
*McCutcheon*, 572 U.S. at 207 (quoting *Buckley*, 424 U.S. at
27).

Below and on appeal, the City has contended that
Measure B furthers its interest in preventing "[t]he risk of
actual or perceived quid pro quo corruption." At summary
judgment, the district court did not expressly identify quid
pro quo corruption as one of the City's interests before
finding that the City had satisfied its "'evidentiary
obligation' to demonstrate a sufficiently important
governmental interest in contribution limits." The district
court instead referred to the purposes listed in the ordinance
enacted by Measure B,**4** which directly quotes one purpose

---

3 The Supreme Court has defined quid pro quo corruption as "dollars for
political favors." *McCutcheon*, 572 U.S. at 192 (quoting *FEC v. Nat'l
Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985)). The Court
has also provided examples of what is *not* quid pro quo corruption:
"[s]pending large sums of money in connection with elections, but not in
connection with an effort to control the exercise of an officeholder's
official duties," or "the possibility that an individual who spends large
sums may garner 'influence over or access to' elected officials or
political parties." *Id.* at 208 (quoting *Citizens United*, 558 U.S. at 359).

4 The full provision reads:

> The purpose of this Article is to advance compelling
> City interests by limiting large contributions from
> single sources to candidates for Mayor, members of
> City Council, City Clerk and City Treasurer, and by
> imposing reporting and accounting procedures for
> local campaigns. The City's interests are to provide a
> representative government which is accessible to all
> citizens, to deter corruption and the appearance of
> corruption caused by the coercive influence of large

from the Supreme Court's decision in *Buckley v. Valeo*: deterring corruption and the appearance of corruption caused by the "coercive influence of large financial contributions on candidates' positions." 424 U.S. at 25. *Buckley* predates the Supreme Court's decisions in *Citizens United* and *McCutcheon*, in which the Court "limited the important state interest . . . to preventing 'quid pro quo corruption, or its appearance,'" *Lair*, 873 F.3d at 1177 (quoting *Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015)). But even if the "coercive influence of large financial contributions on candidates' positions" does not equal quid pro quo corruption, we may affirm "on any ground raised below and fairly supported by the record." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (2015) (quoting *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013)). The City asserted an interest in preventing actual or perceived quid pro quo corruption below and on appeal. Since, as explained in the next section, this interest is fairly supported by the record, I would affirm the district court's holding that the City has demonstrated a constitutionally permissible interest in contribution limits.

**B**

To demonstrate its interest, the government "must show the risk of actual or perceived quid pro quo corruption is more than 'mere conjecture.'" *Lair*, 873 F.3d at 1178 (quoting *Eddleman*, 343 F.3d at 1092). The government "need not show any completed quid pro quo transactions to satisfy its burden." *Id.* at 1180. It "must show only that the

---

financial contributions on candidates' positions, and to inform the electorate as to the sources and uses of political contributions.

Oxnard, Cal., Ordinance 2976, § 2-240 (May 1, 2020).

perceived threat is not illusory." *Id.* at 1178 (cleaned up) (quoting *Eddleman*, 343 F.3d at 1092). Though "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised," the Supreme Court has recognized that "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) (citing *Buckley*, 424 U.S. at 27). If the government asserts an interest in preventing quid pro quo corruption, there is a "low [evidentiary] bar." *Lair*, 873 F.3d at 1172.

To substantiate its asserted interest in preventing quid pro quo corruption, the City relies on: (1) coverage of a corruption scandal that came to light in 2010, including a 2012 report by the Ventura County District Attorney; (2) support of a "government accountability measure" by more than 75% of voters surveyed by the City in 2019; and (3) approval of Measure B by 82% of those who voted on it in 2020. In reviewing a challenge to Missouri's contribution limits in *Nixon v. Shrink Missouri Government PAC*, the Supreme Court found comparable evidence to be sufficient: "newspaper accounts of large contributions supporting inferences of impropriety," an affidavit from a state senator stating that "large contributions have 'the real potential to buy votes,'" and approval of the measure by "[a]n overwhelming 74 percent of the voters of Missouri [who] determined that contribution limits are necessary to combat corruption and the appearance thereof." 528 U.S. at 393–94. That evidence "d[id] not present a close call" as to whether the state had met its "evidentiary obligation." *Id.* at 393.

