**No. 21-56295**

## In the United States Court of Appeals for the Ninth Circuit

Moving Oxnard Forward, Inc.,

*Plaintiff-Appellant*,

v.

Lourdes Lopez, et al.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-04122-CBM-AFM
Hon. Consuelo B. Marshall

### Appellant's Response to Petition for Rehearing En Banc

**Chad D. Morgan, Esq.**
Law Office of Chad Morgan, APC
1950 W. Corporate Way #12279
Anaheim, CA 92801
Tel: 951-667-1927
Email: chad@chadmorgan.com

*Attorneys for Appellant*
Moving Oxnard Forward, Inc.

# TABLE OF CONTENTS

**Table of Contents** ............................................................... 2

**Table of Authorities** ............................................................ 3

**Response to Petition for rehearing en banc** ................................. 4

    A.    The Panel in this Case was the First Ninth Circuit Panel to Correctly Apply *Randall v. Sorrell.* ............................................5

    B.    *Randall* is Controlling Supreme Court Precedent that Abrogated *Lair v. Motl.* ............................................................12

    C.    The Panel Opinion Did Not Improperly Consider the City's Motive. ...................................................................................14

    D.    Oxnard's Contribution Limits are Lower than Anything the Supreme Court has Upheld and are Lower than Most Other California Limits. ..............................................................21

**Conclusion** ......................................................................22

**Certificate of Compliance** .................................................24

**Certificate of Service** ......................................................25

# TABLE OF AUTHORITIES

**Cases**

*Boardman v. Inslee*, 978 F.3d 1092 (9th Cir. 2020) ............................................. 14, 19

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..................................................................passim

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008).............................................6, 7

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)..................................16

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) .......................................................12

*Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015)..........................................................12

*Lair v. Motl*, 189 F. Supp.3d 1024 (D. Mont. 2016) ...............................................17

*Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) .....................................................passim

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014) ......................10, 13, 17, 18

*Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) .......4, 12, 17

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) .............................................. 6

*Randall v. Sorrell*, 548 U.S. 230 (2006) ...........................................................passim

*Stromberg v. People of State of California*, 283 U.S. 359 (1931)................................16

*Thompson v. Hebdon*, 589 U.S. 1 (2019).............................................................passim

*Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) .................................................. 13

*Thompson v. Hebdon*, 909 F.3d 1027 (9th Cir. 2018)...........................................4, 12

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................................14, 15, 16, 19

**Other Authorities**

Bureau of Labor Statistics, CPI Inflation Calculator.................................................7

**RESPONSE TO PETITION FOR REHEARING EN BANC**

In response to the Court's January 27, 2025 order, Plaintiff-Appellant Moving Oxnard Forward, Inc. (Appellant) responds to the Petition for Rehearing En Banc by Defendant-Appellee Lourdes Lopez, in her official capacity as the City Clerk for the City of Oxnard (the City). The City petitions for rehearing on the grounds that the panel opinion (1) created an intra-Circuit conflict with *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) (*Lair III*) and that it (2) conflicts with the Supreme Court's *Randall v. Sorrell*, 548 U.S. 230 (2006) opinion. But both cannot be true because it is *Lair III* that conflicts with *Randall*.

In the *Lair* cases, this Court concluded that *Randall* was not binding because it was a plurality opinion. *Lair III*, 873 F.3d at 1177. Indeed, in *Lair III*, this Court described *Randall* not as abrogating its prior rule but as putting that rule on "less stable footing." *Id.* at 1176; see also *id.* at 1175-76 (citing *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003) (the prior rule)). The Supreme Court corrected this error. *Thompson v. Hebdon*, 589 U.S. 1, 2 (2019) (*Thompson II*).

The instant case is the first time since *Thompson v. Hebdon*, 909 F.3d 1027 (9th Cir. 2018), vacated, 589 U.S. 1 (*Thompson I*) that this Circuit independently applied *Randall*. In this context, there is no Circuit precedent with which it can conflict. In any event, the panel opinion at issue here is the first time that a panel of

4

this Court has correctly applied *Randall* in the first instance. Therefore, rehearing en banc is inappropriate in this case.

