**No. 21-56295**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

MOVING OXNARD FORWARD, INC.,

*Plaintiff-Appellant*,

v.

LOURDES LOPEZ, ET AL.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:20-cv-04122-CBM-AFM
Hon. Consuelo B. Marshall

### APPELLANT'S SUPPLEMENTAL BRIEF

**Chad D. Morgan, Esq.**
LAW OFFICE OF CHAD MORGAN, APC
1950 W. Corporate Way #12279
Anaheim, CA 92801
Tel: 951-667-1927
Email: chad@chadmorgan.com

*Attorneys for Appellant*
Moving Oxnard Forward, Inc.

## TABLE OF CONTENTS

**Table of Contents** ......................................................................... 2

**Table of Authorities** .................................................................... 3

**Appellant's Supplemental Brief** ................................................. 5

**Introduction** ................................................................................ 5

**The *Eddleman-Lair* Test** ........................................................... 6

**Argument** ..................................................................................... 7

       I.     *EDDLEMAN-LAIR* SHOULD BE OVERRULED. .................... 8

           A.    The Supreme Court did not establish "not illusory" as the minimum threshold needed to establish the government's interest. ........................................................................... 8

           B.    A government interest in preventing quid quo pro corruption cannot be presumed. ............................................... 12

           C.    This Circuit's *Eddleman-Lair* approach is in the minority as compared to other circuits. ..................................... 14

           D.    This Circuit has not considered a case where the adequacy of the government's interest was at issue. .................................. 15

      II.    OXNARD DID NOT JUSTIFY ITS INTEREST IN MEASURE B'S CONTRIBUTION LIMITS. .......................................... 18

**Conclusion** ..................................................................................23

**Certificate of Compliance** .........................................................24

**Certificate of Service** .................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ariz. Free Enter Club's Freedom PAC v. Bennett*, 564 U.S. 721 (2011)....................21

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................passim

*Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975)........................................ 9

*Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409 (5th Cir. 2014) ....... 15

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).....................................18

*Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445 (1st Cir. 2000) .......................................................................14

*Deon v. Barasch*, 960 F.3d 152 (3d Cir. 2020) ........................................ 15

*Jones v. Jegley*, 947 F.3d 1100 (8th Cir. 2020)........................................ 15

*Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) ........................................passim

*Lair v. Motl*, 889 F.3d 571 (9th Cir. 2018)........................................ 8, 17

*McComish v. Bennett*, 605 F.3d 720 (9th Cir. 2010)................................ 13

*McCutcheon v. FEC*, 572 U.S. 185 (2014)...............................6, 11, 15, 21

*Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003).........passim

*Moving Oxnard Forward, Inc. v. Ascension*, 124 F.4th 605 (9th Cir. 2024...... 7, 21, 22

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000).............................passim

*Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011)...................................... 15

*Randall v. Sorrell*, 548 U.S. 230 (2006) .......................................... 12, 23

*Schickel v. Dilger*, 925 F.3d 858 (6th Cir. 2019)...................................... 15

*Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244 (9th Cir. 2024)................ 17

*Thompson v. Hebdon*, 589 U.S. 1 (2019)............................................. 7, 17

*Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) .................................... 17

*United States v. Emmons,* 8 F.4th 454 (6th Cir. 2021) ............................... 15

*Upstate Jobs Party v. Kosinski*, 106 F.4th 232 (2d Cir. 2024) .................................. 15

*Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018) ................................... 15

## APPELLANT'S SUPPLEMENTAL BRIEF

In response to the Court's June 16, 2025 order, Plaintiff-Appellant Moving Oxnard Forward, Inc. (MOF) submits this supplemental brief to address whether *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) (*Eddleman*) and *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) should be overruled to the extent that they articulate the threshold showing that a governmental defendant must make to justify any level of limitation on campaign contributions.

## INTRODUCTION

Unless and until the Supreme Court overrules *Buckley v. Valeo*, 424 U.S. 1 (1976), a contribution limit is invalid unless it is closely drawn to a sufficiently important government interest. Only one interest is sufficiently important: Preventing quid pro quo corruption or its appearance. The Supreme Court has never articulated the precise quantum of evidence necessary to justify this interest. Instead, there is a sliding scale where the evidentiary threshold varies up and down based on the limit's novelty and plausibility. *Eddleman* and *Lair* should be overruled because they misconstrue Supreme Court precedents as establishing a minimum burden that is too low.

