**Docket No. 21-56295**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

MOVING OXNARD FORWARD, INC.,

*Plaintiff-Appellant,*

v.

LOURDES LOPEZ, in her official capacity as City Clerk for the City of Oxnard,

*Defendant-Appellee,*

DOES, 1 through 25, inclusive,

*Defendants.*

_____

*Appeal from a Decision of the United States District Court for the Central District of California,*
*No. 2:20-cv-04122-CBM-AFM · Honorable Consuelo B. Marshall*

***AMICUS BRIEF* OF COOLIDGE-REAGAN FOUNDATION IN SUPPORT**
**OF PLAINTIFF-APPELLANT MOVING OXNARD FORWARD, INC.**

DAN BACKER, ESQ.
CHALMERS, ADAMS, BACKER,
& KAUFMAN, LLC
10521 Judicial Drive, Suite 200-A
Fairfax, Virginia 22030
(202) 210-5431 Telephone
dbacker@chalmersadams.com

*Attorney for Amicus Curiae,*
*Coolidge-Reagan Foundation*

 

## DISCLOSURE STATEMENT

The Coolidge-Reagan Foundation is incorporated in the Commonwealth of Virginia. It has no parent corporation. The Foundation has not issued any stock; accordingly, no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..............................................................................i

TABLE OF CONTENTS ...................................................................................ii

TABLE OF AUTHORITIES..............................................................................iii

STATEMENT OF INTEREST........................................................................... 1

ARGUMENT ..................................................................................................... 1

I.     COURTS CANNOT AUTOMATICALLY UPHOLD
CONTRIBUTION LIMITS WHENEVER THE GOVERNMENT
INVOKES CORRUPTION-RELATED CONCERNS ................................. 2

       A.   *A Contribution Limit is Unconstitutional Unless
the Government's Actual Purpose was to Combat
Actual or Apparent Quid Pro Quo Corruption* ................................... 2

       B.   *A Particular Contribution Limit is Unconstitutional
Unless Evidence Exists it Actually Combats
Quid Pro Quo Corruption in that Jurisdiction*.................................... 7

II.    THERE IS NO CONSTITUTIONAL BASIS FOR
OXNARD'S ARBITRARY CONTRIBUTION LIMITS ......................... 10

III.   OXNARD'S CONTRIBUTION LIMITS
ARE UNCONSTITUTIONALLY LOW...................................................... 14

CONCLUSION ............................................................................................... 18

CERTIFICATE OF COMPLIANCE ................................................................ 19

# TABLE OF AUTHORITIES

## Cases

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011)................................................................. 13

*Buckley v. Valeo*,
424 U.S. 1 (1976)........................................... 3, 8, 11, 12, 13, 14

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000)................................................................. 13

*Cal. Med. Ass'n v. FEC*,
453 U.S. 182 (1981)................................................................. 10

*Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley*,
454 U.S. 290 (1981)................................................................. 14

*Citizens United v. FEC*,
558 U.S. 310 (2010)............................................................. 4, 10

*Davis v. FEC*,
554 U.S. 724 (2008)................................................................. 13

*FCC v. Beach Communs.*,
508 U.S. 307 (1993)................................................................... 3

*FEC v. Colo. Republican Fed. Campaign Comm.*,
533 U.S. 431 (2001)................................................................... 9

*FEC v. Ted Cruz for Senate*,
596 U.S. 289 (2022)........................................................... 1, 7, 8

*Free Speech Coal., Inc. v. Paxton*,
No. 23-1122, 2025 U.S. LEXIS 2497 (U.S. June 27, 2025) ........................ 3

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936)................................................................... 6

iii

*Heller v. Doe*,
509 U.S. 312 (1993)........................................................................ 8

In re *Cao*,
619 F.3d 410 (5th Cir. 2010)........................................................ 16

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)........................................................................ 3

*Lair v. Motl*,
873 F.3d 1170 (9th Cir. 2017)..................................................... 8, 9

*McCutcheon v. FEC*,
572 U.S. 185 (2014)............................................. 3, 4, 7, 10, 11, 12

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971)........................................................................ 1

