No. 21-56295

# In the United States Court of Appeals for the Ninth Circuit

MOVING OXNARD FORWARD, INC.,

*Plaintiff/Appellant,*

v.

LOURDES LOPEZ, in her official capacity as City Clerk for the City of Oxnard,

*Defendant/Appellee.*

On appeal from a judgment of the United States District Court for the Central District of California No. 2:20-cv-04122-CBM-AFM

**Brief of *Amicus Curiae* Institute for Free Speech in support of Appellant / Respondent *en banc***

Owen Yeates
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste 801
Washington, DC 20036
Telephone: 202-985-1644
oyeates@ifs.org

July 9, 2025                    *Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

Counsel for *amicus curiae* certify that the Institute for Free Speech is a nonprofit corporation, has no parent companies, subsidiaries, or affiliates, and that no publicly held company owns more than 10 percent of its stock.

# TABLE OF CONTENTS

Disclosure Statement ...............................................................................ii

Table of Authorities...............................................................................iv

Interest of Amici.....................................................................................vi

Introduction ............................................................................................1

Argument.................................................................................................2

    A.    Oxnard's law triggers strict scrutiny...........................................2

        1.    Content- and viewpoint-based restrictions require strict scrutiny...............................................................................2

        2.    *Buckley* does not undermine the need for strict scrutiny here .5

    B.    The novel circumstances here require full review under closely drawn scrutiny ............................................................9

    C.    Oxnard's law must fail scrutiny .................................................14

    D.    *Eddleman* and *Lair* should be overruled..................................17

        1.    These decisions fall short of intermediate scrutiny, much less closely drawn scrutiny ..........................................17

        2.    The cases use an unconstitutional definition of corruption ....20

        3.    The decisions' standard uses faulty tailoring.........................24

Conclusion ...........................................................................................27

Certificate of Compliance for Briefs.....................................................28

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) .....................24

*Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*)........................... passim

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)...... passim

*Edenfield v. Fane*, 507 U.S. 761 (1993).................................................20

*Fed. Election Comm'n v. Ted Cruz for Senate*,
  596 U.S. 289 (2022)................................................................ passim

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)...........................9

*Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) .................................. passim

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  584 U.S. 617 (2018) ..............................................................................25

*Matal v. Tam*, 582 U.S. 218 (2017) .........................................................3

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014)........... passim

*McDonnell v. U.S.*, 579 U.S. 550 (2016)...........................................15, 21

*Montana Right to Life Ass'n v. Eddleman*,
  343 F.3d 1085 (9th Cir. 2003) ........................................................2, 18

*Moving Oxnard Forward, Inv. v. Ascension*, Opinion, No. 21-56295 (Dec.
  20, 2024) ...................................................................................... passim

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)......................27

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000)...................8, 18, 19

*Randall v. Sorrell*, 548 U.S. 230 (2006) .......................................... passim

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...........................................2

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)...............................................................................3

*Tex. v. Johnson*, 491 U.S. 397 (1989) ......................................................3

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................2

*Wash. Post v. McManus*, 355 F. Supp. 3d 272 (D. Md. 2019)...................8

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014)............................25

## INTEREST OF AMICI

The Institute for Free Speech is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, press, and petition. In addition to scholarly and educational work, the Institute represents individuals and civil society organizations in litigation securing their First Amendment liberties. Protecting the right to speak about politics free of unlawful regulation advances the Institute's organizational mission.

*Amicus curiae* confirms that this brief was not authored in whole or in part by counsel for any party, and no person or entity other than *amicus* and its counsel made a monetary contribution to the preparation or submission of this brief.

Counsel for all parties have consented to participation by the Institute as *amicus curiae.*

vi

## INTRODUCTION

Oxnard's Measure B makes multiple incursions against the First Amendment, activating multiple defensive doctrines. To silence a critic and challenger, Oxnard crafted a scheme of campaign contribution limits that would cut his funding. Such a law violates the First Amendment's protections against content- and viewpoint-discrimination, triggering strict scrutiny. The law's novel discriminatory provisions also trigger full review under the closely drawn scrutiny typically applied to contribution limits.