I believe the evidence here is comparable, though our record may present a slightly closer call. As both MOF and

the majority contend, the past instances of alleged corruption involved gifts to already elected officials, rather than campaign contributions to candidates,[5] and became public nine years before Measure B was proposed. Maj. at 24. But the City need not provide proof of completed quid pro quo transactions through campaign contributions to satisfy its evidentiary burden. *Lair*, 873 F.3d at 1180. And evidence of the "gifts of vacations, meals, rounds of golf, and event tickets from companies doing significant business with the city" to elected officials[6] suffices to show that the "perceived threat" of quid pro quo corruption is "not illusory." *Id.* at 1178 (cleaned up) (quoting *Eddleman*, 343 F.3d at 1092). An expert for the City also attested that the 2010 "scandal, as well as new allegations of corruption, . . . featured prominently [in] the debate" over Measure B. This

_____

[5] The District Attorney's 2012 report cited alleged gifts in 1998, 2000, 2005, 2006, 2007, 2008, and 2009 to Tom Holden, who served on City Council from 1993 to 2002 and served consecutive two-year terms as Mayor from 2004 to 2012. The report also cited alleged gifts in 2005, 2006, 2007, 2008, and 2010 to Andres Herrera, who served on City Council from 2002 to 2010. Though the 2010 scandal did not expose alleged instances of quid pro quo corruption through campaign contributions, it did feature alleged gifts made to elected officials during years in which they ran for reelection.

[6] One example discussed in the District Attorney's report concerns a trip to Napa by then-Mayor Holden. Holden traveled to Napa on the private jet of businessman Bernard Huberman and charged his hotel stay to Huberman's credit card. Within three months of the trip, BLT Enterprises, a company affiliated with Huberman, submitted a bid for a contract with the City alongside six other applicants. The City's Utilities Task Force, on which Holden served as the ranking member, selected BLT Enterprises to negotiate the new multimillion-dollar contract. The District Attorney's investigation found "no evidence of criminal activity," but the report notes that "suspicions of city leaders' relationships with Bernard Huberman ran high among some city officials and employees."

testimony confirms that coverage of the scandal, along with the survey and vote results, evinces at least the *perception* of quid pro corruption.  The City's evidence—uncontroverted by MOF—clears the "low bar" of showing that the risk of actual or perceived quid pro quo corruption exceeds "mere conjecture." *Id.* at 1172.  Thus, the City has demonstrated its sufficiently important interest.

## II

Having determined that the City has demonstrated a sufficiently important interest in enacting campaign contribution limits, we next ask whether the challenged limits are "closely drawn" to match the government's asserted interest.  *Shrink Mo.*, 528 at 387–88 (quoting *Buckley*, 424 U.S. at 25).  But as part of that inquiry we must preliminarily determine whether the limits are "so low as to exhibit [the] 'danger signs'" that were first identified in *Randall v. Sorrell*. *Thompson v. Hebdon*, 7 F.4th 811, 822 (9th Cir. 2021); *see also id.* at 818.  The presence of any of these four "danger signs" warrants a court's closer review of both the record and "five sets of considerations" (also listed in *Randall*) to determine whether the limit is closely drawn to the government's interest. *Id.* at 818.  Absent these danger signs, the court's "closely drawn" analysis need only confirm that the limits "(a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Eddleman*, 343 F.3d at 1092.

The majority's analysis at this second step suffers from two flaws:  First, the majority's conclusion that "the record reflects a significant risk that the City may be engaged in 'invidious discrimination,'" Maj. at 6 (quoting *Buckley*, 424

U.S. at 31)—which the majority takes to be a new danger sign warranting heightened review under *Randall*, Maj. at 16—lacks support in the record.  Second, the majority's "*more* 'closely drawn'" analysis, Maj. at 22 (emphasis added), contravenes precedent by applying a motive test instead of a tailoring test.  I would find that no *Randall* danger signs are present and that, even under *Randall*'s more searching five-factor tailoring test, Measure B's limits are closely drawn to the City's asserted interest.

## A

The *Randall* plurality identified four "danger signs" indicating that contribution limits are low enough to "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." 548 U.S. at 249.  As the majority notes, in *Thompson v. Hebdon*, 909 F.3d 1027 (9th Cir. 2018), we declined to consider *Randall* "because no opinion [had] commanded a majority of the Court." *Id.* at 1037 n.5; Maj. at 10 n.6.  The Supreme Court unanimously vacated our decision and remanded the case with the instruction to treat *Randall*—including its "danger signs"—as "precedent." *Thompson v. Hebdon*, 589 U.S. 1, 4 & n.*, 5–6 (2019) (per curiam).

Those four danger signs are: (1) the limits are below "limits upheld by the Court in the past"; (2) the limits are below limits "in force in other States"; (3) the limits apply "per election cycle" (including both primary and general elections), rather than applying per election; and (4) the limits apply to contributions not only from individuals but also political parties, "whether made in cash or in expenditures coordinated (or presumed to be coordinated) with the candidate." *Randall*, 548 U.S. at 249; *see id.* at 268

(Thomas, J., concurring in the judgment) (enumerating the four danger signs analyzed by the plurality). None of the four are present here.