### A. The Panel in this Case was the First Ninth Circuit Panel to Correctly Apply *Randall v. Sorrell*.

The test that evaluates a contribution limit's validity is rooted in *Buckley*'s recognition that "governmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (cleaned up). In deciding the case before it, *Buckley* simply stated that contribution limits "are permissible as long as the government demonstrates that they are "closely drawn" to match a "sufficiently important interest." *Randall*, 548 U.S. at 247, quoting *Buckley* at 25 (cleaned up). *Randall* did not abrogate this basic two-part test.

But *Buckley* itself recognized that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." 424 U.S. at 21. Since then, there have been intensified concerns that "contribution limits might sometimes work more harm to protected First Amendment interests than their anticorruption objectives could justify." *See*

*Randall*, 548 U.S. at 247-48 (italics removed); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 395-97 (2000) (*Shrink*).

Assuming a contribution limit is genuinely aimed limiting corruption (and is not actually an attempt to reduce money in politics)[1] then lower limits are not always better because lower limits "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Randall*, 548 U.S. at 248-49. Thus, the framework against which courts evaluate contribution limits must recognize that as a contribution limit approaches a lower boundary, it proves itself to be "an obstacle to the very electoral fairness it seeks to promote." *Id*. at 249. To this end, there is necessarily a point below which no contribution limit can be sustained regardless of the legitimacy of the governmental interest. *Id*. at 248; *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 737 (2008).

------

[1] As contribution limits move incrementally downward, it is hard to believe that real purpose of most limits is anything but reducing the amount of money in politics. *See, e.g.,* Slip Op., Appendix (limiting expenditures was a big part of the City's motive in this case); *see also* 1-ER-58-59; 1-ER-102; *Randall*, 548 U.S. at 243 (describing the government's effort to justify the measure's expenditure limit). Framing a spending limit as a contribution limit is an end-around the substantial majority view that spending limits violate the First Amendment every time they are implemented. *See, e.g., Buckley*, 424 U.S. at 108.

Looking to the two-part *Buckley* test, the panel opinion assumed that the City satisfied the first part by sufficiently demonstrating its interest in contribution limits as a means of preventing quid pro quo corruption or its appearance. Slip Op., 14; *see also Lair III,* 873 F.3d at 1175. Therefore, the only issue in this petition is whether Oxnard's Measure B is "closely drawn" to match that interest.[2] *See Lair III* at 1175; *Randall*, 548 U.S. at 247.

More specifically, the disputed issue is how to apply the second part of that test. On this issue, *Buckley* observed that courts have no "scalpel to probe" whether a $1,000 limit is as good as or better than a $2,000 limit.[3] 424 U.S. at 30. From this, a pattern of legislative deference developed even though *Buckley* did not expressly demand it. *See, e.g., Davis*, 554 U.S. at 737. To this end, the need for deference started a practical reality and morphed into a rule of law.

Before *Thompson II*, 589 U.S. 1, this Circuit required that district courts conduct the closely drawn analysis with "significant deference to the legislative process." *Lair III*, 873 F.3d at 1180. *Randall* turned this upside down. Recognizing

---

[2] Appellant does not concede that the City made this showing.
[3] In today's dollars, a $1,000 limit from 1976 would be more than $5,700. U.S. Bureau of Labor Statistics, CPI Inflation Calculator, accessed Feb. 13, 2025 from https://www.bls.gov/data/inflation_calculator.htm.

a contribution limit's potential danger to democratic elections, *Randall* prohibits courts from deferring to legislatures whenever there are danger signs that a contribution limit might be such an obstacle to fairness. 548 U.S. at 248-49. In such cases, courts must put in the effort to "review the record independently *and carefully* with an eye toward assessing the statute's tailoring." *Id.* at 249 (emphasis added/cleaned up).

On the facts before it, *Randall* identified four danger signs that demonstrated the risk that the Vermont limit was an obstacle to electoral fairness. 548 U.S. at 250-253; see also *id.* at 268 (Thomas, J., concurring) (summarizing the plurality op.). The City suggests that the four danger signs demonstrating that risk as to the Vermont law are the only danger signs that should be considered with respect to every other contribution limit a court might consider. But *Randall* simply observed the four danger signs that were present in the case before it.