## THE *EDDLEMAN-LAIR* TEST

Appellant refers to the union of *Eddleman* and *Lair* as the *Eddleman-Lair* test, though they are essentially the same. *Eddleman-Lair* is the two-prong test derived from *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) (*Shrink*). *Eddleman*, 343 F.3d at 1092. The first prong "is whether the state has presented sufficient evidence of a valid interest." If so, then the court considers whether the limit is closely drawn to that interest (the second prong). This brief focuses on the first prong.

*Eddleman-Lair*'s first prong has two parts. The first is identification of the government's interest. In accordance with *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014), *Lair* narrowed *Eddleman*'s test such that the only governmental interest sufficient to justify contribution limits is an interest in preventing quid pro quo corruption or its appearance. *Lair*, 873 F.3d at 1177.

The second consideration is the quantum of evidence necessary to substantiate the interest. *Eddleman*, 343 F.3d at 1092. *Eddleman* described Supreme Court precedents as requiring "only that the perceived threat not be 'illusory,' [citation], or 'mere conjecture,'[citation]" and that "[t]he amount of evidence needed [to justify the interest] will thus 'vary up and down with the novelty and plausibility of the justification raised.'" *Id*. (quoting *Buckley*, 424 U.S. at 27 &

6

*Shrink*, 528 U.S. at 391). Under the *Eddleman-Lair* test, "[t]his evidentiary burden is lowest where … the state's purported interest is neither novel nor implausible." *Lair*, 873 F.3d at 1178.

## ARGUMENT

The first prong is a threshold question. *Lair*, 873 F.3d at 1178. It evaluates whether the government can justify a contribution limit of any amount. *Id.* The panel opinion accepted that *Eddleman-Lair* articulated the burden necessary to make this showing and described it as a "low one that merely requires a showing that 'the perceived threat' of corruption 'is not illusory.'" *Moving Oxnard Forward, Inc. v. Ascension*, 124 F.4th 605, 613 (9th Cir. 2024), citing *Lair*, 873 F.3d at 1178. But it also recognized that *McCutcheon* and *Citizens United* cast doubt about the continued viability of this approach. *Moving Oxnard Forward* at 614 (citing *Thompson v. Hebdon*, 589 U.S. 1, 3 (2019) (per curiam)). Nonetheless, it avoided the issue by assuming (without deciding) that the City met its burden before concluding that the limits did not satisfy the second prong. *Id.*

The *Eddleman-Lair* approach is not viable not only because *McCutcheon* and *Citizens United* were "such an important change in Supreme Court jurisprudence", *see Lair v. Motl*, 889 F.3d 571, 575 (9th Cir. 2018) (Ikuta, J., dissenting from denial of rehearing en banc), but also because *Eddleman-Lair*

misconstrued *Buckley* and *Shrink* in the first instance. On this point, this Circuit is just one of two circuits that has construed *Buckley* as holding that the government's interest is sufficient if it is merely "not illusory." Other circuits require more, which is necessary because the perceived threat of quid pro quo corruption is never illusory. Because the threat is never illusory, the *Eddleman-Lair* requirement that the government's interest be "not illusory" renders the first prong a nullity. *Buckley* and *Shrink* do not support this.

## I. *Eddleman-Lair* Should be Overruled.

### A. The Supreme Court did not establish "not illusory" as the minimum threshold needed to establish the government's interest.

*Eddleman* relied on *Buckley* as support for its assertion that, "[w]ith respect to the quantum of evidence necessary to justify [the government's] interest, the Supreme Court has required only that the perceived threat not be 'illusory.'" 343 F.3d at 1092 (quoting 424 U.S. at 27). This misconstrues *Buckley*. As *Shrink* noted: "*Buckley*'s evidentiary showing exemplifies a sufficient justification for contribution limits, it does not speak to what may be necessary as a minimum." 528 U.S. at 391.

The *Buckley* language at issue was its observation that "[t]o the extent that large contributions are given to secure political quid pro quo's [sic] from current

and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one." 424 U.S. at 26-27 (footnote omitted). *Buckley* found a substantial evidentiary basis to support this interest. *See id.* at 27, n. 28 (citing *Buckley v. Valeo*, 519 F.2d 821, 839-40 & nn. 36-38 (D.C. Cir. 1975)). Describing that substantial basis as "not illusory" is different from establishing "not illusory" as the government's minimum threshold.