*Montana Right to Life Ass'n v. Eddleman*,
343 F.3d 1085 (9th Cir. 2003)..................................................... 8, 9

*Moving Oxnard Forward, Inc. v. Ascension*,
124 F.4th 605 (9th Cir. 2024), *vacated*,
No. 21-56295, 2025 U.S. App. LEXIS 13615
(9th Cir. June 4, 2025) (en banc) (order) .................................4-6, 9, 11, 15

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000)................................................................... 7, 8, 9

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972)....................................................................... 10

*Randall v. Sorrell*,
548 U.S. 230 (2006)........................................................ 14, 15, 16, 17

*Riddle v. Hickenlooper*,
742 F.3d 922 (10th Cir. 2014).................................................... 10

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)..................................................................... 13

iv

*Thompson v. Hebdon*,
7 F.4th 811 (9th Cir. 2021)..................................................................... 15-16

*Thompson v. Hebdon*,
589 U.S. 1 (2019)............................................................................... 15, 17

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994).................................................................................. 8

*United States v. Virginia*,
518 U.S. 515 (1996).................................................................................. 3

*Woodhouse v. Mee. Comm'n on Govt'l Ethics & Election Practices*,
40 F. Supp. 3d 186 (D. Me. 2014) ............................................................ 12

**Statutes**

Oxnard City Code § 2-243 ...................................................................11, 15

Oxnard City Code § 2-244 ...................................................................11, 15

**Rules**

9th Cir. R. 29-2.................................................................................. 1, 19

Fed. R. App. P. 29................................................................................... 19

Fed. R. App. P. 32................................................................................... 19

**STATEMENT OF INTEREST**

Putative Amicus Coolidge Reagan Foundation ("CRF") is a § 501(c)(3) nonprofit organization incorporated in the Commonwealth of Virginia with its principal address in the District of Columbia. It is dedicated to protecting freedom of speech under the First Amendment and the integrity of the electoral process.

No counsel for any party authored any part of this brief or made a monetary contribution to fund its preparation or submission. No person other than amicus CRF, its members and supporters, and counsel made a monetary contribution in connection with this brief.[1]

**ARGUMENT**

"The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 302 (2022) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). The panel below correctly concluded the City of Oxnard's contribution limits violate the First Amendment. This Court should likewise invalidate these limits for three main reasons. ***First***, they were not adopted to combat actual quid pro quo corruption, and there is no record evidence they actually do so. ***Second***, the limits are arbitrary, unconstitutionally drawing distinctions among contributors

---

[1] Pursuant to 9th Cir. R. 29-2(a), counsel for all parties have consented to CRF's filing of this amicus brief.

1

based on the candidates with whom they wish to associate. ***Finally***, the limits are unconstitutionally low, both on their own and particularly in light of the lack of any indexing for inflation.

**I.      COURTS CANNOT AUTOMATICALLY UPHOLD CONTRIBUTION LIMITS WHENEVER THE GOVERNMENT INVOKES CORRUPTION-RELATED CONCERNS**

The City of Oxnard adopted contribution limits for various local offices despite any evidence of corruption, for the apparent purpose of retaliating against local activist Aaron Starr. This Court cannot simply assume contribution limits are categorically, or even presumptively, constitutional. To the contrary, Supreme Court precedent confirms, unlike with laws assessed under a rational basis standard, a contribution limit is permissible only if it was adopted for the actual purpose of combatting corruption. *See infra* Section I.A. Moreover, each contribution limit must be justified by actual evidence it is necessary to achieve that goal. *See infra* Section II.B. Oxnard's contribution limits do not satisfy either of these requirements.