Regardless of the standard of review, Oxnard's law cannot survive scrutiny. The Supreme Court has found only one interest sufficient to limit campaign contributions—the interest in combating actual or apparent quid pro quo corruption—and Oxnard's law fails to target conduct within the narrow limits the Supreme Court has established for such corruption.

Lastly, because they incorrectly lower the standard for closely drawn scrutiny, use an incorrect definition of corruption, and use a faulty tailoring analysis, this Court's decisions in *Montana Right to Life*

1

*Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003), and *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017), should be overruled.

## ARGUMENT

### A. Oxnard's law triggers strict scrutiny

#### 1. Content- and viewpoint-based restrictions require strict scrutiny

Oxnard's law discriminates based on content and viewpoint and must therefore be subjected to strict scrutiny. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws are content-based and must "satisfy strict scrutiny" if they "were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (alteration in original)).

Viewpoint-based discrimination like that underlying Oxnard's law only amplifies the constitutional violation. It is a "blatant" First Amendment violation when the government targets a speaker's

2

"particular views," "an egregious form of content discrimination" from which "[t]he government must abstain." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality op.) (viewpoint discrimination is forbidden even when other restrictions are allowed). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society"—or City leaders who dislike criticism—"finds the idea itself offensive or disagreeable." *Tex. v. Johnson*, 491 U.S. 397, 414 (1989).

The City of Oxnard targeted Aaron Starr and Moving Oxnard Forward because City leaders considered Starr not just a thorn to be plucked from their proverbial heels, but an invasive species to be eradicated. He "has been a sharp critic of the City's elected officials," Op. at 19, *Moving Oxnard Forward, Inv. v. Ascension*, No. 21-56295 (Dec. 20, 2024) ("Panel Op."); "he was the proponent of four recall petitions that triggered a special election . . . to remove the Mayor and three other City Council members," *id.* (internal quotation marks

3

omitted); he ran against the mayor, *id*. at 20; and he successfully proposed a measure that City leaders opposed, *id*.

Knowing that Starr, and no one else, relied on particular contributions, the City leaders engineered a law that would undermine his and no one else's financing and thus his ability to communicate with voters: "As the City's own expert and briefing repeatedly stress, Measure B's financing limitations would have little practical effect on anyone other than Starr, whom the City describes as a 'stark' outlier." *Id*. at 25; *see also id*. at 19 (discussing City report on differential effect of law on Starr and other candidates). And the City targeted Starr in the slides it prepared to convince voters to pass the law. *See id*. at 16-18. Oxnard's law is a content- and viewpoint-based restriction on speech, meant to silence the criticism and opposition by Starr and Moving Oxnard Forward, and it must satisfy strict scrutiny. *See also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (noting that "restrictions based on the identity of the speaker are all too often simply a means to control content").

4

### 2. *Buckley* does not undermine the need for strict scrutiny here

The use of closely drawn scrutiny in *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*), does not contravene strict scrutiny here. *Buckley* noted the importance of contributions to "financing political campaigns" and the "severe impact" that contribution limits could have "on political dialogue," *id.* at 21, *i.e.*, on highly protected speech. It nonetheless distinguished between expenditures and contributions, applying the slightly lesser but still "rigorous" closely drawn scrutiny to contribution limits, *id.* at 25-29, only because there was no evidence of two conditions. First, the Court noted "no indication . . . that the contribution limitations . . . would have any dramatic adverse effect on the funding of campaigns and political associations." *Id.* at 21. Second, the Court repeatedly noted no evidence of invidious discrimination, including against challengers, minor parties, and independent candidates. *Id.* at 30-31, 31 n.33, 33; *see also* Panel Op. at 16 (noting scrutiny required for "invidious discrimination" in various contexts, including discrimination against minority parties and independent candidates, as well as efforts to suppress particular speakers).

5

Unlike *Buckley*, however, there is evidence here of both discrimination and an adverse effect on funding. The record demonstrates that Oxnard's contribution limits targeted a particular individual, *see* Panel Op. at 16-20, altogether "rais[ing] a sufficient constitutional risk of invidious discrimination against Starr and other outsiders like him," *id.* at 20. And for a candidate for whom "57.6% of his total funds raised came from contributions" forbidden by the Oxnard law, *id.* at 19, the law would necessarily "have a[] dramatic adverse effect on the funding of [his] campaign[] and political association[]," *Buckley*, 424 U.S. at 21. Given that these conditions exist here, the full "exacting scrutiny" for "limitations on core First Amendment rights of political expression" must apply. *Id.* at 44-45.