First, the City's limits of $500 for candidates for City Council and $750 for candidates for Mayor, City Clerk, and City Treasurer are not below those upheld by the Supreme Court and other courts. Courts in this circuit have found comparable limits for two other Californian cities to be constitutional: a $500 limit in West Covina, *Sotoodeh v. City of West Covina*, No. CV 22-07756, 2024 WL 4113280, at *1, *4 (C.D. Cal. Aug. 13, 2024), and a $500 limit in San Diego, *Thalheimer v. City of San Diego*, No. 09-CV-2862, 2012 WL 177414, at *8–9 (S.D. Cal. Jan. 20, 2012). The Supreme Court and this court have even upheld comparable *statewide* contribution limits. *Shrink Mo.*, 528 U.S. at 383 ($275 to $1,075 for statewide office); *Eddleman*, 343 F.3d at 1088 ($100, $200, and $400 for statewide office).[7] Second, the City's expert presented evidence that Measure B's limits are around the median for limits enacted by California cities of comparable size. Third, Measure B's limits apply per election, not per election *cycle*. Fourth, Measure B's limits do not apply to political parties. Thus, none of the danger signs identified by the *Randall* plurality are present here.

Rather than checking for the four danger signs the Supreme Court specifically listed, the majority recognizes a fifth.[8] Maj. at 14–16. It finds "a sufficient danger of

---

[7] Even adjusting for inflation per the Consumer Price Index, *Shrink Missouri*'s $275 to $1,075 1998 limits equate to about $435 to $1,700 in 2020, and *Eddleman*'s $100, $200, and $400 1994 limits equate to about $175, $350, and $700 in 2020.

[8] The majority appears to be the first and only court to identify a danger sign other than the four listed in *Randall*. Such action is not barred by

invidious discrimination" against "minority parties" or "independent candidacies," and it holds that this type of discrimination constitutes a new *Randall* danger sign. Maj. at 16 (quoting *Nat'l Comm. of the Reform Party of the U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 366 (9th Cir. 1999)). The majority justifies its action because this type of supposed discrimination presents "constitutional risks to the democratic electoral process." Maj. at 15 (quoting *Randall*, 548 U.S. at 248). The majority also notes that "*Buckley* itself underscored that its more lenient standard of review only applies '[a]bsent record evidence of invidious discrimination against challengers as a class.'" Maj. at 15 (quoting *Buckley*, 424 U.S. at 31). And on the majority's read, "the record reflects a significant risk that the City may be engaged in 'invidious discrimination' against Starr and challengers like him." Maj. at 6 (quoting *Buckley*, 424 U.S. at 31). Even assuming that invidious discrimination could be a danger sign warranting heightened review under *Randall*, the record here does not support the majority's "conclu[sion] that the undisputed facts . . . raise a sufficient danger of [such] discrimination." Maj. at 16.

Courts have analyzed whether contribution limits "work . . . invidious discrimination" when plaintiffs have alleged discrimination in violation of equal protection. *Buckley*, 424 U.S. at 30; *see, e.g.*, *Nat'l Comm. of the Reform Party*, 168 F.3d at 366. Addressing equal protection challenges, the Supreme Court and this court have circumscribed what it means for limits to *discriminate* against nonincumbent challengers and have required a factual showing from plaintiffs when such discrimination is alleged. "Absent record evidence of invidious

*Randall* or other Supreme Court cases, but the majority is the first court in the more than eighteen years since *Randall* to do so.

discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." *Buckley*, 424 U.S. at 31. While the Supreme Court has acknowledged, as a reality of our political process, that "[t]hird parties have been completely incapable of matching the major parties' ability to raise money and win elections," *id.* at 98, the Court has never recognized this difference in "funding position relative to their major-party opponents" to constitute invidious discrimination against minority parties, *id.* at 34; *see Nat'l Comm. of the Reform Party*, 168 F.3d at 366. Rather, to determine whether a contribution limit poses a risk of invidious discrimination, the Supreme Court and this court have looked for evidence that the limit "w[ould] have a serious effect on the initiation and scope of minor-party and independent candidacies." *Buckley*, 424 U.S. at 34; *Nat'l Comm. of the Reform Party*, 168 F.3d at 366 ("[T]he *Buckley* Court was reserving the possibility that in the future, plaintiffs *might* be able to demonstrate that the fundraising constraints actually harmed or injured the voting strength of minority parties or their ability to field candidates." (emphasis added)). But a minority-party challenger's argument that a contribution limit "has prevented it from receiving and spending as much money as the major parties" is "not the kind of claim that the Supreme Court reserved for future consideration as invidious discrimination." *Nat'l Comm. of the Reform Party*, 168 F.3d at 366.