On balance, the danger sign analysis relates back to *Buckley*'s observation that courts do not have a scalpel to probe the better of two otherwise acceptable limits (424 U.S. at 30) and forces courts to look carefully at limits that might be problematic (*id.* at 21). Thus, while the danger signs *Randall* found may be exemplar of danger signs that are often present in other cases, there is nothing in *Randall* to suggest that it established an exclusive list of the only danger signs that

8

might be present in every other case. To the contrary, there might be any number of reasons why a contribution limit *could be* an obstacle to electoral fairness.

Because danger signs only affect the level of deference the court should give to the legislature, the next step is to determine whether the limit is closely drawn to a governmental interest in combatting quid pro quo corruption. *Randall*, 548 U.S. 248-49. If danger signs exist, then there is no deference, and the Court must carefully review the record to evaluate the limit's tailoring. *Id.* at 249. When *Randall* did this, it found five reasons why the Vermont limit was not closely drawn to the necessary governmental interest. 548 U.S. at 253-61. *Lair* described these five sets of considerations as controlling this analysis. *Lair III*, 873 F.3d at 1186-87. It summarized them:

> (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by exactly the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are ... adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive."

*Id.* (citing *Randall*, 548 U.S. at 253-62).

But just as there are many different signs that that a contribution limit might be an obstacle to electoral fairness, there are also many reasons why a contribution limit may not be closely drawn to the interest in combatting quid pro quo

corruption. One jurisdiction's limit might be invalid (*or valid*) for reasons that are different from its neighbor. To this end, *Randall* provides for a case-by-case analysis where the ultimate goal is to see if there is a "substantial mismatch between the [City's] stated objective" and "the means selected to achieve it." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014) (plurality). Therefore, relevant considerations include not only the *Randall* considerations but also the three considerations *Eddleman* established as its test (*see* 343 F.3d at 1092) and anything else the facts of a case present.

*Thompson II*, 589 U.S. 1 is the only time the Supreme Court has revisited this issue since *Randall*. Rather than describe *Randall* as setting forth a four-factor danger sign test, *Thompson II* simply stated what *Randall* did: It "identified several 'danger signs' about Vermont's law that warranted closer review", so it independently reviewed the record to determine that law's constitutionality. *Thompson II* at 5; *see also Randall*, 548 U.S. at 249. More significantly, *Thompson II* conflated danger signs from the first part of the test with the considerations *Lair* described as the second part of the test. *Compare Thompson* II at 5-6, *with Lair III*, 873 F.3d at 1176. This underscores the panel's conclusion that *Randall* is more of an open-ended framework than it is a rigid test.

To frame its closely drawn analysis—to decide whether it would evaluate Measure B's tailoring with deference to the City or whether it should independently and carefully review the record —the panel opinion looked for a danger sign (it only needed one) that Measure B would operate in a way that presents constitutional risks to the democratic process. The panel found that danger sign (Slip Op., 16-20) then proceeded to carefully evaluate Measure B's tailoring.

When the panel considered Measure B's tailoring it did so in the context of the specific concerns the City's limit presents. (Slip Op., 21.) But it also noted concerns about the means by which the limits might (or might not) be adjusted for inflation and the lack of any "special justification" to show that the limit was warranted in light of the panel's significant concerns. (Slip Op., 26.) Furthermore, taken as a whole, the opinion and record show that the limit will significantly reduce the amount of funding available for challengers to run competitive campaigns.

For all of these reasons, the panel opinion did not run afoul of *Randall*. There is no conflict with Supreme Court precedent.

11

**B.** *Randall* **is Controlling Supreme Court Precedent that Abrogated**
   *Lair v. Motl.*

*Lair III* (*Lair v. Motl*) concerned limits in Montana that this Court upheld several times. *See Lair III*, 873 F.3d at 1175 (overview of the history). *Eddleman*, 343 F.3d 1085, was the first. Three years later, *Randall* prompted a renewed challenge, and following *Randall*, the district court invalidated the limits. *Lair III at 1177*. When the state appealed, this Court published its opinion to stay the district court's order, *Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) (*Lair I*). In the merits opinion, *Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015) (*Lair II*), this Court remanded the case back to the district court with instructions to follow *Eddleman* (not *Randall*) because *Randall* was a plurality opinion. *See also Liar III* at 1177. On remand, the district court held that the limit was unconstitutional even under *Eddleman*. *Id*. In *Lair III*, this Court reversed the district court again. *Id*. at 1178.