*Eddleman* compounded its error by relying on *Shrink* as authority that a limit can be justified if it is based on more than "mere conjecture." *Eddleman*, 343 F.3d at 1093 (citing *Shink Missouri*, 528 U.S. at 392); see also *Lair*, 873 F.3d at 1179). This was an error because, like *Buckley*, *Shrink* did not establish an evidentiary minimum. *Shrink*'s context is important.

In *Shrink*, the plaintiffs argued that the state failed to justify its interests "with empirical evidence of actually corrupt practices or of a perception among Missouri voters that unrestricted contributions *must have been* exerting a covertly corrosive influence." 528 U.S. at 390-91 (emphasis added). The plaintiffs were looking for evidence that was "real, not merely conjectural." *Id.* at 392. *Shrink*'s statement that it has "never accepted mere conjecture as adequate to carry a First

9

Amendment burden" arose as apparent criticism of the plaintiffs' suggestion that it might do so. *See id.*

Rather than concluding that just a tad more than mere conjecture is enough to satisfy the government's burden, *Shrink* concluded that "[t]he state statute [before it] is not void, however, for want of evidence." 528 U.S. at 391. The evidence supporting the state's interest included, *inter alia*, the "state treasurer's decision to use a certain bank for most of Missouri's banking business after that institution contributed $20,000 to the treasurer's campaign", a $420,000 contribution from an investment bank to candidates in the northern part of the state, and most significantly, three scandals, including one in which a state representative was "accused of sponsoring legislation in exchange for kickbacks." *Id.* at 393-94. From that evidence, *Shrink* concluded that "the case [did] not present a close call requiring further definition of whatever the State's evidentiary obligation might be." *Id.* at 393.

*Lair* added to *Eddleman's* errors by stating *McCutcheon* restated *Shrink's* standard, when neither *McCutcheon* nor *Shrink* adopted that standard. Rather than adopt (or restate) the mere conjecture standard, *McCutcheon* described the government's interest in the aggregate limit it considered not as merely speculative but as "*far too speculative.*" 572 U.S. at 210 (emphasis added). It was, in other

10

words, conjecture (and not just mere conjecture, but something substantially more conjectural).

Indeed, the government interest in *McCutcheon* was completely illogical. That aggregate limit prohibited donors from giving more than $48,600 to federal candidates (on top of an individual limit of $5,200 on contributions to any one candidate). 572 U.S. at 193-94. In this scheme, donors could contribute $5,200 to nine candidates and $1,800 to a tenth candidate or divide their $48,600 between as many candidates as they wish. *See id.* at 210. Given the individual limit, the government had necessarily decided that $5,200 is the boundary between a contribution that might have a corrupting influence and one that does not. *Id.*

Therefore, to support its aggregate limit, the government needed to show that donating $1,801 to a tenth candidate would have a corrupting influence on that candidate even though the $5,200 contributions to the other nine candidates would not. *McCutcheon*, 572 U.S. at 210. Further still, the government would also need to show that $48,600 donors who contributed just ten cents to additional candidates would corrupt those candidates merely because they had already maxed out to other candidates. *Id.* at 193-94. That is the peak of implausibility such that it begins to look more like an expenditure limit masquerading as a contribution limit.

But because *McCutcheon* was limited to the validity of an aggregate limit, *Randall v. Sorrell*, 548 U.S. 230 (2006) is the most recent Supreme Court decision that fully considered an individual limit. While *Randall* reiterated the rule that limits must be "closely drawn" to match a "sufficiently important interest", *id*. at 247 (citing *Buckley*, 424 U.S. at 25-26), it did not weigh in on the question of how much evidence is necessary to substantiate that interest. Without addressing that issue, *Randall*, like the panel here, concluded that the limits before it were not carefully drawn to any interest in combating quid pro quo corruption. *Id.* at 253.

### B. A government interest in preventing quid quo pro corruption cannot be presumed.

Requiring the barest minimum of a showing that the government has an interest in preventing the perception of quid pro quo corruption would render *Buckley*'s first prong a nullity because, human nature suggests, the threat of quid pro quo corruption is always present. Despite this risk, actual instances of quid pro quo corruption are rare. The balancing act, therefore, is to what degree First Amendment rights may be infringed in response to fears of something that is such a rare occurrence.