A.      *A Contribution Limit is Unconstitutional Unless the Government's* Actual *Purpose was to Combat Actual or Apparent* Quid Pro Quo *Corruption*

Oxnard's contribution limits are unconstitutional because they were adopted out of animus toward Aaron Starr, rather than for the actual purpose of combatting actual or apparent *quid pro quo* corruption. In most cases, a court will not scrutinize

a government entity's actual subjective motives. Rather, under the "rational basis" standard, a court must uphold a challenged legal provision so long as the court itself can hypothesize any valid governmental interest it furthers, regardless of the actual reason it was adopted. *Free Speech Coal., Inc. v. Paxton*, No. 23-1122, 2025 U.S. LEXIS 2497, at *12 (U.S. June 27, 2025) (holding a challenged legal provision which is subject only to rational basis scrutiny, rather than some level of heightened scrutiny under the First Amendment, must be upheld "'if there is any reasonably ***conceivable*** state of facts that ***could*** provide a rational basis' for its enactment" (quoting *FCC v. Beach Communs.*, 508 U.S. 307, 313 (1993) (emphasis added))).

Contribution limits, however, are subject to a "rigorous" form of intermediate scrutiny, in which the government must demonstrate the restriction was adopted to further an "important" interest, and is a closely tailored means of actually doing so. *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality op.) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25, 29, 44-45 (1976) (per curiam)). Unlike with rational basis scrutiny, a court applying heightened or intermediate scrutiny must determine the government's ***actual*** purpose for adopting the challenged provision, rather than mechanically accepting any asserted rationale. *United States v. Virginia*, 518 U.S. 515, 532 (1996) (holding when intermediate scrutiny applies, the government's "justification must be genuine, not hypothesized or invented post hoc in response to litigation"); *accord Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022)

("Government justification[s] for interfering with First Amendment rights must be genuine . . . ." (quotation marks omitted)).

The Supreme Court has "identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 206-07. This holding refers solely to "quid pro quo corruption," meaning "a direct exchange of an official act for money." *Id*. at 192, 207; *see also Citizens United v. FEC*, 558 U.S. 310, 359 (2010) ("When Buckley identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption."). Thus, to be valid, a contribution limit must—among other things— have been adopted for the actual purpose of combatting real or apparent *quid pro quo* corruption.

The vacated panel opinion emphasized the court was not making a "subjective inquiry into legislative motivation." *Moving Oxnard Forward, Inc. v. Ascension*, 124 F.4th 605, 609, 618 n.9 (9th Cir. 2024), *vacated*, No. 21-56295, 2025 U.S. App. LEXIS 13615 (9th Cir. June 4, 2025) (en banc) (order). That approach was erroneous. This Court must invalidate Oxnard's contribution limits unless Oxnard can demonstrate they actually were adopted to combat actual or apparent quid pro quo corruption. The record below establishes these measures were not motivated by a desire to combat corruption, but rather personal animus. The panel acknowledged

Aaron Starr, President of Plaintiff Moving Oxnard Forward ("MOF"), as "a 'stark' 'outlier' among local candidates," was the only person for whom the new limits would have any "practical impact." *Moving Oxnard Forward*, 124 F.4th at 619. Accordingly, the panel concluded, "[T]he legislative record indicates Starr and his reliance on larger-size contributions were a *target* of the City Council when it proposed and promoted" the contribution limits. *Id*. at 615 (emphasis added).

Moreover, "the record reveals a considerable history of antipathy between Starr and the City's elected officials over the years immediately preceding [the contribution limits'] adoption." *Id*. at 616. He had been a "sharp critic of the City's election officials" and sponsored recall petitions against the Mayor and three City Council members. *Id*. Starr had also "successfully supported" a ballot initiative to overturn a fee increase the City Council had ordered. *Id*. at 609. He ran for city council three times and, the year before the City Council adopted the challenged contribution limits, "came in second in the race for Mayor." *Id*. at 609, 617. "[T]he four targets of [Starr's] recall were still on the City Council when it unanimously decided to submit Measure B to the voters in October 2019." *Id*. at 616-17. Finally, the slides the City used to explain why it was approving the contribution limits focused on Starr and his campaign (albeit without explicitly mentioning his name). *Id*. at 615-16 (noting "there is no dispute that it is, in fact, Aaron Starr" whom the City's slides were discussing).