Stepping back, it is important to recognize that the decision in *Buckley* predated the development and refinement of the contemporary tiers of strict scrutiny, intermediate scrutiny, and rational basis review. It likewise predated the development and refinement of the Court's decisions distinguishing viewpoint- and content-based laws from viewpoint- and content-neutral laws, and generally mapping the former

6

to strict scrutiny and the latter to intermediate scrutiny. The Court was still figuring out how to subject laws to heightened scrutiny, and the tiers of scrutiny have required substantial adjustment in the five decades since *Buckley*.

Indeed, such confusion and the consequent clarifications are seen in the *Buckley* decision and its later interpretations. The *Buckley* Court used the phrase "exacting scrutiny" rather than the later "strict scrutiny," and it claimed to apply this "exacting scrutiny" in analyzing multiple speech restrictions: in discussing the general standard applicable to *both* expenditure *and contribution* limits, 424 U.S. at 16-17, in reviewing the restrictions on expenditures, *id.* at 44-45, and in reviewing the disclosure requirements, *id.* at 64-65. But the Court then used different tests under this standard for each of the different restrictions. *See id.* at 47-48 (noting that expenditure limits "fail[ed] to serve any substantial governmental interest" and "heavily burden[ed] core First Amendment expression"); *id.* at 25 (requiring "means closely drawn" to "a sufficiently important interest" for contribution limits);

7

and *id.* at 64-66 (requiring "substantial relation" to "sufficiently important" interest for disclosure requirements).

Later courts have acknowledged or tried to explain away *Buckley*'s confusion. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014) (Roberts, C.J., controlling op.) (treating exacting scrutiny for expenditures as strict scrutiny and explaining "closely drawn" standard for contributions);[1] *Wash. Post v. McManus*, 355 F. Supp. 3d 272, 289 n.14 (D. Md. 2019) (noting confusion); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386 (2000) ("*Shrink Mo.*") (noting that "precision" about the "standard to review contribution limits was not a pretense of the *Buckley per curiam* opinion").

Despite *Buckley*'s lack of precision, the opinion nonetheless noted that the application of less scrutiny to contribution limits required two assumptions that fail here, that a challenger still be able to fund a campaign and the absence of discrimination. And the Supreme Court

---

[1] Unless otherwise noted, references to *McCutcheon* are to the Chief Justice's controlling opinion.

8

has since indicated that strict scrutiny applies across the First Amendment's clauses when there is discrimination. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022) (noting "similar standard" of strict scrutiny under Free Exercise Clause and Free Speech Clause, where school district targeted particular speech).

Because Oxnard's law is content- and viewpoint-based, and carries with it the concomitant discrimination of such laws, the Court should review it under strict scrutiny.

## B. The novel circumstances here require full review under closely drawn scrutiny

Even if Oxnard's animus did not demand strict scrutiny, its law would still require full review under closely drawn scrutiny. The First Amendment requires that laws imposing contribution limits survive a "rigorous standard of review," *i.e.*, that "the State demonstrate[] a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25, 29). Notably, this places the burden on the government to justify its restriction.

9

But the City of Oxnard would have the Court uphold Measure B with little additional evidence or analysis. *See* Pet. at 24-26 (arguing court incorrectly examined other danger signs, and failed to "conform" to precedent upholding limits); *id.* at 28-29 (arguing that burden should be reversed to require that appellants "overcome the general presumption" of constitutionality from previous decisions). Defendants in campaign finance cases often argue against applying scrutiny because some other law was previously upheld. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 261 (2006) (Breyer, J., controlling op.) (noting that state merely advanced justifications from *Buckley*).[2] But this is an as-applied challenge, ER-518, and the Court must examine whether Oxnard's interest is sufficient to restrict plaintiff's speech, regardless of whether other governments had sufficient evidence to restrict other people's speech. *Cf. McCutcheon*, 572 U.S. at 200, 206 (noting that *Buckley* upheld the aggregate limits and "provides some guidance," but

---

[2] Unless otherwise noted, references to *Randall* are to the controlling opinion.