To start, MOF has not advanced equal protection, due process, or any other claims based on discrimination by the per-candidate contribution limits.[9] MOF does not allege that

---

[9] MOF does challenge Measure B's aggregate limits on equal protection grounds, but this challenge fails for the reasons explained above. *See supra* note 1.

Measure B's facially neutral per-candidate limits have an unconstitutionally disparate impact, whether on MOF, MOF president Aaron Starr, or all nonincumbent challengers like Starr.  At issue is only the constitutionality of the limits themselves—i.e., whether they are "'closely drawn' to match a 'sufficiently important interest.'" *Shrink Mo.*, 528 U.S. at 387–88 (quoting *Buckley*, 424 U.S. at 25).

Even assuming that the majority can consider invidious discrimination outside of the equal protection framework by treating it as a *Randall* danger sign, MOF's own allegations do not raise the specter of such discrimination.  At most, MOF argues that Measure B's per-candidate limits are so low as to trigger *Randall*'s concern of "insulat[ing] legislators from effective electoral challenge."**[10]**  548 U.S. at 248 (quoting *Shrink Mo.*, 528 U.S. at 404 (Breyer, J., concurring)).  This concern stems from "the typically higher costs that a challenger must bear to overcome the name-recognition advantage enjoyed by an incumbent," *id.* at 256, and therefore amounts to an argument that the limits "prevent[] [MOF] from receiving and spending as much money as the major [or incumbent] parties," *Nat'l Comm. of the Reform Party*, 168 F.3d at 366.  Absent any alleged harm to MOF's "voting strength" or "ability to field candidates," this is not the kind of claim that the Supreme Court reserved for future consideration as invidious discrimination.  *Id.*

And there is no allegation, let alone evidence, of "invidious discrimination against challengers *as a class*." *Buckley*, 424 U.S. at 31 (emphasis added); *see Nat'l Comm. of the Reform Party*, 168 F.3d at 366 ("The term 'invidious

---

[10] As discussed below, MOF's contention that Measure B's limits will prevent nonincumbents from mounting effective campaigns also lacks support in the record.

discrimination' generally refers to treating a class differently in order to harm or repress it. . . . The Court used 'invidious' in *Buckley* in the same sense, i.e., to describe discrimination that tends to harm or repress minority parties."). Even the majority's independent review of the record fails to identify evidence of discrimination against any class. Looking to references to "Starr and his reliance on larger-size contributions" in materials advocating for Measure B, Maj. at 16, the fact that "Starr was the person who would most be affected by Measure B's passage," Maj. at 18, and the "considerable history of antipathy between Starr and the City's elected officials," Maj. at 19, the majority leaps to the conclusion that "[t]aken together, these circumstances raise a sufficient constitutional risk of invidious discrimination against Starr *and other outsiders like him*," Maj. at 20 (emphasis added). But each circumstance cited by the majority is unique to Starr.[11]   No other challengers are identified. The inference that candidates "like" Starr would face the same circumstances is not supported by the record nor even advanced by MOF.[12]

Attempting to individualize the definition of "invidious discrimination," the majority cites *Metro Display Advertising, Inc. v. City of Victorville*, 143 F.3d 1191 (9th Cir. 1998), for the proposition that "it is well settled that 'invidious' discrimination includes 'an effort to suppress the

---

[11] And as discussed above, MOF does not allege that Measure B's per-candidate limits discriminate against a class of one—i.e., Starr.

[12] Indeed, at oral argument, when asked about the presence of other "danger signs" beyond those enumerated in *Randall*, MOF's counsel responded: "If we were to look for other danger signs, I think one would be the inference that Measure B was specifically targeted at reducing the influence of *a singular person* in the city." Oral Argument at 14:31–42 (emphasis added).

speaker's activity due to disagreement with the speaker's view.'" Maj. at 16 (quoting *Metro Display*, 143 F.3d at 1194); *see also* Maj. at 22 n.9 (quoting *Metro Display*, 143 F.3d at 1194). The case is not on point. *Metro Display* concerned not "invidious discrimination" inhibiting association but "'invidious' restraints" on speech. 143 F.3d at 1194. Contribution limits, unlike expenditure limits, largely do not implicate restraints on speech. *Buckley*, 424 U.S. at 21 ("[A contribution] limitation . . . involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues."); *Jacobus v. Alaska*, 338 F.3d 1095, 1108 (9th Cir. 2003) ("Limitations on *contributions* affect the right of association, but unlike expenditure limits, do not primarily implicate the contributor's speech rights."), *overruled in part on other grounds by Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc). Thus, *Metro Display* does not support the majority's definition of "invidious discrimination" or its conclusion that there is a sufficient risk of such discrimination so as to present a new danger sign.