The development of the *Lair* cases is important because it set the foundation for the *Thompson* cases that followed. Prior to *Thompson I*, 909 F.3d 1027, this Circuit described *Randall* as a nonbinding opinion that left *Eddleman* on "less stable footing." *Lair III*, 873 F.3d at 1176. Under the circumstances, "less stable

12

footing" seems like a euphemism for eviscerated because *Randall* came close to overruling *Buckley* on the permissibility of contribution limits in the first instance.[4] For this reason, *Lair*'s plurality argument is particularly weak support for *Eddleman*'s more deferential rule. *See also Thompson II*, 589 U.S. at 4 (criticizing this Circuit for declining to follow *Randall*). Nonetheless, *Lair III* was Circuit precedent, so *Thompson I* did not follow *Randall*. *Thompson II*, 589 U.S. at 4 n. *.

In *Thompson II*, the Supreme Court vacated this Court's judgment and ordered it to apply *Randall*, which it did in *Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) (*Thompson III*). In *Thompson III*, the panel's analysis was guided by the Supreme Court's *Thompson II* opinion. Therefore, the panel in this case was the first Ninth Circuit panel to independently apply *Randall*. For this reason, there is no conflict with Circuit precedent.

---

[4] Justice Alito concurred in part with the plurality but did not join in its approval of *Buckley*. *Randall*, 548 U.S. 263-64; see also *id*. at 243 (a section he did not join). Justice Kennedy concurred only in the judgment and implied that *Buckley* was wrongly decided. *Id*. at 265. Justice Thomas (joined by Justice Scalia) directly stated that *Buckley* should be overruled. *Id*. at 266 (Thomas, J., concurring). *But see McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014) (not seeing the need in *that case* to revisit *Buckley*'s distinction between contributions and expenditures).

### C. The Panel Opinion Did Not Improperly Consider the City's Motive.

To revive *Lair III* and avoid the fact that it is no longer good law, the City tries to shift the paradigm and recast Measure B's constitutional problems as if identifying those problems is an improper consideration of the City's motive. The City's primary support for this argument is *United States v. O'Brien*, 391 U.S. 367 (1968) and *Boardman v. Inslee*, 978 F.3d 1092 (9th Cir. 2020). These cases do not support the City's argument because the constitutional questions they considered were different; neither *O'Brien* nor *Boardman* evaluated anything close to the potential infringement of core political speech that exists here. (*See Randall*, 548 U.S. at 266 (Thomas, J., concurring).

*Boardman v. Inslee* is a particularly misplaced comparison. That case considered the Washington Public Records Act and the constitutionality of a provision prohibiting disclosure of in-home health care providers' personal information to the public while requiring its disclosure to "their exclusive bargaining representatives." 978 F.3d at 1098. The statute's validity turned on the rational basis test. *Id.* at 1119.

Applying the rational basis test, *Boardman* stated that "a bare desire to harm a politically unpopular group" is not a legitimate government interest when those

14

harmed are members of a "traditionally suspect class." 978 F.3d at 1119. Because the entire public (less the care providers' bargaining representatives) is not a suspect class, the *Boardman* plaintiffs could not have made this showing. This was the context where *Boardman* held that it could not consider legislative motive. *Id.* Perhaps more importantly, however, *Boardman* rejected the notion that the statute before it was motivated by any sort of animus. *Id.*

*O'Brien* considered the constitutionality of a statute prohibiting the burning of draft cards, which the defendant argued was intended to suppress freedom of speech. 391 U.S. at 376. According to the defendant, "he burned the certificate publicly to influence others to adopt his antiwar beliefs, as he put it, 'so that other people would reevaluate their positions with Selective Service, with the armed forces, and reevaluate their place in the culture of today, to hopefully consider my position.'" *Id.* at 370. That defendant's problem (the City's problem) was that the Court held that burning draft cards was not speech at all. *Id.* at 376. But even when construed as speech, burning draft cards was not *protected speech*. *Id.* at 377.