Quid pro quo corruption is a crime. Humans balance the risk that they will be a victim of crime against the cost of measures to protect themselves from that risk

12

on a daily basis. Consider random acts violence. Our human experience says that every time we walk outside, we risk getting mugged, stabbed, shot, or any number of other terrible things. It goes without saying that some areas are more prone to crime than others, and people take different safety measures depending on their risk tolerance. Nonetheless, while some areas are safer than others, we all know that violent crime can happen anywhere. To this end, we can take every precaution imaginable and still be the victim of a crime.

The threat of quid pro quo corruption is similar. It can happen anywhere even if some areas are more prone to it than others. So the question becomes how much of our First Amendment rights are we willing to give up in order to feel a sense of safety even if doing so will not actually prevent the problem we fear. The sufficiency of the government's interest must be considered in this context because contribution limits might feel like a prophylactic measure against corruption, but history has shown us that they do very little to serve that purpose. *See, e.g., McComish v. Bennett*, 605 F.3d 720, 735 (9th Cir. 2010) (Arizona "legislators literally sold their votes for cash bribes" despite the existence of contribution limits).

To this end, the ever-present threat of quid pro quo corruption is never illusory. Thus, if the standard is merely "not illusory", then the government would

be able to justify its interest merely by stating somewhere in the record that it was interested in preventing quid quo pro corruption or its appearance, and, because of those magic words, get a free pass to the second prong even if its purported interest is only a pretext for something more nefarious.

### C. This Circuit's *Eddleman-Lair* approach is in the minority as compared to other circuits.

If the goal is to find something closer to a brightline rule, a review of cases from other circuits is not especially illuminating. Relevant cases fall into one of two categories. One tracks this Circuit's *Eddleman-Lair* test, where the government can satisfy its burden simply by showing that its interest is not illusory and is more than mere conjecture. Under this rule, litigants should presume that the government will justify its interest because the risk of corruption is never illusory. Only the First and Ninth Circuits have adopted this view. *See Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 450 (1st Cir. 2000).

Every other circuit that has considered the issue follows *Buckley* and *Shrink* more closely. Each recognizes that an illusory governmental interest or an interest based on mere conjecture will never satisfy the First Amendment. But unlike *Eddleman-Lair*, they do not state "not illusory" or "more than mere conjecture" as the minimum threshold the government must satisfy. (See *Ognibene v. Parkes*,

14

671 F.3d 174, 183 (2d Cir. 2011); *Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 251 (2d Cir. 2024); *Deon v. Barasch*, 960 F.3d 152, 160 (3d Cir. 2020); *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014); *Zimmerman v. City of Austin*, 881 F.3d 378 (5th Cir. 2018); *Jones v. Jegley*, 947 F.3d 1100, 1105 (8th Cir. 2020). Like *Shrink* and *McCutcheon*, this necessarily contemplates a test that is more rigorous than *Eddleman-Lair*.

Precedents from the Sixth Circuit go further in the opposite direction. Those precedents require that the government make at least a showing that there is "a cognizable risk of corruption." *Schickel v. Dilger*, 925 F.3d 858, 870 (6th Cir. 2019) (citing *McCutcheon*, 572 U.S. at 210); see also *United States v. Emmons,* 8 F.4th 454, 466 (6th Cir. 2021). A cognizable threat is closer to (if not the same as) the real threat *Shrink* discussed.

### D. This Circuit has not considered a case where the adequacy of the government's interest was at issue.

*Eddleman* came to the Court after a four-day bench trial. 343 F.3d at 1087. On the standard of review that applied, *Eddleman* concluded that "[t]he district court's factual findings [were] adequately supported by the record and are not clearly erroneous", and it affirmed the judgment upholding the limits. *Id*. at 1088. In *Eddleman*, the state asserted that its limits were "necessary to avoid corruption

15

or the appearance of corruption," and it was not seriously disputed. *Id.* The plaintiff had "argue[d] that the limits imposed [were] unnecessarily stringent and there [was] no evidence that restricting contributions to such small amounts is needed to combat corruption." *Id.* As a tailoring question reserved for the second prong, this essentially conceded that the government's interest was sufficient. *Id.* at 1092; *see also id.* at 1098-1099 (Teilborg, J., dissenting in part) ("I agree with the majority that Montana has a sufficiently important interest in preventing corruption and the perception of corruption …").