5

On the other side of the ledger, the City's evidence it was motivated by a constitutionally permissible rationale is scant, at best. For example, it points to a 2012 report about a corruption scandal in 2010 which had "nothing to do with campaign contributions, or indeed with campaign financing at all." *Id*. at 619. The District Attorney's report about the corruption scandal did "not recommend campaign contribution limits as a solution to any of the five problems it does identify." *Id*. In any event, the City did not consider contribution limits for seven years after the report was issued. *Id*. In short, the City's invocation of this report comes across as evidence of false pretense. And the record contains no other evidence of either actual corruption or concerns about apparent corruption in Oxnard.

"Given the substantial history of political disagreement between Starr and the City's elected officials; the singular and disproportionate burden that the campaign finance restrictions placed on Starr; and the City's stark use of Starr as the poster child for why these limits should be adopted," *Moving Oxnard Forward*, 124 F.4th at 617, this Court should conclude the City Council approved the contribution limits for the unconstitutional reason of impermissibly targeting Starr based on personal and political animus, rather than for the constitutionally valid purpose of eliminating actual or apparent quid pro quo corruption. *Cf. Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936) (holding a tax crafted to target particular newspapers violated the

First Amendment because it was adopted with "the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers").

Moreover, the Court has "consistently rejected" legislative efforts to "reduce the amount of money in politics, to level electoral opportunities by equalizing candidate resources, and to limit the general influence a contributor may have over an elected official." *Ted Cruz for Senate*, 596 U.S. at 301. At best, Oxnard's attempts to cut off Starr's campaign fundraising at the knees, viewed in context and against the backdrop of their legislative history, seem much more designed to further these illegitimate goals than combatting corruption.

B.   *A Particular Contribution Limit is Unconstitutional Unless Evidence Exists it Actually Combats* Quid Pro Quo *Corruption in that Jurisdiction*

Putting aside the City Council's subjective purposes in adopting the challenged contribution limits, they are independently unconstitutional because there is no record evidence they will actually have the effect of combatting actual or apparent quid pro quo corruption in Oxnard. As the panel below correctly recognized, the Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000); *accord McCutcheon*, 572 U.S. at 210 (invalidating aggregate contribution limit in part due to lack of evidence it prevented actual or apparent quid pro quo corruption). Rather, an "extensive evidentiary showing" is required for the

7

government to prevail under "heightened scrutiny." *Heller v. Doe*, 509 U.S. 312, 319 (1993); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.") (internal citation and quotation marks omitted).

The Court has consistently scrutinized the trial record in challenges to contribution limits to confirm sufficient evidence exists the challenged limit was needed to prevent actual or apparent quid pro quo corruption. *Compare Ted Cruz for Senate*, 596 U.S. at 313 (invalidating limit on candidate using campaign funds to repay personal loans more than 20 days after the election because the evidence this limit combated corruption was "scant"), *with Nixon*, 528 U.S. at 393 ("[T]he evidence introduced into the record by respondents or cited by the lower courts in this action . . . is enough to show that the substantiation of the congressional concerns reflected in *Buckley* has its counterpart supporting the [challenged] law.").[2]

---

[2] On June 16, 2025, this Court entered an order directing the parties to brief whether the *en banc* court should overrule the parts of *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003), and *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017), which "articulate the threshold showing that a governmental defendant must make to justify any level of limitation on campaign contributions." *See* Order, D.E. #55, at 1 (June 16, 2025). Both of those rulings are closely tied to, and consistent with, the Supreme Court precedents discussed above. In *Eddleman*, 343 F.3d at 1092, this Court recognized the Government must provide "adequate evidence" its contribution limits "further[] a sufficiently important state interest." The Court derived this standard directly from *Buckley* and *Nixon*.

The panel below declined to "resolve" whether sufficient evidence demonstrates Oxnard's contribution limits actually "further the important state interest of preventing quid pro quo corruption or its appearance," instead invalidating those limits on other grounds. *Moving Oxnard Forward*, 124 F.4th at 614 (quoting *Lair*, 873 F.3d at 1180). As discussed above, however, the record shows Oxnard's limits do not actually further these interests. *Cf. FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) (scouring the evidentiary record to determine whether "adequate evidentiary grounds exist[ed]" to conclude there was "a serious threat of abuse from unlimited coordinated party spending"). The City has failed to identify *any* evidence of a risk of actual or apparent corruption in Oxnard, or that these contribution limits are actually playing some role in preventing it. Accordingly, at most, these limits are based on nothing more than "mere conjecture," and must be invalidated under the First Amendment. *Nixon*, 528 U.S. at 392.