10

holding that courts cannot "truncate th[e] tailoring test at the outset"). Just as the circumstances in *Randall* compelled both scrutiny and invalidation despite *Buckley*'s previous decision upholding contribution limits, *Randall*, 548 U.S. at 246-47, 262-63, the different circumstances of this as-applied challenge require full scrutiny and a decision invalidating Oxnard's limits.

Indeed, *Buckley* anticipated future as-applied challenges as to its holdings, for the kind of discrimination seen in the present case. *See Buckley*, 424 U.S. at 74 (discussing exemptions from disclosure requirements that minor parties might seek); *id.* at 97 n.131 (noting possible future claim by minor parties against public financing scheme).

The Supreme Court likewise anticipated future cases challenging unconstitutionally low contribution limits under *Randall*—indeed, the "special justification" consideration specifically allows courts to attune *Randall*'s danger signs and considerations to the particular facts of a given case. *Randall*, 548 U.S. at 261.

The panel opinion noted one of *Randall*'s danger signs—the failure to adjust for inflation. *See* Panel Op. at 26. But even were none

11

of those particular dangers present, *Randall*'s analysis would still find "strong indication" of constitutional concerns and call for a careful, independent review of Measure B. *Randall*, 548 U.S. at 249. The danger signs are ultimately a means to investigate two questions: Has the government implemented limits to "prevent[] challengers from mounting effective campaigns against incumbent officeholders," creating "an obstacle to the very electoral fairness" they supposedly promote? *Randall*, 548 U.S. at 249. And has the government undermined the "democratic electoral process"? *Id.* Without even getting to the particular symptoms present in *Randall*, the two diseases are apparent here. The City's deliberate attempt to silence a challenger by eliminating the financing that only he used is an attack on the democratic process, and the First Amendment requires an "independent[] and careful[]" review under closely drawn scrutiny. *Id.*

Notwithstanding any contrary claim, *Randall*'s test does not exclude the danger signs seen here. Nowhere does the opinion state that it creates a non-exclusive list. Nowhere does it say a court must examine four and only four danger signs. Rather, the Court explained

12

that it sought "strong indication"—which it restated as "danger signs"—that the risks described above exist. *Id.* at 249. And the Court went on to find that indication with the four danger signs apparent there. *Id.* at 250-53. But the Court's injunction was to seek out "strong indication [of risk] *in a particular case*," *id.* at 249 (emphasis added), demanding a particularized analysis of the dangers in each case. Mechanically examining only the four signs found in *Randall* falls short of the analysis the Court required.

And to disregard the danger signs here would be particularly incoherent. Like the gold leaf and vivid pigments of a medieval manuscript, the danger signs in this case illuminate the *Randall* Court's core concerns: that the government will act to "prevent[] challengers from mounting effective campaigns against incumbent officeholders" and undermine "the integrity of our electoral process." *Id.* at 248-49. To disregard the danger signs in this case would be tantamount to tearing the pages out of the book altogether.

13

## C. Oxnard's law must fail scrutiny

Oxnard's law cannot survive either strict scrutiny or an independent, carefully conducted closely drawn scrutiny analysis. Under either standard, there is "only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 206; *see also Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022).

In a series of decisions, the Supreme Court has curtailed the government's runaway use of the term "corruption." Contribution limits must be aimed at "*quid pro quo* corruption or its appearance," the actual or apparent exchange of "dollars for political favors." *McCutcheon*, 572 U.S. at 192 (internal quotation marks omitted). That definition excludes a theory of actual or apparent "favoritism or influence," as "influence over or access to elected officials" is not corruption and any such interest would be "unbounded and susceptible to no limiting principle." *Citizens United*, 558 U.S. at 359 (internal quotation marks omitted). It excludes the concern that an "elected representative" will "favor certain policies" because of "contributors who

14

support those policies." *Id.* (block quotation omitted). It excludes candidates' concerns that contributors will stop giving if officer-holders don't respond, as "[i]t is well understood that a substantial and legitimate reason, if not the only reason, . . . to make a contribution . . . is that the candidate will respond by producing those political outcomes the supporter favors." *Id.* (internal quotation marks omitted). It also excludes any concern about officials "respond[ing] to even the most commonplace requests for assistance" if "a campaign contribution [was given] in the past." *McDonnell v. U.S.*, 579 U.S. 550, 575 (2016).