**B**

Here, there are no danger signs present. But even if danger signs are present, that does not end the inquiry in a plaintiff's favor. "[C]ourts, including appellate courts, must review the record independently and carefully with an eye toward assessing the [contribution limits'] 'tailoring,' that is, toward assessing the proportionality of the restrictions." *Randall*, 548 U.S. at 249 (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)). In particular, *Randall* outlines "five sets of considerations" that may mean

that contribution limits are not "closely drawn to meet [their] objectives": (1) the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) "political parties [must] abide by *exactly* the same low contribution limits that apply to other contributors"; (3) volunteer services or expenses are considered contributions that would count toward the limit; (4) the limits are "not adjusted for inflation"; or (5) "nowhere in the record [is there] any special justification that might warrant a contribution limit so low or so restrictive as to bring about . . . serious associational and expressive problems," such as whether "corruption (or its appearance) in [the government] is significantly more serious a matter than elsewhere." *Id.* at 253–61; *see also Thompson*, 7 F.4th at 819–23. Even assuming that heightened review under *Randall* is warranted, these five factors support that Measure B's limits *are* closely drawn to the City's asserted interest.

First, the record does not support that Measure B's contribution limits will "significantly restrict" challengers' ability to run competitive campaigns. *Randall*, 548 U.S. at 253. In *Shrink Missouri*, the Supreme Court found that the district court's finding of candidates' continued ability "to raise funds sufficient to run effective campaigns" was "buttressed" by the state's evidence that in the last election before the challenged limits took effect, 97.62% of contributors to candidates for one statewide office (to be subject to a $1,075 limit in the next election) had made contributions not exceeding $2,000. 528 U.S. at 396. The City presents a similar and even clearer picture here: in the last election before Measure B took effect, 93.7% of contributors to candidates for *all* citywide offices made contributions not exceeding Measure B's *actual limits*.

MOVING OXNARD FORWARD, INC. V. ASCENSION          43

The only contrary evidence MOF offers on this point is testimony from its president, Starr:

> In each of my prior campaigns, I have solicited and received contributions in excess of $500, the limit applicable to my 2020 city council campaign. In 2020, my fundraising was limited because there was little point in expending the effort to raise money in such small increments. If I was not able to fund my own campaign, it would have been impossible for me to raise sufficient funds to wage a competitive campaign with Measure B's $500 limit. Even if it would have been possible, I would have had to spend all my time fundraising rather than campaigning such that the funds would have been meaningless because I would not have had time to do anything with them.

At his deposition, Starr confirmed that he "wasn't pursuing donors as much because it's a lot of time to consume to get money at 200, 300, $400 a crack." Starr testified that he "pretty much fore[went] most all of the fundraising [he] would have done because there [wa]s just no point in asking people for small amounts of money." He estimated that he had spent "not a whole lot more" than ten hours on fundraising for his 2020 race. Even viewed in the light most favorable to MOF, Starr's testimony about his resulting reluctance to fundraise does not create a triable issue of fact as to whether Measure B's limits "*prevent*[] challengers [like Starr] from mounting effective campaigns against incumbent officeholders." *Randall*, 548 U.S. at 249 (emphasis added). And as the *Shrink Missouri* Court

recognized, even assuming "that the contribution limits affected [one candidate's] ability to wage a competitive campaign . . . , a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional."[13]  *Shrink Mo.*, 528 U.S. at 396.

Second, Measure B does not require "political parties [to] abide by *exactly* the same low contribution limits that apply to other contributors." *Randall*, 548 U.S. at 256. In fact, Measure B's limits do not apply to political parties. This factor favors the City. *See Thompson*, 7 F.4th at 821.

Third, volunteer services and expenses are not considered contributions that would count toward Measure B's limits. *See Randall*, 548 U.S. at 259. The ordinance provides that "unless the contrary is stated or clearly appears from the context, the definitions set forth in Chapter 2 of Title 9 of the Government Code of the State of California (commencing at Section 82000) shall govern the construction, meaning, and application of words and phrases used in this Article." Oxnard, Cal., Ordinance 2976, § 2-241 (May 1, 2020). And the California Government Code excludes from the definition of "[c]ontribution" "[v]olunteer personal services or payments made by any individual for the individual's own travel expenses." Cal. Gov't Code § 82015(c)(3). This factor favors the City. *See Thompson*, 7 F.4th at 821.

Fourth, the limits are "adjusted for inflation." *Randall*, 548 U.S. at 261. The ordinance provides that the City Clerk will adjust the contribution limits every two years for

---

[13] Indeed, Starr's testimony makes many of the City's points for it. Why would it be some sort of constitutional negative that contribution limits require candidates to try to raise funds from the many, rather than the very rich few?