The difference in the applicable constitutional tests is one of the biggest distinctions between *O'Brien* and the instant case. Assuming the burning of a draft card had an element of speech, the test that applied would be whether "a sufficiently important governmental interest in regulating the nonspeech element

15

can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. To this end, the focus was less on the speech and more on the act of burning a draft card, and the question was whether the statute was within the government's constitutional power. *Id.* at 377. The *O'Brien* statute was valid on its face because there was a multitude of reasons that justified Congress' decision to prohibit a draft card's destruction. *Id.* at 378-80. Based on those reasons, the statute was plainly constitutional, so its constitutionality was unchanged by the possibility that Congress' true purpose was something different.

In reaching this conclusion, *O'Brien* contrasted the case before it with *Stromberg v. People of State of California*, 283 U.S. 359 (1931). The issue in *Stromberg* was a statute that made it a felony to display a red flag in a public place as a sign of opposition to organized government. *Id.* at 361. Displaying a flag may be conduct, but it is more plainly communicative in a way that destroying a draft card is not. Therefore, in *Stromberg*, something more akin to motive was the justifiable basis to invalidate the statute.[5]

---

[5] With *O'Brien*, the City also cited *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022), which stated: "This Court has long disfavored arguments based on alleged legislative motives." *Dobbs* made this observation in response to *amici* arguments that early abortion bans were implemented in response to "the fear that

Turning specifically to contribution limits and the instant petition, the City argues that the panel opinion improperly considered its motive in a way that creates a conflict with *Lair III*. This is rooted in *Lair III*'s characterization of the District Court order it reviewed as basing its tailoring analysis on a finding of "impermissible motive." *Lair III*, 873 F.3d at 1183. But the District Court framed its analysis as one of tailoring where the evidence showed that the Montana measure was tailored to "impermissible interests of reducing influence and leveling the playing field."[6] *Lair v. Motl*, 189 F. Supp.3d 1024, 1034-35 (D. Mont. 2016), rev'd, 873 F.3d 1170) (citing *McCutcheon,* 572 U.S. at 207). The District Court said nothing about motive.

*Lair III* recast the District Court's tailoring findings as motive findings based on its application of the *Eddleman* test. Going back to Supreme Court precedent,

---

Catholic immigrants were having more babies than Protestants and that the availability of abortion was leading White Protestant women to "shir[k their] maternal duties." *Id*. *Dobbs* ultimately held that "laws regulating or prohibiting abortion are not subject to heightened scrutiny." *Id*. at 237. If such laws are not subject to heightened scrutiny, then motive does not matter. However, as discussed herein, motive starts to become relevant as the level of the court's scrutiny increases.

[6] That District Court also ruled that the Montana limit would not allow candidates to amass sufficient resources to wage an effective campaign. *Lair*, 189 F. Supp. 3d at 1034-35.

the purpose of the tailoring analysis—before and after *Randall*—is to "assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199. Put differently, a law that restricts political speech—e.g., campaign contributions—must "avoid unnecessary abridgement" of First Amendment rights. *Id.* (citing *Buckley*, 424 U.S. at 25). *Eddleman*'s interpretation of this requires that courts evaluating a contribution limit's tailoring consider whether the limits "**(a) focus narrowly on the state's interest,** (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Eddleman*, 343 F.3d at 1092 (emphasis added); *see also Lair III*, 873 F.3d at 1175-76.

Lair III's so-called motive inquiry focuses on the first of these three considerations: whether the limits focus narrowly on the state's interest. The *Lair* District Court concluded that there was sufficient evidence of other interests to negate the possibility that the limit focused narrowly on the one justifiable interest. *Lair III* reversed because it looked more narrowly at whether the limit reduced the types of contributions perceived to be associated with quid pro quo corruption. 873 F.3d at 1181-84. But when *Buckley* upheld the limit before it, it did so because that "$1,000 contribution limitation focus[ed] *precisely* on the problem of large campaign contributions." 424 U.S. at 28 (emphasis added). This shows that *Lair*

*III* considered the question too narrowly because the District Court's findings show that the limit <u>did not</u> focus *precisely* on the problem of large campaign contributions. It focused instead on other things.