*Lair* came to the court after cross motions for summary judgment, so a more rigorous review was warranted. 873 F.3d at 1189. *Lair* also described the government's burden as requiring a showing that the "risk of actual or perceived quid pro quo corruption is more than 'mere conjecture'", such that a showing that "the perceived threat is not illusory" was enough. *Id.* at 1178 (cleaned up). Unlike *Eddleman*, there was a dispute in *Lair* over whether the government satisfied the first prong. *See* 873 F.3d at 1188-89 (Bea, J., dissenting); s*ee also Lair*, 889 F.3d at 573-74 (Ikuta, J., dissenting from denial of petition for rehearing en banc). However, it was primarily the panel that disputed the issue, not the parties. (*See Lair*, 873 F.3d at 1179 ("The plaintiffs do not dispute that Montana's interest in

16

combating quid pro quo corruption or its appearance justifies some level of contribution limit.").

Because the parties did not dispute the first prong, the court could have skipped to the second prong without addressing the first. To this end, *Lair*'s discussion of the government's interest, like that discussion in *Eddleman*, is dicta. (See *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1247 (9th Cir. 2024) (Forrest, J., concurring). Therefore, while the court should expressly overrule *Eddleman-Lair*, it need not do so if *Lair*'s discussion of the first prong is not binding. *Id.* at 1250.

Aside from the instant case, *Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021) is the only other case where this Circuit's application of *Eddleman-Lair* might be relevant. After *Thompson v. Hebdon*, 589 U.S. 1 (2019), the case came back to this court following a seven-day bench trial, and the panel concluded that the district court's findings that Alaska satisfied its burden "were not clearly erroneous" without further discussion. 7 F.4th at 833. On this history, the instant case would be this Court's first opportunity to apply a de novo standard of review to a dispute over whether the government satisfied its burden on *Eddleman-Lair*'s first prong in a case where the parties dispute whether the government's evidence is sufficient.

17

## II. OXNARD DID NOT JUSTIFY ITS INTEREST IN MEASURE B'S CONTRIBUTION LIMITS.

When evaluating whether the government has an interest sufficiently important to justify limiting campaign contributions, the first step is to identify what the government's interest actually is. Appellant can accept that, as a general principle, legislation might have multiple purposes. Indeed, when a more deferential standard applies (e.g., rational basis) the fact that legislation might have multiple purposes probably buttresses its validity.[1] But a heightened standard applies here such that an interest in preventing quid pro quo corruption or its appearance is the <u>only</u> interest strong enough to justify Measure B's contribution limits.

Rather than establish that "not illusory" or "more than mere conjecture" is the minimum standard necessary to substantiate this interest, *Shrink* held that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." 528 U.S. at 391; *see also Eddleman*, 343 F.3d at 1092. *Buckley*,

---

[1] It is worth noting that the legislative enactments of cities should receive less deference than Congress. *See, e.g., City of Erie v. Pap's A.M.*, 529 U.S. 277, 311, n. 1 (2000) (Souter, J., concurring in part and dissenting in part).

in the environment that existed immediately after the 1972 election that put Richard Nixon into the White House, considered evidence of a threat that was neither novel nor implausible. *See Shrink Missouri* at 391; *see also Buckley*, 424 U.S. 27 & n. 28.

Because there is only one permissible interest that justifies contribution limits, the possibility that a limit might serve alternate purposes should affect the quantum of empirical evidence needed to satisfy heightened judicial scrutiny. The government's burden is the lowest when its interest is laser focused on more credible and real threats of corruption because this is when the government's interest is least novel and most plausible. *See Lair*, 873 F.3d at 1178. But the government's burden must be substantially higher if its purported interest in preventing corruption is subordinate to other interests and/or the claimed threats of corruption are more speculative because, in this situation, the implausibility of the government's interest grows.

On this point, there can be no doubt that a sometimes latent (but often overt) purpose of a contribution limit is to reduce the total amount of expenditures in politics. Limiting contributions to achieve this purpose is an end-around *Buckley*'s holding that expenditure limits are unconstitutional because limiting campaign contributions can have the same effect. When it appears that a contribution limit

has been enacted for this purpose, it should be looked upon with skepticism because the cumulative effect of those "marginal" restrictions as applied to individual donors, *see Shrink Missouri*, 528 U.S. at 413 (quoting *Buckley*, 424 U.S. at 20-21), becomes a much more substantial First Amendment violation when applied to a campaign.