---

*Lair*, 873 F.3d at 1178, in turn, applied the standard set forth in *Eddleman*. This Court explained, to justify a contribution limit, the government defendant "must show the risk of actual or perceived quid pro quo corruption is more than 'mere conjecture.' [It] need not show any instances of actual quid pro quo corruption," but rather "only that the perceived threat [is] not . . . 'illusory.' This evidentiary burden is lowest where, as here, the state's purported interest is neither 'novel' nor 'implausible.'" *Id.* (quoting *Eddleman*, 343 F.3d at 1092; internal citations omitted). Again, these requirements derive directly from *Buckley* and *Nixon*. There is no basis for this Court to overturn these precedents, which have accurately embodied the law in this Circuit for the past half-century.

## II. THERE IS NO CONSTITUTIONAL BASIS FOR OXNARD'S ARBITRARY CONTRIBUTION LIMITS

Oxnard's contribution limits also violate the First Amendment because they are pervasively arbitrary. The government is free to adopt different contribution limits for various offices, but may not pull them out of a hat. A campaign finance law is unconstitutional if it "burdens the First Amendment rights of [some] persons . . . to a greater extent than it burdens the same rights" of other entities and "such differential treatment is not justified." *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 200 (1981) (hereinafter, "*CalMed*"); *see also Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 98-99 (1972) (recognizing Equal Protection issues arise when the government imposes disparate restrictions on the political activity of different people). As noted earlier, the only constitutionally valid rationale for contribution limits is fighting actual or apparent quid pro quo corruption. *McCutcheon*, 572 U.S. at 206-07; *Citizens United*, 558 U.S. at 359. Accordingly, the government must justify disparities in contribution limits based on its interest in combating corruption. *See Riddle v. Hickenlooper*, 742 F.3d 922, 928 (10th Cir. 2014) ("In evaluating the connection to the statutory distinction [among contribution limits], we must determine whether it is closely drawn to advance the State's interest in preventing corruption or the appearance of corruption.").

Oxnard's various limits are not "closely drawn" to combatting actual or apparent quid pro quo corruption in any meaningful, or even coherent, way.

10

*McCutcheon*, 572 U.S. at 197-98 (quoting *Buckley*, 424 U.S. at 25, 29). To the contrary, they draw arbitrary distinctions among donors and recipients which are completely unrooted in any evidence suggesting corresponding differences in the relative risks of corruption those various parties pose.

Here, the City placed an aggregate limit of $500 per election on contributions from individuals to city council candidates, but $750 per election on contributions from individuals to candidates for mayor, city clerk, and treasurer (collectively, "the Officers"). *Moving Oxnard Forward*, 124 F.4th at 610 (citing Oxnard City Code §§ 2-243(A), 2-244(A)). It likewise placed limits of $1,000 per election on contributions from political action committees ("PACs") to city council candidates, and $1,500 per election on contributions from PACs to the Officers. *Id.* The record does not appear to contain any evidence the City made any empirical effort to calibrate these figures to varying risks of corruption. Oxnard cannot point to any differentials in the corruption-related risks of various officials based on past experience with its own officials, events in other municipalities, empirical studies, arrest or court records, surveys, expert testimony, or any other record evidence. In other words, the limits were simply – and impermissibly - drawn from wholecloth.

The City has put the proverbial cart before the Ox(nard) in adopting these restrictions. There is no record evidence suggesting candidates for city council pose a greater risk of quid pro quo corruption than candidates for Officer positions such

11

as treasurer, such that the contribution limits for city council positions must be systematically lower. The City's failure to point to evidence suggesting these offices pose different levels of actual or apparent corruption renders its decision to impose discriminatory limits unsupported and therefore unconstitutional. *Cf. McCutcheon*, 134 S. Ct. at 1452 (holding that, "[i]f there is no corruption concern" in allowing individuals to make $5,200 contributions to nine different candidates, "it is difficult to understand" how contributing the same amount of money to other candidates would be potentially corrupting).