The need to enumerate all these exclusions demonstrates that the government has unsuccessfully tried to shoehorn far too much into the definition of corruption. What is left after all these failed attempts? Quid pro quo corruption requires an agreement "to perform an 'official act'" in exchange for loans, money, or other gifts, made at the time of the "alleged *quid pro quo*." *Id.* at 572-73. In the campaign finance context, that would require an agreement to perform acts in exchange for contributions, made at the time of the contribution, or the appearance of such exchanges.

As the panel opinion detailed, the government has failed to allege any such actual or apparent corruption. *See* Panel Op.at 23-25. In particular, none of the City's five areas of concern, *id.* at 23, had anything to do with campaign contributions or financing, *id.* at 24. To find examples even of non-campaign corruption, the City had to dig all the way back to 2010 to 2012. *See id.* at 23-24. And since those examples had nothing to do with campaigns, their support for campaign contribution limits amounts to mere speculation. To the contrary, given that the ballot referendum appeared just after Starr's recall efforts and his run against the mayor, it appears that the law was an attempt to punish and silence Starr, not any attempt to curb actual or apparent corruption. *Id.* at 25 (noting "comparatively closer fit" to "squelching Starr"); *cf. Cruz*, 596 U.S. at 310 (holding contribution restriction unconstitutional where record showed that Senators viewed the law "as designed to protect incumbents like themselves from" challengers).

Oxnard's law fails under either strict, exacting, or closely drawn scrutiny, as Oxnard did not set out to combat actual or apparent corruption, the only interest the First Amendment allows for restricting

16

campaign finances. As the law was meant to abridge the associational freedoms of Starr and Moving Oxnard forward, and "designed to protect incumbents" in City leadership, *Cruz*, 596 U.S. at 310, the City cannot claim that the law was "closely drawn to avoid unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 197 (internal quotation marks omitted).

### D. *Eddleman* and *Lair* should be overruled

*Eddleman* and *Lair* should be overruled. They fail to apply even the rigor required for intermediate scrutiny, much less that required for closely drawn or strict scrutiny. They allow too expansive a definition of corruption. And their tailoring analysis falls short of that required by *Randall*.

### 1. These decisions fall short of intermediate scrutiny, much less closely drawn scrutiny

Interfering with the First Amendment protections for campaign contributions requires that the government "demonstrate[] a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25). This standard is less

17

than exacting scrutiny "but still rigorous." *Id.* (internal quotation marks omitted). And it is higher than intermediate scrutiny—the Supreme Court has repeatedly rejected attempts to reduce closely drawn scrutiny to that level. *See Shrink Mo.*, 528 U.S. at 386 (discussing *Buckley*, 424 U.S. at 16-18) (noting that, in discussing the general principles applying to both the expenditure and contribution speech claims, *Buckley* "explicitly rejected" intermediate scrutiny).

*Lair* and *Eddleman* bless government abridgement of speech and association using a standard that falls short even of intermediate scrutiny. They require merely "adequate evidence that the limitation furthers a sufficiently important state interest." *Lair*, 873 F.3d at 1175-76 (quoting *Eddleman*, 343 F.3d at 1092). The decision compounds the error of this minimal evidentiary burden error by requiring only adequate evidence that the risk of actual or apparent corruption is just something "more than 'mere conjecture.'" *Id.* at 1178 (quoting *Eddleman*, 343 F.3d at 1092); *see also id.* (reducing government burden to showing "only that the perceived threat [is] not illusory" (internal quotation marks omitted)).

18

This "mere conjecture" language misconstrues *Shrink Mo.* and *McCutcheon*, which mention "mere conjecture" to rebut the assertion that the Supreme Court had ever allowed such minimal proof, *i.e.*, to reiterate that the Supreme Court had always required the government to demonstrate that its asserted harms were real. *See Shrink Mo.*, 528 U.S. at 392; *see also McCutcheon*, 572 U.S. at 210; *Cruz*, 596 U.S. at 307. *Lair* and *Eddleman* take *Shrink Mo.* and *McCutcheon* to mean the opposite, however, that the government need produce only a smidgeon of evidence beyond mere conjecture, "only that the perceived threat [is] not . . . illusory"—certainly not "any instances of actual quid pro quo corruption." *Lair*, 873 F.3d at 1178 (alterations in original) (internal quotation marks omitted). Further, they eschew any requirement that the government "prove the *existence* of actual or apparent corruption," merely asking that the government "show a 'threat' or 'risk' of actual or apparent corruption." *Id.* at 1179 n.4 (emphasis in original).