"changes in the Consumer Price Index," round the amount to the nearest multiple of 100, and present the new limits to the City Council for "approval by resolution." Oxnard, Cal., Ordinance 2976, § 2-245 (May 1, 2020). According to the majority, because the adjustments are not "automatically effective according to the specified formula" but require the City Council to "review and adopt these changes," there is "insufficient assurance that the limits will be raised" with inflation. Maj. at 26. The majority cites no fact or law to support its finding of insufficiency, let alone its treating the "insufficiency" as presenting a danger sign.        Both the *Randall* plurality and courts applying *Randall* have treated this factor as presenting a danger sign only if the measure outright "*fail*[*s*] to index for inflation." *Id.* at 252 (emphasis added); *Thompson*, 7 F.4th at 821. As explained by the *Randall* plurality, the motivating concern behind this factor is that the burden of updating the limits over time will be placed on "incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral challenges." *Randall*, 548 U.S. at 261. The City's mechanism for indexing addresses this concern by *mandating* the City Clerk to calculate adjustments every two years.[14] So this factor weighs in the City's favor.

---

[14] The majority suggests the City Council could decline to adopt the inflation-adjusted limits presented by the City Clerk, but this risk is speculative. *See* Maj. at 26. At oral argument, when asked if this were possible, the City's counsel responded that the council "would be then subject to a state writ of mandate claim forcing them to comply with their own code" because the ordinance imposes a "ministerial" duty, which the City has "no choice to ignore." Oral Argument at 29:53–30:02, 31:27–37. "A traditional writ of mandate under [California] Code of Civil Procedure section 1085 is a method for compelling a City to

Fifth, the City does not offer any "special justification" for the level of Measure B's limits, so the last factor is not relevant. *Randall*, 548 U.S. at 261. With this factor neutral and the other four favoring the City, the tailoring of Measure B's limits passes muster under even *Randall*'s five-factor test. Absent any factors weighing against the City, *Randall* counsels that we should recognize that "the legislature is better equipped to make such empirical judgments," acknowledge legislators' "'particular expertise' in matters related to the costs and nature of running for office," and "defer[] to the legislature's determination of such matters." *Id.* at 248 (quoting *McConnell v. FEC*, 540 U.S. 93, 137 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310).

Once again, rather than applying *Randall*, the majority decides "we are not limited to the specific considerations identified in *Randall* and must instead broadly consider whether, given the danger signs presented here, there is an unwarranted mismatch between the City's chosen means and professed objective." Maj. at 21–22. As explained above, no danger signs are presented here. But the majority also misstates the inquiry at the second step. The majority frames the inquiry as "whether Measure B's contribution limits are more 'closely drawn' to fit (1) the City's asserted legitimate interest in avoiding actual or apparent *quid pro quo* corruption or (2) an alleged prohibited objective of squelching the political activities of Starr and others like him." Maj. at 22. Rather than analyze the fit of the contribution limit to the government's asserted interest, the

---

perform a legal, usually ministerial duty." *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 280 n.1 (9th Cir. 2018) (quoting *Kreeft v. City of Oakland*, 80 Cal. Rptr. 2d 137, 141 (Ct. App. 1998)).

majority requires a "*comparatively closer* fit"**15** with the asserted interest *over the alleged interest* for the limit to pass constitutional muster. Maj. at 25 (emphasis added). This comparative framing is incorrect. It requires scrutiny into legislative motive,**16** which this court has rejected at step two

---

[15] The majority does not define "more 'closely drawn,'" Maj. at 22, or "comparatively closer fit," Maj. at 25.

[16] The majority purports to apply not "a subjective inquiry into legislative motivation" but "an objective [test] that asks whether the challenged measure is sufficiently closely drawn to the *legitimate* goal of avoiding the appearance or reality of *quid pro quo* corruption so as to dispel the particular 'constitutional *risk*[]' that triggered the application of independent scrutiny—which here is the risk of invidious discrimination." Maj. at 22 n.9 (alteration in original) (citation omitted) (quoting *Randall*, 548 U.S. at 248). There are two problems with the majority's characterization of its tailoring test.

First, it is not the test dictated by controlling precedent. Indeed, the majority reaches for cases involving restraints on speech to support its contention that "settled First Amendment doctrine regularly employs different levels of scrutiny and associated tailoring requirements to address the ultimate risk that 'the government has adopted a *regulation of speech* because of disagreement with the message it conveys.'" Maj. at 22 n.9 (emphasis added) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and citing *Metro Display*, 143 F.3d at 1194; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994); *Leathers v. Medlock*, 499 U.S. 439, 447 (1991); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992)). In so doing, the majority ignores settled First Amendment doctrine specific to campaign contribution limits, which prescribes the levels of scrutiny and associated tailoring requirements to apply to these regulations that "involve[] little direct restraint" on speech. *Buckley*, 424 U.S. at 21; *see id.* at 18 (distinguishing caselaw on time, place, and manner restrictions on speech). *Randall*'s tailoring test for contribution limits is concerned with one particular "constitutional

in evaluating the constitutionality of contribution limits and which the Supreme Court has rejected in the broader context of constitutional adjudication.