Moreover, with *Buckley*'s demand for precision in mind, *Lair III* expressed doubt that its conclusion was correct. *See* 873 F.3d at 1184. On this point, the Court said that "there is some logic that the sponsors' goal … reveals something about the limits' fit." *Id*. Nonetheless, after finding no cases that had previously considered the issue (*id.*), *Lair III* defaulted the more deferential option because it "should not—and indeed cannot—be in the business of fine tuning contribution limits for states." *Id*. at 1183-84. But there is a difference between fine tuning a valid limit to make it better and invalidating limits that unduly burden First Amendment speech.

Looking back to *O'Brien* and *Boardman*, there is necessarily a line where considerations that look like motive might be irrelevant in one case and relevant in another. That line's clarity depends on the level of scrutiny that applies. *O'Brien* and *Boardman* applied a low level of scrutiny, so the line was clear, and motive was completely irrelevant. *Lair III* acknowledged that it considered a closer call. Whether *Lair III* was right or wrong at the time it was decided is immaterial because *Thompson II* has changed the analysis.

Since *Thompson II*, this Court must apply *Randall*, which means that the Court does not defer to the legislature if danger signs are present. If *Lair III*'s decision to disregard motive was a close call under a deferential standard, then there can be no question that motive is a very important (and relevant) consideration in the instant case because the existence of a danger sign means that the Court must increase the level of scrutiny and that it is no longer permitted to defer to the legislature.

This increased scrutiny—the independent and careful review of the record as opposed to deferring to the legislature—supports the panel's "comparatively closer fit" analysis, which the City erroneously describes as a new rule. Rather than establishing a new rule, that analysis simply recognizes that Oxnard's limits fit its improper interests better than those limits fit the City's interest in combatting quid pro quo corruption. For this reason, the limits are not closely drawn to that interest. The panel's approach might not have been allowed prior to *Randall*, but now it is compelled.

### D. Oxnard's Contribution Limits are Lower than Anything the Supreme Court has Upheld and are Lower than Most Other California Limits.

The City generally closes its argument with false statements that its limits are comparable to other California cities and that its expert testimony that Measure B will not restrict challengers' funding was uncontradicted. These conclusions, and others on which the City bases its argument, were hotly contested both in the parties' summary judgment motions and briefing before this Court.

For example, the City's expert witness, Dr. Kousser, only compared Oxnard's limits to cites that had enacted limits. He failed to consider 31 comparably sized cities that had no limit whatsoever. 3-ER-415. Had he considered those cities, the median limit would have been no limit. Id. Since his analysis, California has implemented a statewide contribution limit, which was $4,900 in 2022. Cal. Stats. 2019, ch. 556; see also Cal. Code Regs., tit. 2, § 18545. If the cities Dr. Kousser considered have not made substantial changes, that $4,900 is now the median.

If this Court orders rehearing en banc, it should recognize the presence of several other danger signs. While it may only take one danger sign to trigger the Court's careful review, the existence of others will buttress the panel opinion.

**CONCLUSION**

As discussed above, the panel opinion follows *Randall* more closely than any other decision from this Circuit. There is no conflict. Furthermore, it may be that the panel opinion conflicts with *Lair III*. But that conflict exists only to the extent that *Lair III* conflicts with *Randall*. To this end, the panel opinion should conflict with *Lair III* because *Lair III* is no longer good law. For these reasons, rehearing en banc is improper, and the City's petition should be denied.

Date: Feb. 18, 2025          LAW OFFICE OF CHAD D. MORGAN

By: */s/ Chad D. Morgan*
Chad D. Morgan
*Attorneys for Appellant,*
*Moving Oxnard Forward, Inc.*

**CERTIFICATE OF COMPLIANCE**

**9th Cir. Case Number(s): 21-56295**

I am the attorney or self-represented party.

**This brief contains 4191 MAX words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[XXXXX] complies with the length limit designated by court order dated Jan. 27, 2025

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _/s/Chad D. Morgan_____ **Date** Feb. 18, 2025

24

# CERTIFICATE OF SERVICE

**9th Cir. Case Number(s)**: **21-56295**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[XXXXX] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Appellant's Response to Petition for Rehearing En Banc

**Signature** _/s/Chad D. Morgan_____ **Date** Feb. 18, 2025