In the instant case, the District Court identified Oxnard Measure B's purposes as to "(1) provide a representative government which is accessible to all persons; (2) deter corruption and the appearance of corruption *caused by the coercive influence of large financial contributions on candidates' positions*, and (3) inform the electorate as to the sources and uses of political contributions." AOB 22, citing 3-ER-486 (emphasis added). Despite the fact that Oxnard used the magic words, *deter corruption and the appearance of corruption*, none of these interests is sufficient. The corruption interest is not sufficient because it is linked only to corruption "caused by the coercive influence of large financial contributions on candidates' positions," and that is not corruption. *McCutcheon*, 572 U.S. at 192. The type of corruption that justifies contribution limits is limited only to the direct exchange of an official act for money—i.e., dollars for political favors. *Lair*, 873 F.3d at 1177; *McCutcheon* at 192.

Instead, the record focuses on what the City described as the "three key pieces of evidence" that supported its limits: the 2010 Ventura County District Attorney's report, a survey of residents, and election results. RB 23 (citing 1-ER-6). Neither the survey nor the election results is enough. *Shrink Missouri*, 528 U.S. at 391. The government may not infringe on First Amendment rights merely because it is popular to do so. *See, e.g., Ariz. Free Enter Club's Freedom PAC v. Bennett*, 564 U.S. 721, 754 (2011).

Rather than show that contribution limits are popular, the City needed evidence "sufficient to show why voters would tend to identify a big donation with a corrupt purpose." *Shrink*, 528 U.S. at 391. More to the point, the City needed evidence that voters would identify a $500 contribution as having a corrupt purpose when given to a city council candidate. Neither the District Attorney's report nor anything else the City submitted established this threshold showing. *Moving Oxnard Forward*, 124 F.4th at 618-20.

Even the panel's dissent described the City's evidence as a "closer call" than the evidence at issue in *Shrink*. *Moving Oxnard Forward*, 124 F.4th at 623 (Bennett, J., dissenting). When evaluating that closer call, the dissent was wrong because it applied *Lair*'s erroneous interpretation of *Shrink*. *Shrink* may not require "proof of completed quid pro quo transactions through campaign

contributions", *see Moving Oxnard Forward* at 623, but it does require evidence that voters would identify a $500 contribution as having a corrupting influence, *Shrink*, 528 U.S. at 391. Under this standard, the question is no longer a close call because the record is completely devoid of such evidence.

Furthermore, the dissent should not have disregarded evidence of the City's invidious discrimination against MOF's President, Aaron Starr (and others like him). *Moving Oxnard Forward*, 124 F.4th at 615-17. This is an improper purpose for a contribution limit. Even if it is not a factor as to tailoring, it diminishes the plausibility of the government's lawful purpose by replacing it with an unlawful purpose. Under *Shrink*, this increases the quantum of evidence necessary to justify the City's interest in preventing the perception of quid pro quo corruption. 528 U.S. at 391.

While the majority considered these issues as part of its tailoring analysis, that is not inconsistent with *Randall*. In *Randall*, the Supreme Court found a danger sign in the fact that Vermont did not have any special circumstances, such as a "dramatic increase in corruption or its appearance" as compared to other states, 548 U.S. at 244, that would justify its limits. This suggests a blurring of the line that distinguishes between the government's interest and the limit's tailoring to that interest. This is not an error because, as the government's interest

22

approaches zero, it becomes impossible to tailor a limit to that interest. In such a case, the limits might reasonably serve to reduce money in politics, but they do not otherwise serve a constitutional purpose and can be invalidated under either of the two prongs.

## CONCLUSION

The threat of quid pro quo corruption is never illusory. However, when the government imposes contribution limits for reasons that are only tenuously related to preventing the appearance of quid pro quo corruption, its interest in the contribution limit becomes illusory. In such cases, the limit burdens more First Amendment speech than is warranted and cannot stand.

Date: July 7, 2025                    LAW OFFICE OF CHAD D. MORGAN

By: */s/ Chad D. Morgan*
Chad D. Morgan
*Attorneys for Appellant,*
*Moving Oxnard Forward, Inc.*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s):** **21-56295**

I am the attorney or self-represented party.

**This brief contains 4,064 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[XXXXX] complies with the length limit designated by court order dated Jun. 16, 2025

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/Chad D. Morgan_____ **Date** July 7, 2025

24

# CERTIFICATE OF SERVICE

**9th Cir. Case Number(s)**: **21-56295**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[XXXXX] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

Appellant's Response to Petition for Rehearing En Banc

**Signature** _/s/Chad D. Morgan_____ **Date** July 7, 2025

25