The City may contend city council candidates "need" less funds to successfully campaign and a higher limit would enable them to raise unnecessarily large amounts of money. But "[t]he First Amendment denies government the power to determine that spending to promote ones political views is wasteful, excessive, or unwise." *Buckley*, 424 U.S. at 57; *Woodhouse v. Mee. Comm'n on Govt'l Ethics & Election Practices*, 40 F. Supp. 3d 186, 195 (D. Me. 2014) (holding the fact certain candidates may require more money than others is "not a reason for treating contributors differently" by imposing lower limits on others, because that concern "is not a corruption issue at all"). In short, Oxnard has failed to present a constitutionally valid basis for the varying limits it has imposed on its various candidates.

12

The same is true for the city's arbitrarily disparate limits on contributions to a particular recipient from individuals and PACs. If PACs may contribute $1,000 per election to city council candidates and $1,500 per election to Officer candidates without raising corruption concerns, there is no basis for excluding individuals from doing so, as well. The First Amendment protects an individual's right to decide whether to associate with others by participating in a PAC, or instead engage in political expression on his own. *See Buckley*, 424 U.S. at 15. "[A] corollary of the right to associate is the right not to associate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association therefore plainly presupposes a freedom not to associate.").

The state may not penalize people who choose to refrain from engaging in political association by subjecting them to lower contribution limits than PACs. *See Davis v. FEC*, 554 U.S. 724, 738 (2008) (holding that imposing relatively lower contribution limits on a candidate who spends substantial amounts of his own money on his campaign "impermissibly burdens his First Amendment right" to political expression); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011). Such "discriminatory . . . limitations" constitute a "penalty" on those who choose to engage in political expression as individuals, rather than jointly with others. *Davis*, 554 U.S. at 739. Oxnard lacks any valid anti-corruption interest in burdening a person's choice as to whether to engage in political association by

13

imposing different contribution limits on individuals and groups. *Cf. Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley*, 454 U.S. 290, 296 (1981) (imposing differential limits on "individuals wishing to band together to express their views" and "individuals acting alone . . . is clearly a restraint on the right of association"). Again, because the City can offer no corruption-related rationale for its arbitrary pastiche of contribution limits, this Court should invalidate them.

## III. OXNARD'S CONTRIBUTION LIMITS ARE UNCONSTITUTIONALLY LOW

Finally, this Court should reinstate the panel's judgment and reverse the district court because Oxnard's contribution limits are unconstitutionally low. Contribution limits which "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy" have "a severe impact on political dialogue" and generally fail intermediate scrutiny. *Buckley*, 424 U.S. at 21; *see also Randall v. Sorrell*, 548 U.S. 230, 247-48 (2006) ("[C]ontribution limits might sometimes work more harm to protected First Amendment interests than their anti-corruption objectives could justify."). Low limits also "magnify the advantages of incumbency to a point where they put challengers to a significant disadvantage." *Id*. at 248. Accordingly, courts must exercise their "independent judicial judgment" to enforce "some lower bound" on the range of permissible contribution limits. *Id*. at 248-49.

14

Oxnard's limits on contributions from individuals to candidates "are well below the limits [the Supreme] Court upheld in *Buckley*" **back in 1976.** *Id*. Individuals may contribute only $500 per election to city council candidates and $750 per election to candidates for other municipal offices. *Moving Oxnard Forward*, 124 F.4th at 610 (citing Oxnard City Code §§ 2-243(A), 2-244(A)). While Oxnard's population of approximately 200,000 is smaller than states or congressional districts, "campaign costs do not automatically increase or decrease in precise proportion to the size of an electoral district." *Randall*, 548 U.S. at 252. Moreover, Oxnard is geographically larger than numerous congressional districts at more than 26 square miles of land (and an additional twelve square miles of water).[3]