Indeed, the examples below will show that the *Lair/Eddleman* standard unconstitutionally treats as the appearance of corruption murmurings about conduct that could never be constitutionally treated

19

as corruption even if they were completed, demonstrated acts. It is beyond speculative to restrict constitutional rights because of a rumor of conduct that could never be corruption were it a completed act. Whatever the appearance of corruption is, it must at the very least be based in conduct that would be corruption if it were real. By including rumors of non-corruption, the *Lair/Eddleman* standard falls short even of intermediate scrutiny, which demands that the government "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The standard must therefore fail under closely drawn and strict scrutiny.

## 2. The cases use an unconstitutional definition of corruption

Even after admitting that *Eddleman* incorrectly broadened the definition of corruption, *Lair*, 873 F.3d at 1177, the court in *Lair* continued to apply an unconstitutionally broad definition in upholding the contribution limits at issue there. As noted above, the Supreme Court has strictly limited what the government may treat as corruption, excluding any theory of actual or apparent "favoritism or influence,"

20

*Citizens United*, 558 U.S. at 359, and "demand[ed] adherence to that distinction," *Cruz*, 596 U.S. at 309. Given the narrowed definition of corruption from *Citizens United* and *McCutcheon*, the *Lair* court admitted that it could no longer treat "complian[ce] with the wishes of large contributors" as corruption. *Lair*, 873 F.3d at 1176-77 (internal quotation marks omitted). Yet it continued to apply an overbroad definition of corruption.

For example, as evidence of actual and apparent quid pro quo corruption, *Lair* cited to testimony that "groups 'funnel[] more money into campaigns when certain special interests know an issue is coming up, because it gets results.'" *Id.* at 1179 (alteration in original). But this manifests no agreement "to perform an 'official act'" in exchange for loans, money, or other gifts, made at the time of the "alleged *quid pro quo*." *McDonnell*, 579 U.S. at 572-73.

As another example, the opinion cited "a 'destroy after reading' letter" sent by a state senator to "party colleagues, urging them to vote for a bill so a PAC would continue to funnel contributions to" them. *Lair*, 873 F.3d at 1179. There is again no agreement to perform an act

21

in exchange for contributions at the time of the alleged quid pro quo. And the Supreme Court has explicitly rejected such a concern as an illegitimate favoritism theory: "[i]t is well understood that a substantial and legitimate reason, if not the only reason, . . . to make a contribution . . . is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United*, 558 U.S. at 359 (internal quotation marks omitted).

The opinion also cited to a finding by a state court that "two 2010 state legislature candidates violated state election laws by accepting large contributions from a corporation that bragged . . . that those candidates that it supported rode into office in 100% support of [the corporation's] . . . agenda." *Lair*, 873 F.3d at 1179 (alterations in original) (internal quotation marks omitted). That is the only evidence that *Lair* cited to and found relevant from the state cases, and the state court decisions were likely unconstitutional if that is all the evidence the court had. This allegation—that candidates supported a donor's agenda—carries with it no indication whatsoever about an agreement to perform an act at the time of the alleged quid pro quo. Furthermore,

22

"[d]emocracy is premised on responsiveness," and "[i]t is well understood that a substantial and legitimate reason . . . to make a contribution . . . is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United*, 558 U.S. at 359 (internal quotation marks omitted).

The *Lair/Eddleman* standard thus treats as corrupt conduct what the Supreme Court has specifically excluded from the definition of corruption. And it does no good, as *Lair* does, to say that it is evidence of apparent corruption even if it is not evidence of corruption itself. *See Lair*, 873 F.3d at 1179 n.4. As discussed above, the government cannot limit First Amendment rights because it dislikes the appearance of an act that is itself legitimate. In drawing the line between quid pro quo corruption and other government aims, including general influence, "the First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *Cruz*, 596 U.S. at 308 (internal quotation marks omitted).