In *Lair v. Motl*, we reviewed a First Amendment challenge to Montana's limits on contributions to candidates for statewide office, passed by ballot initiative. 873 F.3d at 1172. Citing justifications advanced by the initiative's sponsors in a "Voter Information Pamphlet" that went beyond quid pro quo corruption,[17] the district court determined that the Montana voters who approved the initiative "acted with an impermissible motive, meaning the limits 'could never be said to focus narrowly on a

---

risk[]"—that the limits are not "too low" to "prevent[] challengers from mounting effective campaigns." 548 U.S. at 248–49.

Second, the majority's characterization of its tailoring test is not the test that it ultimately applies. As discussed above, the majority's conclusion that "the record reflects a significant risk that the City may be engaged in 'invidious discrimination,'" Maj. at 6 (quoting *Buckley*, 424 U.S. at 31), relies on evidence unique to Starr: references to Starr in materials advocating for Measure B, Maj. at 16–18, the relative impact of Measure B on Starr, Maj. at 18–19, and the "considerable history of antipathy" between Starr and the City, Maj. at 19. Whether framed as a search for tailoring sufficient "to dispel . . . th[at] risk," Maj. at 22 n.9, or as a search for a "comparatively closer fit" with the City's asserted interest over its interest as alleged by MOF, Maj. at 25, the majority's test is preoccupied not with objective risks to challengers generally but with the City's subjective motive as it concerns Starr.

[17] The pamphlet "argued '[t]here is just way too much money in Montana politics' and urged voters . . . to prevent '[m]oney from special interests and the wealth' from 'drowning out the voice of regular people,' reasons that are inadequate to justify contribution limits under *McCutcheon*." *Lair*, 873 F.3d at 1183–84 (alterations in original).

constitutionally-permissible anti-corruption interest.'" *Id.* at 1183–84. We reversed, holding:

> The district court incorrectly cast the narrow focus test as a motive inquiry that looks at the voters' underlying intent when they enacted the limits. The narrow focus test, however, is a tailoring test, not a motive test. It measures how effectively the limits target corruption compared to how much they inhibit associational freedoms . . . .

*Id.* at 1184 (citing *Buckley*, 424 U.S. at 28; *Eddleman*, 343 F.3d at 1094). Finding "no case looking to underlying legislative or voter intent in making this evaluation," we noted that the touchstone at step two was not legislative motive but "the actual content and effect of the limits"—that is, whether the limits "target the contributions most likely to generate corruption or its appearance." *Id.*

The "narrow focus" language in *Lair* comes from our formulation of the standard for the constitutionality of contribution limits, first articulated in *Montana Right to Life Association v. Eddleman*:

> After *Buckley* and *Shrink Missouri*, state campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn"—i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and

> (c) allow the candidate to amass sufficient
> resources to wage an effective campaign.

343 F.3d at 1092; *Lair*, 873 F.3d at 1175–76. In *Thompson*,
we applied the *Eddleman* standard and declined to consider
the plurality opinion in *Randall*, as discussed above.
*Thompson*, 909 F.3d at 1037 n.5. The Supreme Court
vacated our decision, noting that our failure to apply *Randall*
in favor of "relying on [our] own precedent predating
*Randall* by three years" (referring to *Eddleman*) represented
a divergence from ten of our sister circuits. *Thompson*, 589
U.S. at 4 & n.*. On remand, we considered *Randall*'s five
"danger signs" in analyzing whether the challenged limits
were "closely drawn" to meet the state's asserted interest in
combating "actual quid pro quo corruption or its
appearance." *Thompson*, 7 F.4th at 817, 819–27. Like
*Eddleman*, *Randall* understood the "closely drawn" analysis
as a question of "narrow[] tailor[ing]." *Randall*, 548 U.S. at
261. Nothing in *Randall* undercuts our characterization in
*Eddleman* of the "closely drawn" analysis as a narrow focus
test, 343 F.3d at 1092, or our characterization in *Lair* of that
test as a "tailoring test, not a motive test," 873 F.3d at 1184.
The *Randall* plurality did not look to legislative motive in its
analysis of any of the five factors it identified to evaluate the
tailoring of contribution limits:

> (1) whether the limits would significantly
> restrict the amount of funding available for
> challengers to run competitive campaigns;
> (2) whether political parties must abide by
> the same low limits that apply to individual
> contributors; (3) whether volunteer services
> or expenses are considered contributions that
> would count toward the limit; (4) whether the

> limits are indexed for inflation; and
> (5) whether there is any "special
> justification" that might warrant such low
> limits.