Oxnard's "failure to index" its contribution limits for inflation is another factor weighing against their validity. *Thompson v. Hebdon*, 589 U.S. 1, 6 (2019) (per curiam). Such failure means Oxnard's limits "will almost inevitably become too low over time." *Id*. at 261. The costs of "meeting voters face-to-face, sending them mailings, and reaching them by television and radio . . . inevitably rise over time." *Thompson v. Hebdon*, 7 F.4th 811, 822 (9th Cir. 2021). As the purchasing power of a given amount of money erodes, the likelihood that figure will continue to allow

---

[3] U.S. Census Bureau, 2019 U.S. Gazetteer Files, https://www2.census.gov/geo/docs/maps-data/data/gazetteer/2019_Gazetteer/2019_gaz_place_06.txt

"candidates to raise the funds necessary to run a competitive election," *Randall*, 548 U.S. at 252, correspondingly diminishes. Moreover, inflation inherently reduces the ration of speech which a given amount of money may purchase or otherwise facilitate; over time, a fixed contribution limit inexorably leads to a consistent reduction in legally permissible political expression. A failure to index contribution limits for inflation warrants "judicial supervision" even more urgently when it is "coupled with a contribution limitation" which is already "suspiciously low." In re *Cao*, 619 F.3d 410, 424 (5th Cir. 2010).

Oxnard's limits tilt the field sharply in favor of the incumbents that approved them, and against outside challengers such as Starr. "Challengers need to expend sufficient funds from the start of campaigns so voters know who they even are," while incumbents have the advantages of incumbency, including name recognition. *Thompson*, 7 F.4th at 819. In addition, "challengers often have to run first in primary elections for which they need to spend money, while incumbents are less likely to face primary challenges, and hence they may save that money to use against their challengers in general elections." *Id*.

In *Thompson*, 7 F.4th at 816, this Court already held Alaska's limit of $500 per election from individuals to candidates and $1,000 per election from a PAC to a candidate was unconstitutionally low in violation of the Supreme Court's ruling in *Sorrell*. It did so at the express direction of the Supreme Court, which explicitly

16

ordered this Court to assess "whether Alaska's contribution limits are consistent with our First Amendment precedents" such as *Randall*. *Thompson*, 589 U.S. at 6. This Court should apply *Thompson* with full force, rather than engaging in hair-splitting to find some level of government at which such low limits become constitutionally permissible. If anything, contribution limits generally hit local candidates the hardest simply because there are fewer people directly impacted by the election from whom to raise funds, press coverage is limited, and interest from outside donors tends to be rare. It is much easier for California's U.S. Senator Adam Schiff to avoid the impact of contribution limits by fundraising across the country than it is for an unknown candidate for Oxnard city council.

In light of this Court's ruling that $500 and $1,000 limits were intolerable at the state level, it would unconstitutionally hamstring local Oxnard candidates to uphold them at the local level. *Randall* does not contemplate a comprehensive matrix of maximum contribution limits which varies by office, jurisdiction, population, and the like. And, because Oxnard declined to index its anemic limits for inflation, their structural deficiencies will only grow over time. Accordingly, this Court should invalidate Oxnard's limits under *Sorrell*.

17

## CONCLUSION

For these reasons, Amicus Coolidge Reagan Foundation respectfully asks this Court to REINSTATE the judgment of the three-judge panel and REVERSE the district court's ruling.

Respectfully submitted,

_/s/ Dan Backer_____
Dan Backer, Esq.
CHALMERS, ADAMS, BACKER,
   & KAUFMAN, LLC
10521 Judicial Drive, Suite 200-A
Fairfax, VA 22030
Tel: (202) 210-5431
dbacker@chalmersadams.com
*Attorney for Amicus*
*Coolidge-Reagan Foundation*

18

## CERTIFICATE OF COMPLIANCE

I am the attorney for amicus Coolidge-Reagan Foundation in *Moving Oxnard Forward, Inc. v. Lopez*, No. 21-56295.

This brief contains 4,085 words, including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c), or Cir. R. 29-2(c)(3).

___/s/ Dan Backer_____
Dan Backer, Esq.
*Counsel for Amicus Coolidge-Reagan Foundation*