23

### 3. The decisions' standard uses faulty tailoring

Several problems beset *Lair*'s tailoring analysis. "In the First Amendment context, fit matters." *McCutcheon*, 572 U.S. at 218. "[I]f a law that restricts political speech does not 'avoid unnecessary abridgment' of First Amendment rights, it cannot survive 'rigorous' review." *Id.* at 199 (citation omitted): *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (even for the lesser standard applicable to disclosure requirements, "a substantial relation to an important interest is not enough," as "[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly").

*Eddleman* and *Lair* fall short of such rigorous review, as they completely bifurcate the examination into the governmental interest and the examination into tailoring, thereby allowing the government to rely on an interest inapplicable to the as-applied challenge. To examine whether Oxnard's law "avoid[s] unnecessary abridgment of First Amendment rights," *McCutcheon*, 572 U.S. at 199, those inquiries must be interrelated to ensure that the government demonstrate an interest in limiting Starr and Moving Oxnard Forward, not just an interest in

24

limiting contributions in general. In completely bifurcating the analyses, *Lair* embraces an interest in the abstract, "whether *any* level of limitation is justified," *Lair*, 873 F.3d at 1178 (emphasis in original). But "[t]he more abstract the level of inquiry, often the better the governmental interest will look," as "almost any state action" will appear to implicate a fundamental governmental concern when viewed from a great enough height. *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014). Such "sliding up the generality scale . . . risks denying constitutional protection" whenever individuals "draw distinctions more specific than the government's preferred level of description." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 652-53 (2018) (Gorsuch, J., concurring). Thus, the question cannot be whether the government can justify any limit, but whether it has any interest in limiting plaintiff's speech.

These decisions also fall short of the required tailoring analysis by using "a moving target" that will allow the government to slowly strangle challenger funding. *Randall*, 548 U.S. at 269. *Lair* approved the contribution limits because they "targeted only the top 10% of pre-

1994 contributions in Montana." *Lair*, 873 F.3d at 1181. Not only does this fail to analyze in absolute terms how a challenger's funding will be impacted in competitive races, as the First Amendment requires, *see Randall*, 548 U.S. at 255-56, but it would allow the government to come back every couple of years and target the next highest 10%, until only nominal contributions were allowed, especially where the court eschewed any need to justify changes in limits when a law is revised, *Lair*, 873 F.3d at 1181 n.6.

Finally, *Lair* gave only lip-service to the requirement that courts examine the effect on challenger funding in competitive elections. *Randall*, 548 U.S. at 255-56. Rather, *Lair* recited anecdotes from certain candidates claiming that their funding wasn't affected, 873 F.3d at 1184-85; it gave statistical information about elections in general, *id.* at 1185; and, when briefly mentioning competitive campaigns, argued that challengers and incumbents maxed out at the same rate, *id.* But *Randall*'s data-driven analysis requires that anecdotal evidence be detailed. *Randall*, 548 U.S. at 256. And the real question under its analysis is whether "a candidate running against an incumbent

26

officeholder [can] mount an effective *challenge*," *id*. at 255 (emphasis in original), *i.e.*, whether she can amass sufficient resources, not whether incumbents and challengers are cut off at similar rates, especially given the name-recognition and other advantages incumbents already enjoy.

Because they do not require even the rigor of intermediate scrutiny, their application of the definition of corruption is unconstitutionally broad, and their tailoring analysis is faulty, *Eddleman* and *Lair* should be overruled.

## CONCLUSION

"[T]he First Amendment bars subtle as well as obvious devices by which political association might be stifled." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982). For the reasons given above, the Court should affirm that Oxnard's Measure B is unconstitutional and overrule the prior decisions in *Eddleman* and *Lair*.

Dated: July 9, 2025          Respectfully submitted,

/s/ *Owen Yeates*
Owen Yeates
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste 801
Washington, DC 20036
202-985-1644 / oyeates@ifs.org

*Counsel for* Amicus Curiae

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s):** 21-56295

I am the attorney or self-represented party.

**This brief contains** __4,744__ **words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

28

Case: 21-56295, 07/09/2025, ID: 12933651, DktEntry: 61-1, Page 35 of 35

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/Owen Yeates*      **Date** July 9, 2025

29