*Thompson*, 7 F.4th at 818 (citing *Randall*, 548 U.S. at 244–
62). Even in analyzing the last factor, the *Randall* plurality
considered "justifications *the State ha*[*d*] *advanced* in
support of such limits." *Randall*, 548 U.S. at 261 (emphasis
added).

The majority points to "no case looking to underlying
legislative or voter intent" in assessing the constitutionality
of contribution limits. *Lair*, 873 F.3d at 1184. And I believe
precedent counsels our not doing so. The Supreme Court
has specifically instructed courts to not "second-guess a
legislative determination as to the need for prophylactic
measures where corruption is the evil feared." *FEC v. Nat'l
Right to Work Comm.*, 459 U.S. 197, 210 (1982); *accord
FEC v. Beaumont*, 539 U.S. 146, 157 (2003). And we have
followed the Supreme Court's instruction in evaluating First
Amendment challenges to contribution limits. *Jacobus*, 338
F.3d at 1098, 1115 (contributions to political parties); *Lair*,
873 F.3d at 1179–80 (contributions to candidates); *see also
Lair v. Motl*, 889 F.3d 571, 581 (9th Cir. 2018) (Fisher &
Murguia, JJ., responding to the dissent from the denial of
rehearing en banc) (quoting *Nat'l Right to Work Comm.*, 459
U.S. at 210, to explain that the *Lair* majority followed
longstanding precedent of deferring to legislative
determinations of the need for prophylactic contribution
limits).

To defend its searching scrutiny into the City's "true"
motive, the majority cites only to *Church of the Lukumi
Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)—

a free exercise case—for the proposition that "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535 (plurality opinion). The *Lukumi* plurality attempted to "determine the city council's object from both direct and circumstantial evidence," such as "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 540. Declining to join this portion of the opinion, Justice Scalia objected to the plurality's motive inquiry:

> [Such an inquiry] departs from the opinion's general focus on the object of the *laws* at issue to consider the subjective motivation of the *lawmakers*, *i.e.*, whether the Hialeah City Council actually *intended* to disfavor the religion of Santeria. . . . [I]t is virtually impossible to determine the singular "motive" of a collective legislative body, and this Court has a long tradition of refraining from such inquiries.
>
> Perhaps there are contexts in which determination of legislative motive *must* be undertaken. But I do not think that is true of analysis under the First Amendment (or the Fourteenth, to the extent it incorporates the First).

*Id.* at 558 (Scalia, J., concurring in part and concurring in the judgment) (citations omitted).

It is a "fundamental principle of constitutional adjudication" that courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (declining to invalidate a statute with an allegedly suspect motive when the legislature "had the undoubted power to enact" it, *id.* at 384); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 652 (1994); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986). The Supreme Court "has long disfavored arguments based on alleged legislative motives," out of recognition that "inquiries into legislative motives 'are a hazardous matter.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) (quoting *O'Brien*, 391 U.S. at 383) (collecting cases). "Even when an argument about legislative motive is backed by statements made by legislators who voted for a law, [the Court] ha[s] been reluctant to attribute those motives to the legislative body as a whole." *Id.* at 253–54. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 254 (quoting *O'Brien*, 391 U.S. at 384). A motive inquiry becomes even more unworkable when the law was placed on the ballot and passed by voters. And we have "refuse[d] to impute upon . . . voters the allegedly invidious motivations" of a ballot measure's sponsors. *Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020) (rejecting an equal protection challenge to a ballot initiative because "there [was] no evidence in the record . . . indicating that *the more than 2.2 million Washington voters* who voted in favor of Initiative 1501 were motivated" in the same way as its union sponsors allegedly were).

The majority nonetheless dives headfirst into a legislative motive inquiry. Its case for the City's alleged

illicit "objective of squelching Starr" rests in large part on two slides of a PowerPoint presentation created by the City's unelected City Manager. Maj. at 25; *see* Maj. at 16–18; App. The majority fails to consider that what motivated a city employee to make a PowerPoint presentation about a law is not necessarily what motivated thousands of others to enact it. No evidence shows that the *25,393* Oxnard voters (again, 82% of those who voted on the measure) who cast a ballot in favor of Measure B were motivated by whatever had motivated the City Manager or sponsors of Measure B. And any "alleged illicit legislative motive" is irrelevant because the City—and its voters—"had the undoubted power to enact" these campaign contribution limits for their candidates for elected office. *O'Brien*, 391 U.S. at 383–84.

\*    \*    \*

Because the City's contribution limits are closely drawn to its interest in preventing quid pro quo corruption, I would affirm the district court's grant of summary judgment to the City. I therefore respectfully dissent.

## **APPENDIX**



